U.S. DISTRICT COURT
SO. DIST. AL.
MOBILE, AL 36602

**IN THE UNITED STATES DISTRICT COURT -91 A 9 06**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

FILED
CLERK'S OFFICE

| | |
|---|---|
| VICTOR R. STEPHENS, | ) |
| | ) |
| Petitioner, | ) |
| | ) CV-01-0257-CB-L |
| v. | ) |
| | ) |
| MICHAEL HALEY, Commissioner, | ) |
| Alabama Department of Corrections, | ) |
| | ) |
| Respondent. | ) |

---

**PETITION FOR WRIT OF HABEAS CORPUS**
**BY A PRISONER IN STATE CUSTODY**
**UNDER SENTENCE OF DEATH**

---

James S. Christie, Jr.
Kenneth D. Sansom
**BRADLEY ARANT ROSE & WHITE** LLP
2001 Park Place, Suite 1400
Birmingham, Alabama 35203-2736
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

Attorneys for Petitioner

REFERRED TO JUDGE *Lee-PSU*
For Ruling or Appropriate Action

# TABLE OF CONTENTS

I.    PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   SUMMARY OF EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    THE STATE'S EVIDENCE OF A CAPITAL OFFENSE . . . . . . . . . . . 3

    B.    THE STATE'S DISCRIMINATORY JURY STRIKES . . . . . . . . . . . . 9

III.  THE STATE'S EVIDENCE OF A CAPITAL OFFENSE . . . . . . . . . . . . . . . . 11

    A.    The State's Pellet-in-the-Barrel Theory . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    Reliance on the Pellet in the Barrel . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    C.    Three Experts' Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        1.    Dr. John R. McDuffie's Expert Opinions . . . . . . . . . . . . . . . . . 16
        2.    David Higgins's Expert Opinions . . . . . . . . . . . . . . . . . . . . . . . 18
        3.    Dr. Robert Fleck's Medical Opinions . . . . . . . . . . . . . . . . . . . . 19

    D.    The Pellet Evidence as New Evidence . . . . . . . . . . . . . . . . . . . . . . . . 22
        1.    The Pellet Purportedly in the Barrel . . . . . . . . . . . . . . . . . . . . . 23
        2.    The Pellet Indentations On The .25 Pistol . . . . . . . . . . . . . . . . . 26

    E.    Dr. McDuffie's Opinion as Exculpatory Evidence . . . . . . . . . . . . . . . 31

    F.    The Pellet Evidence and Ineffective Assistance . . . . . . . . . . . . . . . . . 35
        1.    Trial Counsel's Failure to Investigate . . . . . . . . . . . . . . . . . . . . 35
        2.    Prejudice from the Failure to Investigate . . . . . . . . . . . . . . . . . . 39

IV.   THE STATE'S DISCRIMINATORY JURY STRIKES . . . . . . . . . . . . . . . . . . 42

    A.    The Court of Criminal Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    B.    The State's *Batson* Argument on Appeal . . . . . . . . . . . . . . . . . . . . . . 44

    C.    The *Batson* Issue at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    D.    The *Batson* Issue on Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . 47

E.   New Evidence Shows a *Batson* Violation . . . . . . . . . . . . . . . . . . . . . . . 48
       1.   "Don't Particularly Think Much of" Black Jurors . . . . . . . . . . . 49
       2.   Twice Marking Only Black Jurors . . . . . . . . . . . . . . . . . . . . . . 50
       3.   "Need Reason to Strike" Spence and Shelton . . . . . . . . . . . . . 52
       4.   The State's Reason for Striking Sarah Harris . . . . . . . . . . . . . 54
       5.   The State's Reason for Striking Gracie Lewis . . . . . . . . . . . . . 56
       6.   The State's New *Batson* Admissions . . . . . . . . . . . . . . . . . . . 57
       7.   New Evidence and Disparate Treatment . . . . . . . . . . . . . . . . . 59

F.   Relief Based on the New *Batson* Evidence . . . . . . . . . . . . . . . . . . . . . 62

G.   The *Batson* Violation and Ineffective Assistance . . . . . . . . . . . . . . . . 63

V.   ADDITIONAL GROUNDS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . 68

A.   Lesser Included Offenses (Claim B) . . . . . . . . . . . . . . . . . . . . . . . . . . 68
       1.   No Reckless or Felony Murder Charges . . . . . . . . . . . . . . . . . 69
       2.   The Confusing Intentional Murder Charge . . . . . . . . . . . . . . . 72

B.   Jury Nullification (Claim C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

C.   Standardless Override of Jury (Claim D) . . . . . . . . . . . . . . . . . . . . . . 79

D.   Finding of Aggravating Circumstances (Claim E) . . . . . . . . . . . . . . . . 80

E.   Reasonable Doubt Charge (Claim H) . . . . . . . . . . . . . . . . . . . . . . . . . 82

F.   Coerced Statements (Claim I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

G.   Prosecutorial Misconduct (Claim J) . . . . . . . . . . . . . . . . . . . . . . . . . . 87

H.   Reliance on a Subsequent Conviction (Claim K) . . . . . . . . . . . . . . . . 90

I.   Death by Electrocution (Claim L) . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

J.   Prejudicial Photographs (Claim M) . . . . . . . . . . . . . . . . . . . . . . . . . . 94

K.   Mental or Emotional Disturbance (Claim N) . . . . . . . . . . . . . . . . . . . . 95

L.   Appreciate Criminality of Conduct (Claim O) . . . . . . . . . . . . . . . . . . 96

M.  Non-Statutory Aggravating Factor (Claim III) . . . . . . . . . . . . . . . . . . . . 97

N.  Randolph County Conviction (Claim IV) . . . . . . . . . . . . . . . . . . . . . . . 98

O.  All Non-Statutory Mitigating Circumstances (Claim VI) . . . . . . . . . . . 99

P.  The Rulings on Raised Claims as if Not Raised . . . . . . . . . . . . . . . . . 100

VI.  ADDITIONAL INEFFECTIVE ASSISTANCE OF COUNSEL . . . . . . . . . . . 104

VII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

ATTORNEY'S VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

Petitioner, Victor R. Stephens, is now on death row at the Holman State Prison in Atmore, Alabama. He petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2254 and the U.S. Constitution. As grounds for this Petition, Victor Stephens states as follows:[1]

1.     The State unconstitutionally excluded twenty-one black jurors from the jury for Victor Stephen's trial. The State erroneously convinced the Trial Court that there is no distinction under Alabama law between capital robbery-murder and non-capital robbery, which resulted in erroneous jury instructions. The State necessarily relied on circumstantial evidence of intent to kill, which has been shown at the July 18, 1997 Rule 32 hearing, based on new or undisclosed evidence, to have been inaccurate and misleading, to convict Victor Stephens of a capital offense and later sentence him to death by judicial override. In addition, Victor Stephens was prejudiced by the ineffectiveness of his counsel at the trial and penalty phases of his capital case. On these and other grounds, Victor Stephens respectfully requests this Court to grant his petition for habeas corpus.

2.     The Alabama court proceedings (1) resulted in decisions that are contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, (2) resulted in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding, (3) or resulted in decisions that otherwise entitle Victor Stephens to a writ of habeas corpus under the

---

[1]This Petition refers to the State of Alabama's Fourth Circuit Court as the "Circuit Court" for the Rule 32 Petition proceeding and as the "Trial Court" for the jury trial and sentencing.

United States Constitution.  These incorrect decisions involve evidence showing that the State unconstitutionally excluded twenty-one black jurors from the trial jury, that the State erroneously convinced the trial court that there is no distinction under Alabama Law between capital robbery-murder and non-capital robbery-murder, that the State's circumstantial evidence of the required element of intent to kill was inaccurate and misleading, and that Victor Stephens received ineffective assistance of counsel, as well as numerous other grounds for relief.

## I.      PROCEDURAL BACKGROUND

3.      Victor Stephens was convicted of two counts of capital murder under Ala. Code § 13A-5-40(a)(2) (hereinafter "capital robbery-murder") on December 17, 1987, in the Fourth Circuit Court, Hale County (the "Trial Court").  The jury recommended that Victor Stephens be sentenced to life imprisonment without parole.  On July 24, 1989, the Trial Court overrode the jury's recommendation and imposed a sentence of death by electrocution.

4.      On August 3, 1990, Victor Stephens's capital conviction and sentence of death was affirmed by the Alabama Court of Criminal Appeals.  Stephens v. State, 580 So. 2d 11 (Ala. Crim. App. 1990).  This decision was affirmed per curiam by the Alabama Supreme Court on March 15, 1991.  Ex parte Stephens, 580 So. 2d 26 (Ala. 1991).  A petition for writ of certiorari was denied by the United States Supreme Court on October 7, 1991.  Stephens v. Alabama, 502 U.S. 859 (1991).

5.      On April 9, 1993, Victor Stephens filed his Petition for Relief From Conviction and Sentence of Death Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court and later amended the Petition with his "Supplement to Petition" (collectively the "Rule 32 Petition"). In the Rule 32 Petition, Victor Stephens alleged numerous separate grounds requiring that Victor Stephens be granted relief from his conviction and death sentence. The Circuit Court entered an order denying Victor Stephens's Rule 32 Petition.

6.      Victor Stephens filed a timely appeal with the Alabama Court of Criminal Appeals of the denial of the Rule 32 Petition. The Alabama Court of Criminal Appeals denied Victor Stephens's appeal. After his Application for Rehearing was denied, Victor Stephens petitioned the Alabama Supreme Court for a writ of certiorari. On April 14, 2000, the Alabama Supreme Court denied the petition for writ of certiorari and on that day issued a Certificate of Judgment.

## II.    SUMMARY OF EVIDENCE

### A.    THE STATE'S EVIDENCE OF A CAPITAL OFFENSE

7.      The State's trial evidence tended to Show that, on January 20, 1986, a man buying gasoline at the Bailey Store in Hale County, Alabama, discovered two men, shot, in the store. Both died as a result of gunshot wounds.

8.      At roughly the same time, a witness observed a small black pickup truck speeding down the road away from the Bailey Store. Two black males were observed inside the truck.

9.      A .20 gauge shotgun, a .25 caliber pistol, several bullets and shotgun pellets were discovered at the Bailey Store.  Investigators determined that Mr. Bailey had likely shot one of the robbers with his shotgun and blood was found in the Bailey Store near the .25 pistol.

10.      The following day, Victor Stephens was found at a Georgia hospital being treated for a shotgun blast to his left hand.  Victor Stephens had the same type blood as was found near the .25 pistol at the crime scene.  Pellets removed from Victor Stephens's hand at the hospital were of the same type as the shotgun pellets found at the crime scene.

11.      A small black pickup truck registered to Christopher Starks's family was searched.  Among the items recovered from the truck were a box of .32 caliber Remington ammunition, a box of .25 caliber Federal ammunition, and food stamps that had been issued in Hale County.  Also found in the truck was a .32 caliber revolver.  The truck also contained several pieces of identification that belonged to Victor Stephens.

12.      Scientific testing indicated that the bullets recovered from the Bailey Store and from the two victims were fired from the .32 revolver recovered in the truck and from the .25 pistol recovered at the scene.  Blood stains found in the truck were determined to be of the same type as Victor Stephens's blood.

13.     The indictment charged Victor Stephens with capital robbery-murder.  1987 Trial Record (hereinafter "TR") at 827-28.  Under Ala. Code § 13A-5-40, to establish the elements of capital robbery-murder, the State had to prove beyond a reasonable doubt that Victor Stephens participated in an armed robbery resulting in a homicide and that Victor Stephens had the requisite intent to kill.

14.     At trial, the State introduced three statements by Victor Stephens.  In these statements, Victor Stephens arguably confessed that he participated in an armed robbery.  Victor Stephens admitted that he and another man, Christopher Starks, drove up to the Bailey Store.  Victor Stephens said that he waited outside the Bailey Store until he noticed that Starks had been in the store for too long.  Victor Stephens then entered the Bailey store with a .25 pistol in his pocket to help Starks.

15.     In his statements, Victor Stephens said that when he entered the Bailey Store to help Starks, Mr. Bailey fired a shotgun at him.[2]  The pellets from the blast struck Victor Stephens's left

---

[2]The Court of Criminal Appeals Opinion, p. 2, provides that the State established as follows at trial:

> According to the appellant, he guarded the entrance while his companion took the money from the register.  As they were leaving, victim Bailey pulled out a shotgun and fired a shot into the appellant's left hand.

The state's evidence at trial did not, however, even suggest that Victor Stephens was in the Store while his companion took the money or that Victor Stephens was leaving the Store when he was shot.  No evidence during the Rule 32 proceeding so suggests, either.  Instead, the State's evidence at trial (and at the Rule 32 proceeding) tended to show that Victor Stephens waited in the truck

hand.  Victor Stephens, in response to being shot, with his right hand returned fire at Mr. Bailey

using the .25 pistol, emptying the handgun, and then threw the handgun down.

16.     At trial, the State argued that Victor Stephens's three statements were not true in one

respect.  The State argued that Victor Stephens shot Mr. Bailey before Mr. Bailey shot him.

17.     The State's incorrect argument relied entirely on the testimony of Dr. John R.

McDuffie, the State's forensic expert.  Dr. McDuffie testified at trial that a shotgun pellet had fallen

out of the .25 pistol when he had removed the handgun from a plastic bag to examine it.  TR 557.

Dr. McDuffie determined that this pellet was like those from Mr. Bailey's shotgun.  TR 557.

18.     Later, in closing arguments, the State argued as if the pellet had fallen out of the

barrel of the .25 pistol, claiming that the pellet was deposited in the barrel of the handgun by a blast

from the shotgun.  TR 796-97 & 823.  According to the State, this circumstantial evidence showed

that Victor Stephens must have shot Mr. Bailey before Mr. Bailey shot Victor Stephens.

19.     The State argued that if Mr. Bailey had shot Victor Stephens first, the bullets from

Victor Stephens's handgun would have pushed the pellet out of the barrel.  In essence, the State

---

outside the Bailey Store as his companion went inside to rob the Store and that, when his companion
had been in the Store too long, Victor Stephens put a .25 pistol in his pocket, went into the Store to
help his companion, and the victim fired a shotgun and hit Victor Stephens in the left hand as Victor
Stephens entered the Store.  Trial Record ("TR") at 599-627 & 669-670.

claimed that Victor Stephens's intent to kill could be inferred from the circumstantial evidence of a pellet found in the barrel of Victor Stephens's .25 pistol.  TR 796-97 & 823.

20.     Despite all the physical evidence and Victor Stephens's three statements, Victor Stephens's trial counsel argued a mistaken identity defense. TR 800-808. Nonetheless, over defense counsel's objection, the Trial Court gave a self-defense charge, based on Victor Stephens's statements.  TR 852.  Victor Stephens was convicted of capital robbery-murder on December 17, 1987.  TR 855.

21.     The night of Victor Stephens's conviction, the Trial Court began a sentencing hearing after supper.  TR 856-906.  That same night, the jury recommended that Victor Stephens be sentenced to life imprisonment without parole.  TR 906.

22.     Victor Stephens's trial counsel made no effort during or after the sentencing hearing to show that the less culpable version of events in Victor Stephens's statements were correct or that the State's circumstantial evidence of intent to kill, based on a pellet-in-the-barrel argument, were inaccurate and misleading.

23.     Over 19 months later, the Trial Court reconvened to conclude Victor Stephens's sentencing hearing.  TR 908-930.  The Trial Court overrode the jury's recommendation and

sentenced Victor Stephens to death, reading into the record the Sentencing Order drafted ex parte by the State, specifically relying on the State's pellet-in-the-barrel argument.

24.     The Sentencing Order was drafted by the prosecutors who had tried the case. The Sentencing Order was provided to the Trial Court ex parte. The original ex parte memorandum, as signed by Edgar W. Greene, Jr., one of the prosecutors, transmitting the draft Sentencing Order, should be in the Hale County Circuit Court files for Victor Stephens's 1987 conviction.

25.     A duplicate original of Mr. Greene's ex parte memorandum and the Sentencing Order were offered as evidence during the Rule 32 hearing. Without explanation, the Circuit Court excluded this evidence and did not consider it during the Rule 32 proceedings.

26.     At the Rule 32 hearing held on July 18, 1997, Victor Stephens introduced testimony by two expert witnesses: Dr. McDuffie, the State's forensic expert at trial, and Dr. Robert Fleck, the physician who had treated Victor Stephens at the Georgia hospital in 1987 for the gunshot wound to his hand. The State produced a third expert, David Higgins, a State firearms expert, who testified for the first time at the Rule 32 hearing.

27.     Each of these three witnesses gave expert testimony that disproves the State's circumstantial evidence of intent to kill.

28.     Dr. McDuffie's new expert opinion shows that the pellet could not have been fired by Mr. Bailey directly into the barrel of Victor Stephens's .25 pistol.

29.     Dr. Fleck's medical opinion is that Victor Stephens did not have a hard object like a pistol in his hand when a shotgun blast wounded his hand.

30.     David Higgins's new expert opinion is that the pellets from the shotgun struck the .25 pistol at nearly a right angle, which he admitted would make it difficult for a pellet to have been shot into the barrel of the handgun.

31.     Based on the new evidence, the circumstantial evidence on which the State relied at trial to show intent to kill was wrongly argued and wrongly used by the State to show the required intent to kill.

## B.     THE STATE'S DISCRIMINATORY JURY STRIKES

32.     The trial record shows an unusually strong prima facie case of the State purposefully excluding blacks from Victor Stephens's jury.  The evidence included at least four separate suspicious factors that each would establish a prima facie case, including 21 of the State's 22 regular strikes being against blacks.

33.     The Trial Court found a prima facie case of a <u>Batson</u> violation.  TR 388.

34.     Then, the State proffered reasons for its strikes and one of the prosecutors assured the Trial Court as "an officer of the court" that race was not the basis for its strikes.

35.     Victor Stephens's trial counsel did not effectively argue pretext, did not prepare the trial record for direct appeal, and did not otherwise effectively handle the Batson issue.

36.     The Trial Court accepted the State's proffered reasons.  TR 386-399.

37.     Victor Stephens's argument of pretext on direct appeal was the weakness of the State's proffered reasons.  The Court of Criminal Appeals recognized that the Batson issue was close, but affirmed on the available record with "grave reservations." Stephens v. State, 580 So. 2d 11, 15-21 (Ala. Crim. App. 1990), aff'd per curiam, 580 So. 2d 26 (Ala. 1990), cert. denied, 502 U.S. 859 (1991).

38.     Now, new evidence of pretext shows that (1) on the State's strike sheets, the State marked the names of 13 black jurors with an S for strike, which meant the State did not "particularly think much of" the black jurors, and never similarly marked any white jurors, (2) on the State's strike sheets, the State twice separately marked black jurors' names, once early in voir dire marking black jurors with an S and later marking black jurors with an S or an OK, and never similarly marked white jurors, (3) the State noted on its strike sheets that it would "need reason to strike" two black jurors and then only proffered questionable and off the record reasons for these two strikes, (4) the

State struck Sarah Harris (a black) based on off the record and, as now has been shown, wrong information about family criminal involvement, despite her having the plus of a family member who was a State Trooper, (5) the State struck Gracie Lewis (a black) based on what the State admitted was uncertain information that the State now indirectly has admitted would not have led to her being struck if explored on voir dire, (6) the State admitted that it used (and today still uses) off the record information to strike black jurors, without trying to verify even "uncertain information," despite the requirement under Alabama and federal law that the State not rely upon information that cannot be put on the record, and (7) the State struck three black jurors who the State had marked on its strike sheets as OK, while allowing Michael Harris (a white) to serve on the jury as the alternate, despite the State's having on the record information about Mr. Harris's family's criminal involvement and the State's having now admitted that it would not want a less desirable juror to serve as the alternate.

## III.    THE STATE'S EVIDENCE OF A CAPITAL OFFENSE

### A.    The State's Pellet-in-the-Barrel Theory

39.    The indictment charged Victor Stephens with capital robbery-murder.  Capital robbery-murder requires proof of an additional element not required for noncapital robbery-murder: The intent to kill.  See Ala. Code §§ 13A-5-40(a), 13A-5-40(b) and 13A-6-2(a) (defining capital robbery-murder as requiring intent to kill and to rob, while defining noncapital robbery-murder as a felony-murder requiring only a killing and intent to rob).  See also Ala. Code § 13A-2-2(1) (defining "intentionally" as requiring purpose to cause that result).

40.     For the State, Victor Stephens's statements helped prove the required elements of capital robbery-murder except one: The intent to kill.  To the contrary, the statements negate any intent to kill by Victor Stephens.

41.     Victor Stephens's statements show that Victor Stephens shot Mr. Bailey and Mr. Pickens as a sudden reaction to Mr. Bailey shooting him first.  In fact, based on the statements alone, the Trial Court gave a jury charge on self-defense over the objection of Victor Stephens's trial counsel.  TR 852.

42.     For this reason, the State's circumstantial evidence concerning a pellet-in-the-barrel of the .25 pistol was crucial at trial.  To get a death sentence, the State tried to convince the jury and Trial Court that Mr. Bailey did not shoot Victor Stephens first.

43.     As explained below, the State relied at trial upon the inaccurate circumstantial evidence of a pellet in the barrel of the .25 pistol to argue that, instead of shooting back, Victor Stephens shot first and "emptied" the .25 pistol before being shot and having a pellet lodged inside the barrel of his .25 pistol.

44.     The State's pellet-in-the-barrel argument was that Victor Stephens must have shot Mr Bailey first, so he could not have shot Mr. Bailey in response to being shot.  With this pellet-in-

the-barrel argument, the State convinced the jury and the Trial Court of Victor Stephens's intent to kill.

**B.    Reliance on the Pellet in the Barrel**

45.    At trial, the State relied on its inaccurate circumstantial pellet in the barrel evidence as its only evidence of intent to kill.  The State made the pellet-in-the-barrel argument for the first time at closing argument:

> Now Mr. Stephens is in effect saying that he walked in and this man started firing. . . .
>
> Ladies and gentlemen, there's no way that this .25 caliber was pulled and fired after [Mr. Bailey] started shooting at [Victor Stephens].  It didn't happen that way. Remember, ladies and gentlemen, you've got a pellet inside the .25 caliber pistol. That the .25 caliber is unloaded.  It's empty.  It had been emptied.  That Victor Stephens tells you that he emptied that weapon.  In fact, ladies and gentlemen, in these last two written statements [Victor Stephens] doesn't talk about the pistol, he talked about [Mr. Bailey] getting the shotgun and fired at him and he started shooting back.

TR 796-797.

46.    After Victor Stephens's trial counsel gave his closing, the State further discussed the pellet-in-the barrel argument again in its final closing argument:

> [T]he picture that wells up in my mind is that of [Victor Stephens and Christopher Starks] walking in the front door of that little community store with their guns out saying, "Your money or your life."  Mr. Bailey objected to it and tried to get to the shotgun and he got shot to pieces as he did and "Pop" crawling on the floor getting pumped full of bullets.  You say, well, how do you know he didn't shoot him first? I say Mr. Bailey had one shot.  He fired one shot that hit this man right over there in

the hand. That blew the gun out of his hand and he dropped it on the floor. The very gun that killed him. It put a number 8 bird shot down the barrel. He couldn't shoot that gun anymore after his hands were shot up with bird shot and the bird shot was down the barrel. He had already shot. He had already killed two men.

TR 823.

47.    The State's arguments in paragraphs 45 and 46 above were the State's only trial arguments marshaling evidence to argue the intent to kill required for a capitol offense.

48.    The State ex parte provided the Trial Court with a Sentencing Order. The Trial Court entered the Sentencing Order, which overrode the jury recommendation of life without parole, and sentenced Victor Stephens to die in the electric chair. In the Sentencing Order, the Court again relied on the same evidence concerning a shotgun pellet in the barrel of the .25 pistol, which the jury had already rejected.

49.    In the Sentencing Order's preliminary Findings of Fact, the Court found as follows:

Further examinations of the scene revealed that one individual, later determined to be the Defendant, Victor R. Stephens, had been hit by the shotgun as blood was found near the front door together with a .25 caliber automatic pistol. A No. 8 shotgun pellet was removed from the barrel of the weapon.
. . .
Stephens further stated that after entrance to the store by [Christopher Starks], the white man fired his shotgun at Stephens striking him in the left hand. It was at this time Stephens "emptied" his .25 caliber pistol.

Sentencing Order at 3 & 4; accord TR 915 & 917 (Trial Court's reading Sentencing Order into the trial record).

14

50.    In the discussion of the first aggravating circumstance of the murder occurring during a robbery, the Court wrote that Victor Stephens's "intent to kill these victims was as clear as glass." The Trial Court followed this comment with the following finding:

> Statements made by the Defendant that he only fired after [Mr. Bailey] fired at him with the shotgun are totally false and unworthy of belief. Forensic evidence revealed that a No. 8 shot pellet was removed from the barrel of the .25 caliber automatic pistol. The Defendant admitted "emptying" his weapon. Obviously the Defendant "emptied" his pistol before Mr. Bailey fired his single shot .20 gauge shotgun. These .25 caliber bullets were recovered in the cash register as well as from the bodies of both Bailey and Pickens. To suggest, as Defendant has, that he fired in self-defense is completely beyond comprehension.

Sentencing Order at 6 & 7; accord TR 920.

51.    In rejecting the mitigating circumstance based on acting under extreme duress, the Court wrote as follows:

> [Victor Stephens] attempts to suggest that the only reason the weapon was fired was in self-defense to James R. Bailey's shotgun. In retrospect, when all the evidence is considered the truth is simply not told by Victor R. Stephens. Victor R. Stephens did not know that a shot pellet from the Bailey's .20 gauge shotgun was recovered inside the barrel of Stephens's pistol.

Sentencing Order at 11; accord TR 927.

52.    In the Sentencing Order, the Trial Court also rejected the mitigating circumstance based on minor participation in the crime based in part on the pellet evidence and the .25 pistol. Sentencing Order at 9-10.

C.     **Three Experts' Opinions**

53.     Today, it is "clear as glass" that the State's circumstantial evidence of intent to kill and pellet-in-the-barrel argument are inaccurate and misleading.  New expert evidence by the State's own expert witnesses refutes the State's claim that Mr. Bailey must have fired a shotgun pellet into the barrel of the .25 pistol.

54.     During the Rule 32 Proceeding, the Circuit Court denied Victor Stephens's motion for expert funds.  Victor Stephens should have been provided funds for his own expert, especially in light of the State's offering a new expert with new expert opinions during the Rule 32 proceeding.

55.     In summary, the following three experts' opinions show the following: (1) A pellet shot into the barrel of a .25 pistol would have flattened and the pellet in question is round; (2) indentations on the side of the .25 pistol indicate that its side was hit at a right angle, not head on as would be necessary to have a pellet shot into the barrel; and (3) Victor Stephens could not have had a hard object like a pistol in his hand when he was shot by a shotgun.

1.     **Dr. John R. McDuffie's Expert Opinions**

56.     Dr. John McDuffie had been the State's forensic expert at trial.  At the July 18, 1997 Rule 32 hearing, Dr. McDuffie gave new expert testimony showing that the State's circumstantial evidence of intent to kill and pellet in the barrel theory of the case is false.  TR 557 (emphasis added).

57.    At trial, Dr. John McDuffie had testified as follows concerning State's Exhibit No. 44, which was a single shotgun pellet:

> During initial examination of the pistol in my laboratory, as I took it out of the envelope in which I had packed it at the scene, a small pellet <u>fell out of the pistol</u>.

TR 557 (emphasis added).

58.    As indicated, the State seized upon this statement to argue that the presence of the pellet <u>in the barrel</u> of the .25 pistol proved that Victor Stephens could not have shot Mr. Bailey in reaction to being shot by Mr. Bailey.

59.    At the hearing, Dr. McDuffie testified that he did not know whether the pellet was in the barrel or in some other part of the .25 pistol.  R45-46.  Because the State based its only argument for intent to kill on the presence of a pellet in the barrel of the .25 pistol, the State's entire evidence of Victor Stephens's intent to kill was and is insufficient to establish intent to kill.

60.    Dr. McDuffie testified that the shape of this same pellet was round.  R44.  In Dr. McDuffie's expert opinion, even if this pellet had been in the barrel of the .25 pistol, it could not have been directly put there by a shotgun blast.  R42-45.  According to Dr. McDuffie, if the pellet had been shot directly into the barrel of the .25 pistol by a shotgun blast, the pellet would have flattened out.

### 2.    David Higgins's Expert Opinions

61.    Like Dr. McDuffie, David Higgins works for the State of Alabama.  Mr. Higgins is a firearms expert.  He did not examine the .25 pistol (State's Exhibit 17) and form his expert opinions until July, 1997.

62.    At the July 18, 1997 Rule 32 hearing, the State called Mr. Higgins in an attempt to re-establish that Victor Stephens shot Mr. Bailey before being shot by Mr. Bailey.

63.    Mr. Higgins testified that when he examined the .25 pistol, he found faint indentations on the right side of the handgun.  Based on his professional experience, Mr. Higgins testified that the indentations on the side of the .25 pistol indicate that the gun "was hit with shotgun pellets".

64.    The shape of these pellet indentations indicates that the shotgun blast hit the .25 pistol on the right side at a right angle or the handgun "could [have been] turned slightly."  Based only on the indentations, Mr. Higgins testified that it "would be reasonable to believe" that Mr. Bailey's shotgun hit Victor Stephens's in the left hand and caused him to drop the .25 pistol.

65.    If the .25 pistol was hit by a shotgun blast while held in someone's right hand (Victor Stephens is right handed), then the pellet indentations would be on the left side of the handgun.

66.    Rather than submitting a brief after the Rule 32 hearing, the State submitted a proposed order.  The Circuit Court retyped the State's proposed order, made minor changes such as deleting record cites, and adopted it.

67.    In the State's proposed order, the State argued that the pellet indentations on the side of the .25 pistol are only consistent with a blast from Mr. Bailey's shotgun hitting Victor Stephens in the left hand and causing Victor Stephens to drop the .25 pistol on the floor of the Bailey Store.

68.    Yet, on cross-examination, Mr. Higgins testified that he could not tell what shotgun, or even if a shotgun, had shot the pellets.  He also testified that he could not tell when the .25 pistol was hit by pellets or under what circumstances.  Finally, he testified that the .25 pistol could have been hit by pellets before it was used in the Bailey Store.

69.    Nonetheless, the State has argued, through its proposed order that the Circuit Court adopted, that Mr. Higgins's testimony proves that the State's new pellet indentations theory of the case must be true.

### 3.    Dr. Robert Fleck's Medical Opinions

70.    In 1987, Robert Fleck, M.D. had treated Victor Stephens's shotgun wound to his left hand.  Based on this treatment and reading a 1997 X-ray of the hand, Dr. Fleck's testimony shows

that Victor Stephens could not have been holding a pistol in his left hand when he was struck by the shotgun blast.

71.     At the Rule 32 hearing, the transcript of Dr. Fleck's deposition and copies of the X-rays were admitted as Defendant's Exhibit 5. The original X-rays were admitted as Defendant's Exhibit 6.

72.     Dr. Fleck testified that Victor Stephens had many pellets in his hand from a gunshot wound. The entry of the pellets was on the palm side of Victor Stephens's hand. In 1987, Dr. Fleck removed many of the pellets, but removing all of them would not have been reasonable or feasible.

73.     Dr. Fleck also testified about X-rays taken by the Department of Corrections on July 8, 1997. Dr. Fleck testified that the numerous white dots in the X-ray of Victor Stephens's hand are from pellets still lodged in Victor Stephens's hand today.

74.     Dr. Fleck was asked whether he had an opinion as to whether Victor Stephens had a hard object like a pistol in his left hand when his left hand was struck by the shotgun blast. Dr. Fleck did have an opinion, which was that he "would not think there was an object in the hand . . ."

75.     On cross-examination by the State, Dr. Fleck was asked whether he could testify with any degree of certainty that Victor Stephens did not have a handgun in his hand when his hand was hit by a shotgun.  Dr. Fleck responded, "I think with a reasonable certainty because of the distribution of the pellets."

76.     Dr. Fleck also gave testimony relevant to Victor Stephens's physical reaction, if he were hit by a shotgun blast, as reflected in Victor Stephens's three statements introduced at trial. Cf. TR 599-627 & 669-670 (Victor Stephens's statements, which indicate that Victor Stephens shot back after Mr. Bailey shot him with a shotgun).  Dr. Fleck said a person's reactions would vary, but in medical terms "a flight or fright type reaction is what normally would happen with somebody."

77.     Dr. Fleck thought someone's adrenaline level would be pumped up if he had been hit by a shotgun.

78.     Furthermore, Dr. Fleck explained that the palm-side of the hand has more nerve fibers and the nerve fibers are more dense than for most parts of the body.  For this reason, someone would suffer pain more immediately from a wound to the hand than to other parts of the body.

79.     Dr. Fleck's medical opinion further shows that the State's arguments are false.  Both the State's pellet-in-the-barrel argument and pellet indentations argument require Victor Stephens to have been holding the .25 pistol in his left hand when his left hand was struck by the pellets.

1/625307.1

21

According to the State's arguments, the pellets striking Mr. Stephens's left hand caused him to drop the handgun.

80.     Based on Dr. Fleck's testimony, the State's arguments are and were, to a reasonable degree of medical certainty, false.  The State's theories of the case require the .25 pistol to be in Victor Stephens's left hand, which is refuted by Dr. Fleck's medical opinion.

81.     The Circuit Court found that the new evidence shows that Victor Stephens was shot by Mr. Bailey with the .25 pistol in his left hand.  This finding is unsupported by any medical evidence.

**D.     The Pellet Evidence as New Evidence**

82.     Under Ala. R. Crim. P. 32.1(e), Victor Stephens is entitled to relief based on the above experts' opinions as newly discovered evidence.  The hearing developed two sets of "newly discovered material facts" related to the pellets: (1) Dr. McDuffie's expert opinion based on the shape of State's Ex. 44, the pellet purportedly removed from the barrel of the .25 pistol, and (2) Mr. Higgins's expert opinion based on the pellet indentations on the .25 pistol combined with Dr. Fleck's medical opinion based on the pellets removed from and in Victor Stephens's hand.

### 1.    The Pellet Purportedly in the Barrel

83.    At trial, Victor Stephens was convicted of capital robbery murder without any direct evidence. Stephens v. State, 580 So. 2d 11, 24 (Ala. Crim. App. 1990), aff'd per curiam, 580 So. 2d 26 (Ala. 1990), cert. denied, 502 U.S. 859 (1991).  Because the State relied upon circumstantial evidence, the test of the sufficiency of the evidence was and is "whether the evidence excluded every reasonable hypothesis but that of the accused's guilt."

84.    From Victor Stephens's statements, the following reasonable hypothesis was presented at trial: Victor Stephens participated in Christopher Stark's robbery of the Bailey Store and Victor Stephens killed Mr. Bailey and Mr. Pickens, but he did not have the intent to kill.  Instead, only reacting to Mr. Bailey having already shot Victor Stephens's left hand with a shotgun blast, Victor Stephens found the .25 pistol with his right hand and used it in a panic to kill the two men.

85.    This hypothesis leads to a non-capital robbery-murder conviction, not a capital robbery-murder conviction.  This hypothesis is so self-evident from Victor Stephens's statements that the Trial Court gave a self-defense jury charge over the objections of Victor Stephens's trial counsel.  TR 852.

86.    Whether Victor Stephens had the .25 pistol in his left hand when shot or whether the .25 pistol had indentations in it before Victor Stephens entered the Bailey Store is immaterial to this

reasonable hypothesis.  Either way, the pellet indications do <u>not</u> tend to show that Victor Stephens shot first.

87.    At trial, the State recognized that a capital conviction required it to produce evidence excluding this reasonable hypothesis beyond a reasonable doubt.  For its burden, the State relied on its pellet-in-the-barrel argument, which is that the circumstantial evidence of the pellet in the barrel of the .25 pistol showed intent to kill.  Without this circumstantial evidence and the State's pellet-in-the-barrel argument, the State lacked sufficient evidence for a capital conviction.

88.    For sentencing, the State's pellet-in-the-barrel argument was used in weighing several aggravating and mitigating circumstances.  For example, the Trial Court expressly rejected the extreme duress mitigating circumstance, based on the Trial Court's incorrectly believing that a pellet in the barrel of the .25 pistol proved that the pertinent part of Victor Stephens's statements (that Victor Stephens shot his .25 pistol after Mr. Bailey shot him first) was a lie.  Sentencing Order at 11.

89.    At the Rule 32 hearing, the newly discovered expert evidence about this pellet was introduced: Dr. McDuffie's opinion is that the shape of the pellet shows that it was <u>not</u> shot directly into the barrel of the .25 pistol.  One can only speculate as to how (or if) the pellet came to be in the barrel of the .25 pistol.  It could have been the result of the .25 pistol being thrown on the floor or of many people walking in and out of the Bailey Store.  It could have never been in the barrel of the .25 pistol.

90.    One new material fact is undisputed: As the State's own expert testified, the pellet was not shot directly into the barrel of the .25 pistol.  Therefore, this pellet evidence does not even tend to show that Victor Stephens shot first and emptied the .25 pistol before a shotgun blast put a pellet in the barrel of the .25 pistol.

91.    The Circuit Court said that this pellet evidence was not new evidence under Ala. R. Crim. P. 32.1(e) for two reasons: (1) "The shape of the pellet was the same at the time of Stephen's [sic] trial as it is today;" and (2) "The defense had access to the pellet as well as Dr. McDuffie."

92.    Of course, the shape of the pellet is the same today as it was at trial.  The pellet's shape would not be probative if it had changed after the trial.  The pellet's shape is not "new" evidence, just like any physical evidence underlying an expert's opinion would not be new evidence. The new evidence is Dr. McDuffie's expert opinion based on the pellet's shape.

93.    Victor Stephens's access to Dr. McDuffie prior to closing arguments is not determinative under the peculiar circumstances.  Victor Stephens's trial counsel had no reason to anticipate that the State would argue the pellet-in-the-barrel argument at closing.  As indicated, Dr. McDuffie never testified that he discovered a pellet in the barrel of the .25 pistol, only that a pellet fell out of the handgun.  Victor Stephens's trial counsel could not have known that the State would misuse this circumstantial evidence, much less that the State would manufacture a false argument based upon this misused circumstantial evidence.

94.     Nor could Victor Stephens's trial counsel have discovered the State's false pellet-in-the-barrel argument by questioning Dr. McDuffie prior to trial.  First, Dr. McDuffie, was the State's expert witness, not a fact witness.  Second, Dr. McDuffie had no idea that the State would use such a wrong argument based on the pellet.  Therefore, even if Victor Stephens's trial counsel had access to Dr. McDuffie, such access would not have mattered.

### 2.     The Pellet Indentations On The .25 Pistol

95.     At the Rule 32 hearing, the State put on new expert evidence showing that the .25 pistol had at some time been hit by shotgun pellets.  Recognizing that the State had relied solely on circumstantial evidence of intent to kill that was inaccurate and misleading, the State (and Circuit Court) changed to a new argument based on Mr. Higgins's new expert testimony.

96.     According to the Circuit Court, by adopting the State's proposed order: "The only reasonable inference, from the evidence, is that Stephens was holding the gun in his left hand when he was wounded and the shotgun blast caused him to drop the gun and leave it on the scene as he retreated."

97.     The State's new position is that Dr. McDuffie's new opinion evidence based on the round shape of the pellet purportedly in the barrel of the .25 pistol is immaterial.  The State's new pellet indentations argument, based on Mr. Higgins's new expert opinion that the .25 pistol was hit

by a shotgun at some undetermined time and place, supposedly proves that Victor Stephens must have shot Mr. Bailey first.

98.     The Circuit Court did find that the only reasonable inference is that Victor Stephens shot Mr. Bailey first and then dropped the .25 pistol when shot with the pistol in his hand.  This finding is based on an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceeding.

99.     First, Victor Stephens's statements offer an alternative and more reasonable hypothesis: Victor Stephens used the .25 pistol after being shot in the left hand and then threw the .25 pistol down after emptying the handgun, an irrational act to be expected from someone who is intoxicated and in extreme pain from a shotgun blast to his other hand.  See TR 619, 626, 669-690, 779 & 879 (evidence and arguments at trial concerning acid, cocaine and drugs in Victor Stephens at the time he was in the Bailey Store).

100.    Second, no evidence other than Mr. Higgins's new expert testimony suggests this inference by the Circuit Court, much less make it the only reasonable inference.

101.    Third, Mr. Higgins's expert testimony does not support this inference, even disregarding Dr. Fleck's medical opinion.  Mr. Higgins's testimony is just as consistent with Victor

Stephens's being shot first with the .25 pistol in his left hand and Victor Stephens's then responding in a panic by picking up the handgun with his other hand and using it.

102.    Fourth, Mr. Higgins's new expert testimony does not support this inference, because it does not tend to show when the indentations were made in the .25 pistol or what individual, if any, might have had the .25 pistol in his or her hand.

103.    Regardless, the Circuit Court's Order reflects that denying Victor Stephens's Rule 32 Petition depended on the State's new expert evidence from Mr. Higgins.  The State contends that Mr. Higgins's new expert opinion about the pellet indentations on the .25 pistol shows that Victor Stephens must have emptied his handgun before being shot by Mr. Bailey.  The State has abandoned the pellet-in-the-barrel argument for its new pellet indentations argument.

104.    Perhaps as weak as the State's old pellet-in-the-barrel argument, the State's new pellet indentations argument is not the type of circumstantial evidence upon which a finding of guilt beyond a reasonable doubt could be based.

105.    Mr. Higgins's expert opinion, as well as the State's new pellet indentations argument, have never been considered by a jury.  While his expert opinion might be admissible in Victor Stephens's new trial, the State's reliance and Circuit Court's reliance on his expert opinion only show that Victor Stephens is entitled to a new trial.  Under the Alabama and U.S. Constitutions, the

State cannot show "harmless error" based on a new expert opinion that has never been considered by a jury.

106.    Furthermore, the Circuit Court denied Victor Stephens's motion for funds to hire an expert to respond to Mr. Higgins's new expert opinion and to the State's new pellet indentations argument.  Victor Stephens's right to due process has been violated.

107.    The Court of Criminal Appeals Opinion, p. 3, provides that the Circuit Court did not err by relying on David Higgins's "new expert opinion," because his opinion was merely cumulative to testimony already elicited from Dr. McDuffie, who also was an expert witness for the State.  First, Mr. Higgins testimony for the most part was unique.  Second, to the extent Mr. Higgins's and Dr. McDuffie's opinions overlapped, this evidence was newly discovered evidence, too.  Dr. McDuffie admitted that he did not know anything about the pistol before 1997 other than what he testified to in 1987.  Therefore, if the Circuit Court had relied on Dr. McDuffie rather than David Higgins, the error would have been the same.

108.    Perhaps not surprisingly, Mr. Higgins's expert opinions also further undermine the State's pellet-in-the-barrel argument.  Mr. Higgins testified that the .25 pistol was struck on the right side at a right angle or that it could have been "turned slightly."  HR180.  Shotgun pellets fire in straight lines.  While perhaps not theoretically impossible, a pellet traveling past a .25 pistol at a right angle would  not enter the barrel.

1/625307.1

29

109.    Additionally, the State's new evidence, when combined with the medical evidence, is new exculpatory evidence for another reason.  The medical evidence now shows that Victor Stephens did not have a pistol in his left hand when shot in his left hand.

110.    If Mr. Higgins's expert testimony did indicate that someone had the .25 pistol shot out of his or her hand in the Bailey Store, then it would be someone besides Victor Stephens.

111.    Consequently, the State's new evidence, when combined with the medical evidence, would show that Victor Stephens was not the robber shot in the Bailey Store.  At trial, Victor Stephens's lawyer offered a defense of mistaken identity based only on a dying declaration by Mr. Pickens that his killer was white, while Victor Stephens is black.  Victor Stephens's lawyer offered no corroborating evidence to support this dying declaration.  Now, the State's newly discovered evidence, Mr. Higgins's expert opinion, would corroborate the dying declaration, when combined with Dr. Fleck's opinion

112.    If Mr. Higgins's new expert opinion, the State's pellet indentations argument, and Dr. Fleck's medical opinion had been used at the time of trial, the result would have been different. Therefore, Victor Stephens's conviction should be vacated.

### E.   Dr. McDuffie's Opinion as Exculpatory Evidence

113.    To the extent Dr. McDuffie's opinion based on the shape of the pellet might not be "newly discovered" evidence under Ala. R. Crim. P. 32.1(e), the State suppressed this expert evidence.  Under Brady v. Maryland, 373 U.S. 83 (1963), the State is required to disclose all exculpatory evidence to the prosecution so that the prosecution may then disclose it to defense counsel.  For the Brady rule, exculpatory evidence is evidence "favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id. at 87.

114.    To prove a Brady violation, a defendant must show (1) that the prosecution suppressed the evidence, (2) that the evidence was favorable to the defense, and (3) that the evidence is material.

115.    First, if Dr. McDuffie's expert opinion is not newly discovered evidence, then the State suppressed the evidence.  A Brady violation occurs when the State's exculpatory evidence is not disclosed to the prosecution, so the prosecution could not have disclosed the exculpatory evidence to the defense.  Here, the prosecution did not know that the State had the exculpatory expert evidence showing that the pellet was not shot directly into the barrel of the .25 pistol.

116.    If the prosecutor knew that the State had the exculpatory expert evidence, then the State also intentionally misled the jury with its closing argument relying on the pellet-in-the-barrel

argument.  Cf. Davis v. Zant, 36 F.3d 1538, 1549-550 (11th Cir. 1994) (granting post-conviction

relief based on State's intentionally misleading closing argument).  Moreover, if the prosecutor had

known that the State had the exculpatory pellet evidence, the prosecution would not have drafted the

Trial Court's Sentencing Order (which overrode the jury's recommendation of life without parole)

to rely so heavily on the inaccurate and misleading pellet-in-the-barrel argument.


117.    Such an inadvertent nondisclosure, though, would still be a Brady violation.  Id. Cf.

Giglio v. United States, 405 U.S. 150, 154 (1972) (reversing conviction and recognizing that this rule

requires prosecution offices to establish procedures and regulations "to insure communication of all

relevant information of each case to every lawyer who deals with it.").


118.    If Dr. McDuffie's expert opinions about the shape of the pellet existed at the time of

the trial, then the Circuit Court erred in holding that Dr. McDuffie's expert opinions were not

suppressed.  The State has an affirmative duty to disclose exculpatory evidence in the possession of

its agents.  See Troedel, 667 F. Supp. 1456, 1463 (S.D. Fla. 1986), ("It is well settled that a

prosecutor bears the constitutional duty to disclose to the defense evidence which is both favorable

and material to guilt or punishment."), aff'd, 828 F.2d 670 (11th Cir. 1987) (expressly adopting

reasoning in district court's opinion).


119.    The Circuit Court's comment that it would not hold that the State had a duty to

examine the evidence and develop arguments for the defense also is misplaced.  The State, not

Victor Stephens, developed and presented the inaccurate and misleading pellet-in-the-barrel argument. Once the State developed this argument and thereby identified what evidence would be relevant, the State was under a duty not to suppress the State's evidence that the circumstantial evidence and pellet-in-the-barrel argument were inaccurate and misleading. Cf. Troedel v. Wainwright, 667 F. Supp. at 1459-460 (overturning conviction after State made knowing use of wrong evidence by eliciting testimony from expert witness about who fired murder weapon).

120.     Second, as discussed above, Dr. McDuffie's expert opinion about the shape of the pellet purportedly in the barrel of the .25 pistol favors Victor Stephens. See United States v. Bagley, 473 U.S. 667, 676 (1985) (explaining that a court assumes that defense counsel would have used the undisclosed evidence effectively).

121.     Third, Dr. McDuffie's expert opinion about the shape of the pellet is material. In Bagley, "material" was defined as follows:

> Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

473 U.S. at 682. One cannot have any confidence in a conviction or a sentence that is undermined by the State's own expert. Therefore, the exculpatory expert evidence here is material.

122.     While the materiality of Dr. McDuffie's expert opinion is clear, an even lower standard of materiality applies here, because the State relied on misleading evidence.  Generally, if the State relies on false testimony or fails to correct false testimony the state knew or should have known was false, the evidence is deemed to be material "if there is a reasonable likelihood that the false testimony *could have* affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976) (emphasis added).  This very low standard of materiality is equivalent to a harmless beyond a reasonable doubt standard. United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995).  False testimony for this rule includes the State's misleading use of forensic expert testimony. Troedel v. Wainwright, 667 F. Supp. 1456, 1458-460 (S.D. Fla. 1986), aff'd, 828 F.2d 670 (11th Cir. 1987) (expressly adopting reasoning in district court's opinion); see Davis v. Zant, 36 F.3d 1538, 1549-550 (11th Cir. 1994) (applying same materiality standard to State's intentional misrepresentations during closing arguments).

123.     Because the State's pellet-in-the-barrel argument was based on the State's misleading use of forensic expert testimony, the harmless beyond a reasonable doubt standard applies.  While Dr. McDuffie's opinion would be material under any standard, recognizing that such a low standard of materiality applies helps bring into focus the unreasonableness of the State's pellet-in-the-barrel argument.

124.    Dr. McDuffie's expert opinion based on the shape of the pellet was not disclosed to the defense, is favorable to Victor Stephens, and would have been material to the outcome. Therefore, if this evidence is not newly discovered, the State violated <u>Brady</u> by not disclosing it.

**F.    The Pellet Evidence and Ineffective Assistance**

125.    As indicated above, Victor Stephens's trial counsel would not have been able to anticipate that the State would argue the false pellet-in-the-barrel argument in closing during the guilt phase of the trial.

126.    Once the State made this argument, however, Victor Stephens's trial counsel had a duty to conduct a reasonable investigation concerning this argument. The results of the investigation could then have been available for post-trial motions, sentencing or direct appeal.

**1.    Trial Counsel's Failure to Investigate**

127.    As part of its ruling, the Alabama Court of Criminal Appeals relied upon the Circuit Court's refusal to find deficient performance based on possible "trial strategy." As explained below, no investigation cannot be a "trial strategy" and is deficient performance as a matter of law.

128.    Victor Stephens's trial counsel did not conduct any investigation before or after the guilt phase of trial, much less the reasonable investigation required for effective representation. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 690-91 (1984) (requiring reasonable investigation).

129.    Victor Stephens's trial counsel offered only one witness in the guilt phase, Jessie Portis, who heard Mr. Pickens's dying declaration indicating that the robber was white.  Victor Stephens's trial counsel did not interview even this one witness before trial.  TR 805.

130.    Victor Stephens's trial counsel did not interview Dr. Fleck about Victor Stephens's wounds, he did not ask Dr. McDuffie about the State's pellet-in-the-barrel theory, and he did not consult an expert witness on his own.  TR 804; R48-49.  See Troedel v. Wainwright, 667 F. Supp. 1456, 1461 (S.D. Fla. 1986) (ineffective assistance found where defendant failed to depose prosecution's expert witnesses and failed to consult a expert on his own); see also Ake v. Oklahoma, 470 U.S. 68 (1985) (holding that indigent defendants have a right to experts).

131.    The Circuit Court unreasonably found that if Victor Stephens's trial counsel had consulted Dr. McDuffie about the State's pellet-in-the-barrel argument, Dr. McDuffie would not have held anything back.  Therefore, if this finding were correct, Victor Stephens's trial counsel would have learned that the State's circumstantial evidence and pellet-in-the-barrel argument are false if he had only investigated them once he learned about them.

132.    Victor Stephens's trial counsel did not interview Dr. McDuffie.  Dr. McDuffie also does not remember ever talking to Victor Stephens's trial counsel.

133.    No rational strategy could include not using Dr. McDuffie's expert opinion at the sentencing phase.  For these reasons, the only possible inference, other than his trial counsel blundering by knowing and not using Dr. McDuffie's expert opinion, is that trial counsel never investigated and thus did not find the expert evidence.

134.    In rejecting this aspect of Victor Stephens's ineffective assistance claim, the Circuit Court found that his trial counsel's failure to investigate the State's pellet-in-the-barrel argument was a strategic decision.  This finding is based on an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceeding.

135.    First, not conducting an investigation cannot be a strategic decision.  See Strickland v. Washington, 466 U.S. 668 (1991) (requiring reasonable investigation for effective assistance); Troedel, 667 F. Supp. at 1461 (finding that failure to depose prosecution's expert witness and to consult with an independent expert witness could not be "any kind of rational defense strategy")."

136.    Second, at trial, the defense was based on mistaken identity.  One would expect that forensic evidence might support such a defense, as the pellet indentations evidence indeed does.  As explained above, Mr. Higgins's new expert opinion about the pellet indentations and Dr. Fleck's medical opinions, together, corroborate the mistaken identity defense.

137.    Third, no rational strategy for the penalty phase of Victor Stephens's trial could have included not using Dr. McDuffie's opinions or Dr. Fleck's opinions. See Strickland, 466 U.S. at 690-691 (holding that separate investigation for penalty phase is required for effective representation).  At the guilt phase of the trial, the defense was based on a claim of mistaken identity. Once the jury delivered its verdict at the guilt phase of the trial, Victor Stephens's trial counsel could no longer argue the mistaken identity theory.

138.    For sentencing, trial counsel had a duty to present evidence showing that Victor Stephens's statements were true and that the State's pellet-in-the-barrel argument was false.  See Stevens v. State, 552 So. 2d 1082, 1086-088 (Fla. 1989) (finding trial counsel to be ineffective for failing to present evidence, which would have supported less culpable version of crime, to judge after jury recommendation of life imprisonment, which resulted in judge overriding the jury's recommendation).

139.    To discharge this duty, Victor Stephens's trial counsel had to investigate whether or not the State's pellet-in-the-barrel argument was true.  His failure to do so, even though he had over a year and a half between the closing arguments and the conclusion of the  sentencing hearing, is ineffective assistance of counsel.

## 2.    Prejudice from the Failure to Investigate

140.    In rejecting Victor Stephens's ineffective assistance claim, the Circuit Court found that Victor Stephens did not show that he was prejudiced by his trial counsel's ineffectiveness. This finding is also based on an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceeding.

141.    This erroneous finding was based on the Circuit Court's rejecting Dr. Fleck's medical opinions, the Circuit Court's reliance on Mr. Higgins's new expert opinions, and the Circuit Court's disregarding Dr. McDuffie's new expert opinions.

142.    Dr. Fleck was Victor Stephens's treating physician. His medical opinion was that Victor Stephens did not have a hard object like a pistol in his left hand when his left hand was hit by a shotgun blast.

143.    The Circuit Court rejected Dr. Fleck's medical opinion on two erroneous grounds: (1) "Dr. Fleck based his opinion solely on the distribution of the pellets as reflected by X-rays made over 10 years after the wound was inflicted. The location of the pellets could have changed over the course of 10 years." And, (2) Victor Stephens has large hands and "the murder weapon is a very small pistol."

144.    In its opinion, the Court of Criminal Appeals repeated part of the Circuit Court's error.  The Court of Criminal Appeals wrote that Dr. Fleck "based his opinion solely on the location of the pellets on the current X-ray."

145.    First, Dr. Fleck did not base his opinions solely on the distribution of the pellets. Nonetheless from the X-rays, anyone reading the X-rays can only reasonably see that the distribution of the pellets is inconsistent with Victor Stephens's having had a handgun in his hand when he was shot.  See Def. Ex. 6 (the original X-rays).

146.    Dr. Fleck also based his medical opinions on his medical training and experience and on the medical records from having treated Victor Stephens's left hand for a shotgun wound.  This treatment included removing numerous pellets from Victor Stephens's palm, as well as treating the flesh wounds from where the pellets entered Victor Stephens's left hand.

147.    Second, whether shotgun pellets in someone's hand can move significantly over ten years is an issue requiring a medical opinion.  The only medical evidence in the record is Dr. Fleck's deposition.  Dr. Fleck knew that the X-rays were taken in July 1997, ten years after Dr. Fleck treated Victor Stephens.  Therefore, Dr. Fleck's opinions already considered, and rejected, the possibility that the location of the pellets might have changed significantly over the course of ten years.

148.    Third, no evidence suggests that the size of the .25 pistol matters and Dr. Fleck knew the size of Victor Stephens's hand. Dr. Fleck's opinion was that Victor Stephens did not have a hard object "like a pistol" in his hand. If the size of a pistol were relevant, Dr. Fleck's opinions would reflect that. Moreover, only the barrel of the .25 pistol is small; the butt is a normal size for a handgun. <u>See</u> Def. Trial Ex.17 (the .25 pistol); Def. Trial Ex. 1 (reduced photograph of the .25 pistol).

149.    As to Mr. Higgins, the Circuit Court relied on Mr. Higgins's new expert opinion to find that Victor Stephens was holding the .25 pistol in his left hand when the shotgun blast hit the handgun on the right side causing Victor Stephens to drop the handgun. As discussed above, Mr. Higgins admitted that he had no way of telling where or when the .25 pistol was hit by a shotgun.

150.    Furthermore, Mr. Higgins's opinions, even disregarding Dr. Fleck's medical opinions, do not suggest whether the .25 pistol was hit by a shotgun blast before or after it was used in the Bailey Store, because the .25 pistol still will fire today.

151.    Moreover, the State cannot produce this new expert evidence, never considered by any jury, to show somehow "harmless error."

41

152.    Most important, when considering prejudice, the Circuit Court disregarded Dr. McDuffie's new expert opinion showing that the pellet was not directly shot into the .25 pistol. Yet, the State's closing argument turned on the State's pellet-in-the-barrel argument and the Trial Court expressly and repeatedly relied on the State's pellet-in-the-barrel argument to override the jury recommendation and to sentence Victor Stephens to death. Victor Stephens's trial counsel's failure to investigate the State's wrong argument led to the override, as well as led to the capital conviction.

153.    Under Strickland, 466 U.S. at 694, the test for prejudice is the same as the test for materiality of exculpatory evidence not disclosed to the defense by the State. If the ineffective assistance of counsel "undermine[s] the confidence in the outcome" by creating a sufficient probability that the result would have been different, then there is prejudice. Since the State's own experts' opinions, as well as Dr. Fleck's, undermine any confidence in the outcome at trial, Victor Stephens has shown prejudice.

## IV.    THE STATE'S DISCRIMINATORY JURY STRIKES

154.    The State violated Victor Stephens's federal constitutional rights under Batson to a jury untainted by prosecutorial race discrimination. In his initial trial, the State violated Victor Stephens's Batson rights and thus he is entitled to a new trial. In his Rule 32 proceeding, Victor Stephens introduced newly discovered evidence that further proves the violation of his Batson rights and that also requires a new trial. Victor Stephens's trial and appellate counsel were ineffective in protecting his Batson rights, which also entitles him to relief.

## A.     The Court of Criminal Appeals

155.     The Court of Criminal Appeals Opinion, p. 3, provides that it could not consider Victor Stephens's claim based on the new evidence that shows the State's <u>Batson</u> violation, because the argument "is raised for the first time on appeal; [our] review is limited to the evidence and arguments considered by the trial court." This statement by the Court of Criminal Appeals is wrong.

156.     These <u>Batson</u> arguments were raised at length during the Rule 32 proceeding.  The Circuit Court even expressly considered this new evidence on Victor Stephens's ineffective assistance of counsel claim, but ruled that the substantive <u>Batson</u> claim was procedurally barred as having been raised at his initial trial and on appeal.

157.     The substantive <u>Batson</u> claim was raised before the Rule 32 hearing as Claim F of the petition and Claim V of the Supplemental Petition.  At the Rule 32 hearing and afterward, new <u>direct</u> evidence (in addition to the previously available circumstantial evidence) was developed further showing that the State had violated <u>Batson</u>.  With Victor Stephens's next substantive submission to the trial court, Victor Stephens again raised the argument in question, arguing at length that this additional new evidence further entitled him to relief under <u>Batson</u>.  Victor Stephens's brief to the trial court included 14 pages of argument that the newly discovered evidence entitled him to Rule 32 relief under <u>Batson</u>.

158.     The Circuit Court expressly considered this new <u>Batson</u> evidence, recognizing that the new evidence was offered "to support the substantive <u>Batson</u> claim." Nonetheless, the trial court held that the <u>Batson</u> claim was barred because it had been raised at trial and on appeal. Therefore, the Court of Criminal Appeals' reason given for not considering Victor Stephens's <u>Batson</u> claim is based on an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceedings.

159.     The Court of Criminal Appeals also makes two inconsistent statements. First, it says on page 3 that Victor Stephens failed to show that the prosecutor's strike sheets (which are part of the new direct evidence of race discrimination) "could have been timely discovered through due diligence." Later, it says on page 4 that Victor Stephens's counsel's performance was not deficient because "[t]he prosecutors strike sheets were not assessible [sic] to [his] counsel at the time of the <u>Batson</u> challenge." Both of these statements cannot be true. One cannot reject one claim based on strike sheets' being accessible and reject another claim based on the strike sheets' not being accessible.

**B.      <u>The State's *Batson* Argument on Appeal</u>**

160.     May a Rule 32 petitioner ever obtain relief based on newly discovered evidence concerning the composition of the trial jury? The Court of Criminal Appeals did not address this issue. Victor Stephens's Brief to the Court of Criminal Appeals, pp. 68-71, argues yes. <u>See</u> <u>Amadeo</u>

v. Zant, 486 U.S. 214 (1988) (granting post-conviction relief based on newly discovered evidence of race discrimination affecting the jury composition).

161.    The state's Brief to the Court of Criminal Appeals, pp. 27-34, argues no, based on such evidence not being "newly discovered material facts" under the requirements of Rule 32.1(e). This argument was the state's only argument addressing the new Batson evidence.  Based on the affirmance of the denial of the Rule 32 Petition, Alabama law allows no state court post-conviction review concerning the composition of a trial jury.

162.    A prisoner on death row must be able to obtain relief based on newly discovered evidence concerning the composition of the trial jury.  Accordingly, no deference to any state court proceedings on this issue is appropriate and this Court should address these Batson issues de novo. In addition, the State's failure to provide any post-conviction review based on such a clear constitutional violation is itself a violation of Victor Stephens's constitutional rights.

## C.    The *Batson* Issue at Trial

163.    The Trial Court quickly determined that Victor Stephens had established a prima facie case of racially discriminatory strikes by the State. TR 388.  In making this decision, the Trial Court relied on the fact that the State had used its first 21 strikes, and 21 out of 22 strikes (95 percent), not counting the alternate, to remove blacks from the venire.  TR 386.

164.    At least three additional factors also each could have established Victor Stephens's prima facie case of the State's racially discriminatory strikes: (1) The State struck 21 black jurors who were as heterogeneous as the community as a whole; (2) during individual voir dire, the State asked almost no questions of any of the black jurors that it struck; and (3) the State used its challenges to strike more than four out of every five black venire members.

165.    Victor Stephens's trial counsel asserted a timely Batson motion after the striking of the jury.  TR 386-87.

166.    The State proffered its reasons, which were inadequate for many of the black jurors. See, infra, ¶¶ 170-233.  The Batson spokesperson for the State also testified "as an officer of the Court" that the States strikes were not based on race.  TR 400.

167.    Then, Victor Stephens's trial counsel argued pretext by comparing characteristics of white and black jurors, but failed to cross-examine the State's Batson spokesperson, failed to point out adequately that nine strikes of black jurors were based on off the record information that was not raised during voir dire, and failed to take adequate steps to have the State put its off the record information on the record so that either he (trial counsel) or appellate counsel could effectively argue the Batson issues.  TR 396-99.

**D.      The *Batson* Issue on Direct Appeal**

168.    On direct appeal, Victor Stephens argued that the State violated Batson on the record developed by trial counsel.  Stephens v. State, 580 So. 2d 11, 15-21 (Ala. Crim. App. 1990), aff'd per curiam, 580 So. 2d 26 (Ala. 1990), cert. denied, 502 U.S. 859 (1991).

169.    The Court of Criminal Appeals rejected Victor Stephens's argument and, in affirming the Trial Court's decision, stated as follows:

> In reviewing this issue, we find particularly helpful this Court's recent decision in Warner v. State, [Ms. 3 Div. 945, February 23, 1990] (Ala. Crim. App. 1990).
> . . .
> Just as in Warner, we find the tenets of Batson and Branch have been minimally satisfied.
> . . .
> While this Court has concern about several of the reasons articulated by the prosecutor for the exercise of his peremptory jury challenges, we find that, as a whole, the prosecutor provided sufficiently race-neutral reasons for the exercise of those challenges.
> . . .
> Just as in Warner, we find the trial court's ruling was not clearly erroneous.

Id. at 17-21 (omitting discussion of the State's strikes and omitting quotations from Warner).

170.    The Alabama Supreme Court affirmed Stephens v. State on March 15, 1991, and denied a rehearing on April 11, 1991.  The Alabama Supreme Court reversed Warner nine months later on December 6, 1991.

171.     For this Rule 32 proceeding, three points can be drawn from the Court of Criminal Appeal's opinion overruling Victor Stephens's direct appeal.  First, the Batson issue was close on direct appeal.  The Court of Criminal Appeals noted its "concern" and "grave reservations," but held that Batson had "been minimally satisfied."  Id.  Second, the Court of Criminal Appeals decision was based on the limited record available and assumed (incorrectly as has now been shown) that the State's proffered reasons were factually well founded.  Id. at 19.  Third, the Court of Criminal Appeals, when ruling against Victor Stephens on the Batson issue, relied primarily on Warner, a case later reversed by the Alabama Supreme Court on the Batson issue.  See Ex parte Bird & Warner, 594 So. 2d 676 (Ala. 1991) (reversing Bird v. State, 594 So. 2d 644 (Ala. Crim. App. 1990), rev'd, 594 So. 2d 676 (Ala. 1991) and Warner v. State, 594 So. 2d 664 (Ala. Crim. App. 1990), rev'd, 594 So. 2d 676 (Ala. 1991), which both arose from the same trial).

E.     **New Evidence Shows a *Batson* Violation**

172.     As will be apparent from the discussion below, the State's proffered reasons were inadequate and the record from the trial shows a Batson violation.  More so than showing the Batson violation, the new evidence shows why the procedural safeguards from Batson are a necessary part of our constitutional jurisprudence.

173.     At the July 18, 1997 Rule 32 hearing, the State's venire investigation tables (or "strike sheets") were admitted at the Rule 32 hearing as Defendant's Exhibits 12 to 15, with the originals filed as Defendant's Exhibits 12 to 15 to the Deposition of Edgar W. Greene, Jr.

174.    Mr. Greene's deposition and copies of Exhibits 12 to 15 are in the clerk's record between C267 and C268.  The originals of Exhibits 12 to 15 are on file with the clerk in Hale County.

175.    In addition, three witnesses gave testimony related to the State's discriminatory peremptory jury strikes: (1) Sarah Harris, (2) Gracie Lewis and (3) Edgar W. Greene, Jr.  The evidence from these exhibits and witnesses was not available to the Trial Court or to the Court of Criminal Appeals on direct appeal.

176.    As new evidence, these exhibits and witnesses (identified in the prior three paragraphs) further show that the State violated Batson.  Moreover, the new evidence confirms that Batson's safeguards, such as prohibitions on off the record information and on unverifiable reasons for peremptory strikes are necessary rules for protection of individual constitutional rights.

### 1.    "Don't Particularly Think Much of" Black Jurors

177.    At trial, Mr. Greene was the State's Batson spokesperson who proffered the State's purported reasons for striking 21 black jurors.  TR 387-401.  In this Rule 32 proceeding, Mr. Greene testified about the State's four strike sheets, which are Defendant's Exhibits 12, 13, 14 and 15.  The State's strike sheets reflect the State's notes from voir dire and reflect its investigative information on the jurors.

178.    Defendant's Exhibit 14 has "Ed" at the top, has Mr. Greene's handwriting, and was his personal strike sheet.  As to the S's on Defendant's Exhibit 14, Mr. Greene testified that an S was his handwritten notation for strike, because "that's somebody that I [Mr. Greene] don't particularly think much of."  Greene depo. at 37-38.

179.    Mr. Greene marked an S next to the names of 13 (jurors 4, 5, 7, 10, 32, 46, 47, 49, 59, 60, 80, 85, and 87) black jurors out of the 21 black jurors that the State struck.  Mr. Greene did not mark an S next to the name of any white jurors on his strike sheet.  Def. Ex. 14.  The State has not offered any explanation for why Mr. Greene, the State's <u>Batson</u> spokesperson, did not "particularly think much of" only black jurors.

### 2.    Twice Marking Only Black Jurors

180.    Mr. Greene twice marked his personal strike sheet with S's.  First, he marked black jurors' (jurors 4, 7, 10, 32, 46, 47, 59, 60 and 80) names with an S with a circle in black ink.  Mr. Greene did not mark an S with a circle in black ink by the name of any white juror.

181.    Later, Mr. Greene used a black felt tip marker to mark an S or an OK by the name of seventeen black jurors (jurors 4, 5, 39, 40, 43, 46, 47, 49, 59, 62, 65, 80, 82, 85, 87, 92 and 101).  Mr. Greene did not use his black felt tip marker to mark an S or an OK by the name of any white juror.

182.    The State struck all nine black jurors (jurors 4, 5, 46, 47, 49, 59, 80, 85 and 87) who Mr. Greene had marked with a black felt tip S by their name on Defendant's Exhibit 14.  For five (jurors 4, 46, 47, 59 and 80) of these nine black jurors, Mr. Greene had marked the S by their name in black felt tip marker <u>and</u> in black ink.  (The four jurors (jurors 7, 10, 32, and 60) who had an S written by their name only in black ink were excused from the jury venire by the Trial Court.) Mr. Greene did not initially mark four black jurors (jurors 5, 49, 85 and 87) with an S in black ink, but marked them later with his black felt tip S.

183.    Mr. Greene marked eight black jurors with a black felt tip OK by their name. Because the State only had 22 strikes, it could not strike every black juror.  Five (jurors 62, 65, 82, 92 and 101) of these eight OK black jurors were the five black jurors who served on the jury.  The State struck three (jurors 39, 40 and 43) of these eight OK black jurors.

184.    Mr. Greene's marks on the State's strike sheets are direct evidence of discriminatory treatment of black venire members.  As indicated by marking an S by the name of four black jurors excused by the Trial Court, the State decided early in voir dire to strike nine black jurors and marked these blacks with an S with a circle in black ink.  No whites were marked with an S of any type.

185.    After the Trial Court excused jurors, the State decided whether or not to strike seventeen black jurors and marked these blacks with an S or an OK in black felt tip marker.

186.    No whites were marked with an S or an OK in black felt tip marker.  Then, the State

struck three of the OK black jurors, rather than strike white jurors.  No reported cases were found

with similar *direct* evidence that the State discriminatorily struck black jurors.  Cf. Amadeo v. Zant,

486 U.S. 214 (1988) (granting post-conviction relief based on discovery of prosecutor's notes that

were direct evidence of prosecution's involvement in clerk's discriminatory selection of jury venire).

### 3.    "Need Reason to Strike" Spence and Shelton

187.    On Defendant's Exhibit 13, the State's strike sheets have a telling note about striking

jurors.  Next to two black jurors' names (Minnie Spence and Willie Shelton), the State's handwritten

note says "need reason to strike."  Def. Ex. 13.  No similar note appears next to any white juror's

name.

188.    The State needed a "reason to strike" juror 87, Minnie Spence, a black.  At trial, the

State proffered only one reason for striking Ms. Spence:

> The information was that her sons had been in some very serious criminal offenses.
> We just felt like she would not be a good State's juror in this case.

TR 390.  As with Sarah Harris, the trial record has no evidence supporting this purported family

criminal information.  See TR 154-56 (group questions and responses concerning venire members'

family being charged with a criminal offense) & TR 208-210 (no individual voir dire of Ms. Spence).

No evidence indicates that the State's information about Ms. Spence was any more well-founded

than the similar wrong information about Ms. Harris. (As discussed below, the information about

Ms. Harris's family's purported criminal involvement was false).

189.    The State also needed a "reason to strike" juror 85, Willie Shelton, a black. At trial,

the State proffered two reasons for striking Ms. Shelton:

> This juror, in the course of individual voir dire, is from the community and, of
> course, was listed here, her marital status here, as separated. She was very insistent
> on that. She reported that she lives in this particular community and never heard
> anything about the case whatsoever. We find that extremely strange and based on
> that, felt like she could not remain as a juror in this case.

TR 392. The Trial Court had instructed each juror to stand and, among other personal information,

give their marital status. TR 111. The trial record reflects that Ms. Shelton simply stated "I'm

separated." TR 122. No other evidence about Ms. Shelton being separated is in the record.

190.    As to not having heard about the case, two white jurors (Carl Corley, juror 17; and

Donna Tucker, juror 94), who also lived not far from the Bailey Store, served on the jury after saying

that they had not heard or read anything about this case before coming to court as a juror. TR

208-210 & 333-36. (Ms. Corley and Ms. Tucker were from Greensboro; Ms. Shelton was from

Sawyerville; and, the Bailey Store was in Wedgeworth.).

191.    The State's "need reason to strike" note is direct evidence that the State's proffered reasons were only a pretext.  The State's weak and questionable proffered reasons for striking these two black jurors further corroborate that the State's purpose was to remove blacks from the jury.

192.    Again, no reported case has been found that has similar *direct* evidence of pretext.

### 4.    The State's Reason for Striking Sarah Harris

193.    One of the three OK black jurors struck by the State was juror 39, Sarah Harris.  At trial, the State proffered only one reason for striking Sarah Harris:

> The information reported was that she had kinspeople who had been in criminal trouble and though we had otherwise felt that she was all right, that information caused us to remove her.

TR 394-95.  At the July 18, 1997 Rule 32 hearing, Ms. Harris made clear that at the time of the trial she did not have kinspeople who had been in criminal trouble.  R34-35.

194.    The State has never disclosed the source of its incorrect "information" about Ms. Harris.  As with Ms. Spence, Ms. Harris indicated during group voir dire that she did not have relatives who had been in criminal trouble.  TR 154-56 (group questions, with responses, asking all venire members whether they personally, a member of their immediate family, or a close personal friend had ever been charged with a criminal offense).

195.    As with Ms. Spence, the State did not ask Ms. Harris any questions during individual voir dire related to relatives who had been in criminal trouble. TR 274-277 (no questions concerning criminal troubles during individual voir dire of Ms. Harris); but see TR 354-357 (individual voir dire of Charles Wyatt, a white, concerning a relatives' criminal trouble and drug involvement). Information is also not reflected on the State's strike sheets of relatives of Ms. Harris who had been in criminal trouble. Def. Ex. 12-15 (Ms. Harris, juror 39).

196.    The State did have sources for other information about Ms. Harris. Ironically, the State's on the record information indicates that the State should have wanted Ms. Harris on the jury. From group voir dire, the State knew that Ms. Harris's cousin was a State Trooper. TR 196-97; Def. Ex. 12. The State has admitted that venire member's law enforcement connections normally favorable from prosecutor's perspective.

197.    At the Rule 32 hearing, Ms. Harris made clear that the State's only proffered reason for striking her was wrong. This wrong reason is particularly important, because the Alabama Court of Criminal Appeals discussed the reason and squarely relied on it as if it were well founded when affirming on direct appeal. Stephens v. State, 580 So. 2d 11, 19 (Ala. Crim. App. 1990), aff'd per curiam, 580 So. 2d 26 (Ala. 1990), cert. denied, 502 U.S. 859 (1991).

### 5.     The State's Reason for Striking Gracie Lewis

198.    At trial, the State proffered only one reason for striking juror 59, Gracie Lewis, a black:

> Also, our investigative information indicated that her son had been involved in a death or a killing.  Information was not clear as to whether it was some type of automobile accident or whether it was some criminal charge, but in any event, her son was involved in it in some manner and we felt like she could not stay on as a juror.

TR 392.  At the Rule 32 hearing, Ms. Lewis made clear that her son had only been a passenger on a motorcycle in an accident and that the driver had died.

199.    The State has never disclosed the source for its information about Ms. Lewis's son. The source is not voir dire, because the State's ambiguous information quoted above is otherwise contradicted by the trial record.  See TR 155 (Ms. Lewis's not responding when venire asked if anyone had a relative or a close friend who had been involved in a criminal offense).

200.    Defendant's Exhibit 15, one of the State's strike sheets, does note "son - kills another person," next to Ms. Lewis' name.  Contrary to this note, Ms. Lewis's testimony at the hearing was that her son was a victim, not a killer.

201.    Despite knowing that its "[i]nformation was not clear," the State did not ask Ms. Lewis any questions about this information in individual voir dire. TR 293-94.  At the hearing,

Ms. Lewis testified that her son had only been a victim in an accident, showing the prejudice resulting (another black being struck) from the State's using its unclear and off the record information.

### 6.  The State's New Batson Admissions

202.  At the Rule 32 hearing, Ed Greene testified about the State's off the record information used to strike at least nine black jurors. No off the record information was used to strike any white jurors.

203.  In addition to Minnie Spence, Sarah Harris and Gracie Lewis, the State proffered off the record information about personal and family criminal involvement as a reason for the State's fifth, sixth, seventh and fifteenth strikes of black jurors. TR 389-390 & 393 (juror 47, Margaret Hood -- husband's criminal nonpayment of child support; juror 46, Mattie Holliefield -- two worthless check charges; juror 36, Carolyn Harris -- brother a defendant in criminal case; and juror 102 Bertha Wilson -- husband "in some type of criminal trouble"). As with Sarah Harris and Minnie Spence, none of the criminal involvement information for these four black struck jurors appears anywhere in the voir dire or is otherwise developed on the trial record. Furthermore, the State's ninth and eighteenth strikes of black jurors were based primarily on information about the black jurors that is not anywhere in the trial record. TR 390-91 & 394 (juror 49, Dorothy Johnson -- defendant in small claims court; juror 9, Ruby Lee Brown -- Sheriff concerned about her belief that husband's homicide had been mishandled).

204.    Mr. Greene testified that the State's off the record information was gathered from law enforcement officers or other persons.  Mr. Greene testified that, when the State was not sure whether this off the record information was substantiated, the State generally would not ask the juror on voir dire to clarify.  The State has never been able to explain why it did not gather and use any off the record information for white jurors.

205.    As to uncertain information about family involvement in criminal activities, Mr. Greene testified as follows:

> Q    . . . If you had some uncertain information about someone's family involvement in criminal activities, that's the kind of information that you could have gone into on voir dire, is that correct?
>
> A.    You're asking me could you ask jurors about things like that?  The answer is certainly.
>
> Q.    What you're telling me is that your practice is not to do that?
>
> A.    I don't think it's a wise way to handle jurors, no sir.  Yes, sir, that's my answer.

R125-26.  See also R128  (Mr. Greene testifying that he had "drawn back a nub" asking voir dire questions, so he thought it was better to gain information other ways).

206.    From the new evidence introduced at the Rule 32 hearing concerning Minnie Spence, Sarah Harris and Gracie Lewis, one can see the discriminatory result from the State's practice of using uncertain off the record information as proffered reasons for striking at least nine black jurors

from Victor Stephen's jury -- the State saying it struck black jurors based on information that now has been shown to be wrong information.  Because the State did not use off the record information to strike any white jurors, the disparate impact on black jurors is undeniable.

207.    Under <u>Batson</u>, a trial court cannot merely accept the State's reasons at face value. Furthermore, the State is required not to rely upon reasons that cannot be put on the record and, for most proffered reasons, the State must have evidence from voir dire or from documents to support its reasons.

208.    At the Rule 32 hearing, however, the State admitted that it violated and still violates this part of <u>Batson</u>.  The State admitted that when the State was not sure whether its off the record information was substantiated, it would not even ask the juror to clarify.  Moreover, the State used (and apparently still uses in Hale County today) its uncertain off the record information as proffered reasons for striking black jurors.

### 7.    New Evidence and Disparate Treatment

209.    At the Rule 32 hearing, Mr. Greene explained that the prosecution team generally first struck the jurors who the State wanted off most.

210.    The State's pattern of strikes at trial was consistent with this approach.  By the State's tenth of twenty-two strikes, all blacks with any personal or family involvement with drugs or crime

that appears in the trial record had already been struck.  TR 388-89 & 391 (State's explaining strikes for jurors 4, 5, 18 and 76).

211.   Finally, the State struck its first white juror, one of the three white jurors about whom the State had on the record information concerning the juror's family's involvement with drugs and crime, with its twenty-second and last regular strike.  TR 155-56 & 396.

212.   The State's pattern of strikes further shows that its proffered reasons were a pretext for racial discrimination.  After all the black jurors marked with an S had been struck, the remaining jury venire included (1) eight black jurors that the State had marked as being "OK", (2) two white jurors (Carol Barnette, juror 6; Charles E. Wyatt, juror 106) with a family member or close friend who had problems with alcohol or drugs, (3) two white jurors (Charles E. Wyatt, juror 106; Michael G. Harris, juror 38) with a family member or close friend who had been charged with a criminal offense, and (4) other white jurors.  TR 155-56 (Ms. Barnette and Mr. Wyatt among the jurors responding to group voir dire questions about family drug or criminal involvement); TR 192 (Mr. Michael Harris approaching the bench about his brother's criminal involvement).  The State's next three strikes (its 19th, 20th and 21st strikes) were of three of the eight black jurors that the State had marked as OK (Lelia Hayes, juror 40; Meloneal Hobson, juror 43; and Sarah Harris, juror 39).

213.     After striking three OK black jurors, the State had only one regular strike (its 22nd strike) and one alternate strike (its 23rd strike) left.  Yet, the State had left three whites with family drug and criminal involvement still on the jury venire.

214.     The State had just struck Sarah Harris (its 21st strike) based on unsubstantiated, off the record, and wrong information about family criminal involvement and had not struck three white jurors (Ms. Barnette, Mr. Harris and Mr. Wyatt), who all had on the record information about family drug and criminal involvement.

215.     The State's pattern of strikes ensured that one of these three white jurors would serve as an alternate and risked that one would serve as an alternate and one would serve as a regular juror.

216.     Ms. Barnette did not serve on the jury, because Victor Stephen's lawyer struck Ms. Barnette with his last regular strike.  Nonetheless, the State had left her on the jury venire, striking blacks that the State thought were OK instead, without knowing whether she would be struck by Victor Stephens's trial counsel.

217.     As the State admitted at the Rule 32 hearing, generally it first strikes those jurors it wants off most.  The State also admitted that it would not allow a less desirable juror to become the alternate.

218.    These admissions, when compared to the State's pattern of strikes in this case, further show the State's disparate treatment of black jurors and show that its proffered reasons were only a pretext for removing blacks from the jury.

**F.      Relief Based on the New *Batson* Evidence**

219.    The Circuit Court found that the evidence introduced during this Rule 32 proceeding was <u>new</u> evidence.

220.    Then, the Circuit Court stated only one ground for avoiding granting Rule 32 relief based on the new <u>Batson</u> evidence: The Circuit Court held that "the substantive <u>Batson</u> claim is precluded from review because it was raised and addressed both at trial and on appeal."

221.    The Circuit Court's reading of the Alabama procedural rules in overruling Victor Stephens's Rule 32 petition on these <u>Batson</u> issues violates Victor Stephens's federal constitution rights. <u>Cf.</u> <u>Powers v. Ohio</u>, 499 U.S. 400, 411 (1991) ("racial discrimination in the selection of jurors casts doubt on the judicial process, . . . and places the fairness of a criminal proceeding in doubt"); <u>Batson v. Kentucky</u>, 476 U.S. 79, 87 (1986) ("Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice.").

222.    Under federal law, post-conviction relief based on new evidence <u>cannot</u> be precluded when the death penalty has been imposed and the right violated was the accused's right to a constitutionally composed jury.

223.    Here, the State's prosecutorial notes marking only black jurors, twice, with S and saying "need reason to strike" black jurors are new and direct evidence that the State purposefully excluded black jurors, resulting in an unconstitutionally composed jury. <u>Cf.</u> <u>Amadeo v. Zant</u>, 486 U.S. 214 (1988) (granting post-conviction relief where accused's trial counsel did not have actual knowledge of race discrimination affecting composition of jury, which was shown by prosecutor's notes).

224.    Victor Stephens was tried and sentenced to death by an unconstitutionally composed jury.   New evidence establishes the violation of Victor Stephens's right to a constitutionally composed jury.   Victor Stephens should be granted a writ of habeas corpus based on the constitutional violations.

## G.    The *Batson* Violation and Ineffective Assistance

225.    One point is obvious from comparing the trial and appellate records here with the record in <u>Ex parte Bird & Warner</u>, 594 So. 2d 676 (Ala. 1991).  The finding of a <u>Batson</u> violation in <u>Ex parte Bird & Warner</u> rested largely on defense counsel's effective cross-examination of the State.  <u>See</u> <u>id.</u> at 682-84 (quoting defense counsel's cross).  Victor Stephens's trial counsel, on the

other hand, did not attempt to cross-examine the State, much less effectively cross-examine the State, as to whether the State's proffered reasons were well founded.

226.    After the State struck so many jurors based on off the record information, the Trial Court prompted defense counsel by asking for "[c]ross examination." TR 396. Victor Stephens's trial counsel replied, "Judge, I'm not sure that I have any cross." Id. Unfortunately for Victor Stephens, his trial counsel did not have any cross, despite at least nine (jurors 9, 36, 39, 46, 47, 49, 59, 87 and 102) of the State's 21 strikes of blacks being based on off the record information.

227.    From the trial record, Victor Stephens's trial counsel did attempt to argue pretext, but did not know how to do so effectively. TR 396-99. He failed to argue that the State's proffered reasons based on off the record information were evidence of pretext and of racial discrimination. He did not even make the obvious point that the State should have had some unfavorable off the record information for the half of the jury venire that was white.

228.    Moreover, he failed to point out the significance of the State's not striking the white juror who served as the alternate despite on the record criminal connections. See TR 387-88 (only discussing how white alternate might change composition of jury).

229.     Adopting the Rule 32 Order drafted by the State, the Circuit Court held that Victor Stephens's trial counsel's performance was not deficient.  This finding is based on an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceeding.

230.     After describing generically the new evidence showing that the State had violated Batson, the Court dismissed all the new evidence with one comment: "Trial Counsel did not have the luxury of studying strike sheets while preparing to depose the prosecutor [Mr. Greene] who exercised the peremptory strikes." Id.

231.     First, an accused's trial counsel's performance is deficient if he does not conduct a reasonable investigation. Strickland v. Washington, 466 U.S. 688 (1984).  Victor Stephens's trial counsel did not cross-examine the State's Batson spokesperson, Mr. Greene, or take any other steps to investigate whether the State's proffered reasons were a pretext.  If Victor Stephens's trial counsel had handled the Batson issues in a reasonably professional manner, a Batson violation would have been found at trial, even without access to the State's strike sheets and the newly discovered direct evidence of race discrimination reflected thereon.

232.     Second, Victor Stephens's trial counsel's deficient performance was followed by the result on direct appeal.  Victor Stephens's trial counsel failed to have the State put its off the record information on the record.  Even if the Trial Court would not have recognized the Batson violation,

the Court of Criminal Appeals would have, if only Victor Stephens's trial counsel had taken some steps to put evidence on the record for an appeal.

233.    Third, Victor Stephens's trial counsel should have investigated the prosecution's strikes, including seeking the prosecutor's notes on the strike sheets.  Even if trial counsel might not have had the "luxury" of looking at the State's strike sheets, appellate counsel would have had time to study the strike sheets.  If Victor Stephens's trial counsel had been given access to the State's work product on its strike sheets, the direct appeal would have resulted in a reversal on the Batson issue.

234.    Victor Stephens's appellate counsel's performance on the direct appeal was deficient, too.  Despite the State's having struck at least nine black jurors based on off the record information, appellate counsel did not point out to the Court of Criminal Appeals that the State had impermissibly struck black jurors based on off the record information.  Consequently, the Court of Criminal Appeals wrongly assumed that the State's proffered reasons were well founded.  Stephens v. State, 580 So. 2d at 19 (discussing the State's proffered reasons for striking Minnie Spence, Sarah Harris and Gracie Lewis, among others, as well founded).  Without appellate counsel's deficient performance, the Court of Criminal Appeals would have known that the State's strikes were impermissibly based on off the record information.

235.    Furthermore, an appellate counsel's failure in a death penalty case to supplement the appellate record to support a Batson argument is itself a denial of effective assistance of counsel. Watkins v. State, 632 So. 2d 555 (Ala. Crim. App. 1992). Therefore, Victor Stephens's appellate counsel was ineffective because appellate counsel did not supplement the trial record with the State's information showing whether the State's strikes based on off the record information were well founded. Watkins v. State, 632 So. 2d 555, 559-564 (Ala. Crim. App. 1992) (holding that Alabama appellate courts in a death penalty case "will not give any force to any authority that would authorize the omission from the transcript of any portion of the proceedings pertaining to [a Batson] issue"). See Carr v. State, 640 So. 2d 1064, 1070 (Ala. Crim. App. 1994) (Court of Criminal Appeals's obtaining the parties' strike sheets to avoid a later argument based on appellate counsel's failure to supplement the record). For this additional reason, Victor Stephens was denied effective assistance of counsel on direct appeal.

236.    Because Victor Stephens's trial and appellate counsel did not effectively represent him on the Batson issues, he is entitled to a writ of habeas corpus. Central Alabama Fair Housing Center, Inc. v. Lowder Realty Co., 236 F.3d 629, 639 n.3 (11th Cir. 2000) (holding that Supreme Court precedent requires automatic reversal without showing of prejudice for Batson violation); Ex parte Yelder, 575 So. 2d 137, 139 (Ala. 1991), cert. denied, 502 U.S. 898 (1991) ("prejudice is presumed where Batson violations are established in the context of a charge of ineffective counsel"); Dinkins v. State, 701 So. 2d 302, 303 (Ala. Crim. App. 1995) (same).

## V.      ADDITIONAL GROUNDS FOR RELIEF

237.    Victor Stephens is entitled to relief on grounds in addition to those discussed above. These additional substantive grounds for relief are also in the Rule 32 Petition, which is incorporated by reference.

### A.      <u>Lesser Included Offenses (Claim B)</u>

238.    The jury instructions on the lesser included offenses were wrong, as explained below. Moreover, during the post-conviction appeal, the Court of Criminal Appeals gave one reason for rejecting this ground: Rule 32.2(a)(3).  (The State waived other grounds for preclusion by failing to raise them.)  The Court of Criminal Appeals said that Victor Stephens "failed to sufficiently object at trail and state grounds for his objection."

239.    Based on the plain error review of Rule 45A, however, this reason cannot be the basis for denying Rule 32 relief, especially when the issue was raised and considered on direct appeal. Therefore, this claim is not precluded and, as explained below, Victor Stephens is entitled to a writ of habeas corpus.

240.    Moreover, the trial record reflects that, after the jury charges, Victor Stephens's trial counsel objected adequately.   <u>See</u> R851 (objecting to "the failure of the Court to give the manslaughter charge and I renew my objection").  <u>Cf. Molton v. State</u>, 651 So.2d 663 (Ala. Crim. 1994) (explaining requirements for preserving objections related to not giving charges for lesser

offenses). For this additional reason, the Circuit Court's opinion is based on an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceedings.

241. The Trial Court's failure to instruct the jury on the lesser included offenses violated Victor Stephens's rights to due process, equal protection, a fair trial, a jury and a reliable sentencing procedure under the United States Constitution (Claim B & Claim G, ¶ 81(c)).

242. At Victor Stephens's trial, the Trial Court should have charged the jury on the lesser included offenses of reckless murder and felony murder (non-capital robbery-murder), neither of which are capital offenses under Alabama law. Because no reasonable jury could find that Victor Stephens participated in murder without also finding that he participated in robbery, in effect no charge for a lesser offense was given.

243. The Trial Court also violated Victor Stephens's constitutional rights when it presented the jury with an incomplete and confusing charge on capital robbery-murder and intentional murder. The confusion was made worse by the lack of any basis for a jury to find Victor Stephens guilty of intentional murder without also finding him guilty of robbery and thus of capital robbery-murder.

### 1.    No Reckless or Felony Murder Charges

244. The Trial Court's failure to instruct on either reckless murder or felony murder, and the Trial Court's incomplete and confusing charge on capital robbery-murder and intentional murder,

ensured that Victor Stephens would be found guilty of capital robbery-murder rather than a non-capital offense. This, in turn, unnecessarily subjected Victor Stephens to the death sentence he received when the Trial Court overrode the jury verdict of life imprisonment without parole.

245.    The United States Supreme Court has reaffirmed that, in capital cases, the jury must be given the opportunity to convict a defendant of a lesser included offense in any case in which the evidence warrants such an instruction and that the failure to give the jury such an opportunity violates the capital defendant's Fourteenth Amendment Due Process rights.  Schad v. Arizona, 501 U.S. 624 (1991); see Hopper v. Evans, 456 U.S. 605, 610 (1982); Beck v. Alabama, 447 U.S. 625, 627 (1980).

246.    A lesser included instruction is required, regardless of whether the State or the defendant offers the evidence warranting such an instruction, whenever the evidence would permit a jury rationally to find a defendant guilty of the lesser offense and acquit him of the greater one.

247.    Victor Stephens was indicted on two counts of capital robbery-murder, a capital offense which includes robbery in the first degree and intentional murder.  See Ala. Code § 13A-5-40(a)(2).  According to the Alabama capital punishment statute, a defendant charged with capital robbery-murder is entitled to a jury charge on a lesser included offense of "murder" whenever there is a rational basis for such an instruction.  See Ala. Code § 13A-5-41.

248.    Under Alabama law, there are three types of non-capital "murder" that are statutory lesser-included offenses of capital robbery-murder: (1) intentional murder, Ala. Code § 13A-6-2(a)(1); (2) reckless murder, Ala. Code § 13A-6-2(a)(2); and (3) felony murder, Ala. Code § 13A-6-2(a)(3).  See also Ala. Code § 13A-5-40(b).

249.    Victor Stephens was thus constitutionally entitled to a jury charge of the lesser included offenses of both reckless murder and felony murder, charges that were clearly supported by the evidence.  While reckless murder was rejected outright by the Trial Court with no discussion, the State somehow convinced the Trial Court that there is no difference between intentional murder during a robbery (i.e., capital robbery-murder) and felony murder (i.e., noncapital robbery-murder). TR 782.

250.    Neither reckless murder nor felony murder require a finding of intent to kill.  See Ala. Code § 13A-2-2(3) (a person acts "recklessly" when "he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists") & § 13A-6-2(a)(3) (felony murder occurs when during the commission of an enumerated felony a person "causes the death of any person").

251.    At Victor Stephens's trial, there was compelling evidence that the killings were the unintended consequence of Mr. Bailey's drawing and firing his shotgun after Victor Stephens entered the store.  This evidence included Victor Stephens's three statements, which the State presented to

the jury. TR 619, 626-27 & 669-670. Such evidence clearly negated intent and thus supported a jury instruction of either reckless murder or felony murder.

252.     The evidence of an unintentional killing was so strong that the Trial Court actually instructed the jury on self defense. TR 829-830. See Beck v. Alabama, 447 U.S. 625 (1980) (holding that accused's due process rights require jury charge on a lesser included murder offense when self-defense charge given); Williams v. State, 675 So. 2d 537, 541-42 (Ala. Crim. App. 1996) (holding that lesser included murder charges are required where the jury might find an imperfect self-defense defense).

### 2.     The Confusing Intentional Murder Charge

253.     Effectively, the Trial Court only charged the jury on the components of the capital offense of capital robbery-murder (which combines both robbery in the first degree and intentional murder). The remainder of the Trial Court's jury charge regarding lesser included offenses was incorrect and confusing. After charging the jury on capital robbery-murder, the Trial Court rejected all lesser-included offenses except for one generically referred to as "murder." TR 847.

254.     The Trial Court did not specify which of the three degrees of murder he was referring to -- intentional murder, reckless murder, or felony murder. The charge he gave, however, appears to be one of intentional murder:

> A person commits the crime of murder if, one, he causes the death of another person, and in performing the act or acts which caused the death of the person he <u>intended</u> to kill that person or another person.

TR 838 (emphasis added).   <u>Cf.</u> <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990) (when jury instructions in death penalty case are ambiguous, the constitutional test is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence").

255.   In context, this charge was confusing.   Immediately after being charged with the "intentional murder" prong of capital robbery-murder, the jury was charged with the lesser-included offense of intentional murder.   That meant that the jury heard identical back-to-back charges of intentional murder, without any explanation as to the distinction.

256.   Based on these charges, there is a reasonable likelihood that the jury believed that they were the same charge.   Based on the evidence at trial, no reasonable jury could have found that Victor Stephens committed intentional murder unless that jury also found that he participated in the robbery.   In context, the jury could not have understood that the intentional murder charge was a lesser separate offense, but instead would have thought that the intentional murder charge was the Trial Court restating a prong of the capital robbery-murder instruction.

257.   This problem was exacerbated because the Trial Court never charged the jury that a conviction on the lesser included offense of intentional murder meant that Victor Stephens would

not be eligible for the death penalty.  He only told them that there was a "lesser included offense",
TR 838, without defining "lesser included offense."  Because capital robbery-murder combines the
elements of robbery in the first degree and intentional murder, this failure was inherently confusing.

258.    Another problem is that the Trial Court imbedded, in the middle of the intentional
murder charge, the Trial Court's self defense charge.  TR 838-840.  The self-defense charge,
however, was not included in the intentional murder prong of the capital robbery-murder charge.
For this reason, if a juror understood that intentional murder was a separate offense, the evidence
supporting self-defense would be relevant only in context of the intentional murder charge.  Such
a juror finding an imperfect self-defense would have rejected intentional murder and had no choice
but capital robbery-murder.  Based on this ambiguity, there also is a reasonable likelihood that the
jury applied this charge improperly.

259.    The jury was therefore given a choice that essentially ensured a conviction on a
capital offense, if the jury wanted to convict.  Based on the Trial Court's confusing charge, there is
a reasonable likelihood that the jury concluded that there was only one charge of murder available
in the form of capital robbery-murder.

260.    The confusing nature of the charge on intentional murder effectively meant the jury
was not charged on any lesser included offense.  Consequently, failure to adequately charge the jury
on  intentional  murder  violated  Victor  Stephens's  due  process  rights  under  the  Fourteenth

Amendment.  See Schad v. Arizona, 501 U.S. 624, 645-648 (1991) (jury charge will violate a defendant's due process rights when charge creates a risk of an unwarranted capital conviction by giving the jury a choice between a capital conviction and acquittal).

261.    Finally, the Trial Court confused matters more by charging the jury not to consider punishment.  TR 828.  A jury convinced that Victor Stephens was guilty of robbery and of murder, but unconvinced of the State's evidence of intent to kill, would be put to a difficult choice.  Without intent to kill, neither intentional murder nor capital robbery-murder are supported by the evidence.  Nonetheless, capital robbery-murder would seem to be more supported by the evidence.  Such a jury, instructed to ignore issues of punishment, would reasonably chose the capital offense that would be more supported by the evidence over the non-capital offense that would be less supported by the evidence.

262.    By charging the jury to ignore issues of punishment, the Trial Court effectively deprived the jury of their right to choose the "third option" between a capital offense and acquittal in the event they were unconvinced by the State's proof of Victor Stephens's intent to kill.

263.    Thus, the Trial Court's failure to instruct on reckless murder and felony murder and its incorrect, confusing and ambiguous charge on capital robbery-murder and intentional murder deprived Victor Stephens of rights secured by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

1/625307.1

75

**B.**     <u>Jury Nullification (Claim C)</u>

264.     The Court of Criminal Appeals held that this claim was precluded by Rules 32(a)(3) and (5).  First, Rule 32(a)(3) should not apply based on Rule 45(a), because jury charge issues are plain error and this issue was raised and considered on appeal.  Moreover, the trial record reflects that, after the jury charges, Victor Stephens's trial counsel objected adequately.  <u>See</u> R851 (objecting to "the failure of the Court to give the manslaughter charge and I renew my objection").

265.     Victor Stephens pointed out to the Court of Criminal Appeals that the Circuit Court erroneously barred Claim C for not being raised on appeal under Ala. R. Crim. P. 32.2(a)(5).  Claim C is based on Victor Stephens's right under <u>Beck v. Alabama</u>, 477 U.S. 625 (1980), to have proper jury charges on lesser included offenses for possible jury nullification of a capital offense.  This claim, without dispute, was raised during the initial appeal.  <u>See</u> Application for Rehearing and Brief in Support of Application for Rehearing (filed March 29, 1991) at 6 (explaining that not instructing the jury on felony-murder "deprived Mr. Stephens of his due process rights guaranteed under <u>Beck v. Alabama</u>, 477 U.S. 625 (1980), and applicable state law.")  Therefore, Claim C was not procedurally barred under Rule 32.2(a)(5), either.

266.     The Trial Court's charge to the jury precluded the jury from exercising its right to nullification in violation of Victor Stephens's right to trial by jury and due process of law under the Alabama Constitution and the Sixth and Fourteenth Amendments to the United States Constitution (Claim C & Claim G, ¶ 81(l)).  <u>See</u> <u>Beck v. Alabama</u>, 447 U.S. 625 (1980) (holding that jury

1/625307.1

76

instruction on non-capital offense is required if any evidence could support such a charge); cf. United States v. Funches, 135 F.3d 1405, 1408-09 (11th Cir. 1998) (holding that jury has no general right of nullification).

267.    The right to trial by jury in criminal cases is embodied in Article III and in the Sixth Amendment of the United States Constitution.  At the time of the drafting of the Constitution, the jury played a crucial role in determining the sentence of a defendant in a criminal trial.  This practice was the subject of legal commentary at the time.  See, e.g., The Federalist No. 83, at 543 (A. Hamilton) (Moderns Library ed. 1937).

268.    This point is made in Jack B. Weinstein, "Considering Jury 'Nullification': When May and Should a Jury Reject the Law To Do Justice", 30 Am. Crim. L. Rev. 239 (1993), Welsh S. White, "Fact-Finding and the Death Penalty:  The Scope of A Capital Defendant's Right to Jury Trial", 65 Notre Dame L. Rev. 1 (1989), and Thomas Andrew Green, Verdict According to Conscience, The University of Chicago Press (1985), all of which appeared after Spaziano v. Florida, 468 U.S. 447 (1984).

269.    Called "jury nullification," the procedure is in effect today, as it was at the time of passage of the Constitution.  Stated simply, the practice involved the jury acquitting defendants (when charged by the court to determine their guilt or innocence), or finding defendants guilty of

lesser included offenses, in order to avoid the heinous penalties (often death) attached to the crimes with which the defendants were charged.

270.    At the outset of the case in the opening statement of counsel, the jury was informed that they were to determine the guilt or innocence of the accused.  Just before the jury retired to determine Victor Stephens's guilt or innocence, however, at a time in a conventional trial when they could have exercised their option of nullification by finding Victor Stephens guilty of a lesser included offense rather than capital murder, the Trial Court gave the following charge:

> The law provides that if a defendant is convicted of a capital offense, additional proceedings will be held to determine whether his punishment is to be life imprisonment without parole or death.  But you are not to concern yourselves at this time with any issue of punishment.

TR 828.

271.    Only <u>after</u> the trial on guilt or innocence did the jurors learn that their determination on sentencing would be a "recommendation," "advisory" to the Trial Court who would make the "ultimate decision" as to whether the defendant is "sentenced to death or sentenced to life without parole."  TR 859.  The jurors were, in effect, deprived of any opportunity to exercise nullification, a traditional component of trial by jury.

272.    The Alabama statute does not require that the jury be informed before their deliberations of guilt or innocence that their later sentencing function is merely advisory and does

not preclude the Trial Court from mentioning the later sentencing function at this stage. Therefore, the Alabama capital procedure seems almost designed to frustrate the process of jury nullification. But cf. Harris v. Alabama, 513 U.S. 504 (1995) (upholding constitutionality of other aspects of Alabama's override statute).

273.    This sequence effectively deprived the jury of their nullification option in a death penalty case. Unless reversed by this Court, the sequence deprived Victor Stephens of his life. The process was a denial of Victor Stephens's right to due process and to trial by jury.

### C.   Standardless Override of Jury (Claim D)

274.    The Court of Criminal Appeals held that this claim was only precluded under Rule 32.2(a)(3). Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply, especially since this issue was raised on appeal. Because the State waived all other grounds of preclusion, this claim was not precluded.

275.    The Trial Court's override of the jury's recommendation of life imprisonment without parole violated Victor Stephens right to due process, equal protection and a reliable sentencing hearing (Claim D & Claim G, ¶ 81(g)). Alabama permits a trial court to impose a sentence of death by overriding a jury's recommendation for life imprisonment without parole without any standard of review. See Harris v. Alabama, 513 U.S. 504 (1995) (upholding the constitutionality of Alabama's override scheme). As applied in this case, however, the standardless imposition of the

death penalty violated Victor Stephens's jury trial, due process and equal protection rights and the prohibition against cruel and unusual punishments as guaranteed by the Alabama laws and Constitution and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

276.   The Trial Court imposed a sentence of death upon Victor Stephens after the jury returned a verdict of life imprisonment without parole at the sentencing phase.  In overruling the jury, the Trial Court used a Sentencing Order verbatim that was drafted ex parte by the State.

277.   This Sentencing Order has numerous factual and legal errors, as discussed elsewhere. Especially because the Trial Court considered the same evidence as was before the jury, these errors show that Ala. Code § 13A-5-47, as applied to Victor Stephens, violated his rights to due process, equal protection and a reliable sentencing hearing in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**D.      Finding of Aggravating Circumstances (Claim E)**

278.   The Court of Criminal Appeals held that this claim was precluded under Rule 32(a)(3) and (5).  Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply here.

279.   The Trial Court made an erroneous finding of an aggravating circumstance that denied Victor Stephens his right to a reliable sentencing proceeding (Claim E & Claim G, ¶ 81(b)). This error deprived Victor Stephens of his rights under Ala. Code § 13A-5-47(d) and the Eighth and

Fourteenth Amendments to the United States Constitution.  See Epinosa v. Florida, 505 U.S. 1079 (1992) (weighing invalid aggravating factor violates Eighth Amendment).

280.    The Trial Court found the first of two aggravating circumstances based on the Trial Court's erroneous acceptance of the State's pellet inside the barrel argument. Ala. Code § 13A-5-47(d) requires the Trial Court to "enter written findings of facts summarizing the crime and the defendant's participation in it."

281.    The Trial Court found that Victor Stephens had to have shot Mr. Bailey first, based solely on the evidence of a pellet supposedly found inside the barrel of Victor Stephens's .25 pistol. The Trial Court wrote "Forensic evidence revealed that a No. 8 shot pellet was removed from the barrel of the .25 caliber automatic pistol." (emphasis added).  The finding that a pellet was "removed from the barrel of the weapon", was based on an unreasonable determination of the facts in light of the evidence presented at the Rule 32 proceeding.

282.    No one, including Dr. McDuffie, testified that a pellet was "removed from the barrel of the" .25 pistol.  Rather, Dr. McDuffie only testified that the pellet "fell out" of the pistol. TR 557.

283.    In addition, the State offered evidence that there were numerous pellets on the floor of the Bailey Store in and around the area where the .25 pistol was recovered.  TR 555-57, 576.

284. There are numerous theories which could explain the existence of the pellet. <u>See</u>, <u>supra</u>, pp. 11-41 (discussing new evidence showing that the Trial Court's factual finding was wrong).

285. Moreover, the Trial Court's factual finding is contradictory to other evidence offered by the State. The autopsy performed on Mr. Bailey by the State's pathologist, Dr. Joseph Embry, revealed that Mr. Bailey was killed almost instantly after being shot three times -- once in the face, once in the abdomen, and twice in the chest. One of the chest bullets went through Mr. Bailey's heart, diaphragm, liver and stomach. TR 496-97.

286. Taking this evidence as true, it would have been almost impossible for Mr. Bailey to fire his shotgun at Victor Stephens after suffering these wounds. If we were to accept the Trial Court's findings of fact, the following would have had to have occurred: Mr. Bailey, <u>after</u> sustaining these fatal gunshot wounds, then would have had to be able to lift his shotgun, aim at Victor Stephens and fire his weapon, hitting Victor Stephen's .25 pistol and left hand, while also lodging a shotgun pellet into the barrel of Victor Stephens's handgun. Once again, the Trial Court never addressed how such a completely implausible and unreasonable circumstance could have occurred.

**E.    Reasonable Doubt Charge (Claim H)**

287. The Court of Criminal Appeals held that this claim was only precluded under Rule 32.2(a)(3). Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply, especially since this issue

was raised on appeal.  Because the State waived all other grounds of preclusion, this claim was not precluded.

288.    The Trial Court violated Victor Stephens's rights to due process and to a fair trial when it charged the jury that to acquit Victor Stephens it must have "an actual and substantial doubt" as to his guilt and to find him guilty to a "moral certainty".  TR 832-33 (Claim H & Claim G, ¶ 81(d)).  The Trial Court's jury charges had the effect of relieving the State of its burden of proof beyond a reasonable doubt as to each essential element of the crimes of which Victor Stephens was convicted.

289.    The U.S. Supreme Court recently decided a case almost exactly on point.  Cage v. Louisiana, 498 U.S. 39 (1990) (per curiam).  See also Victor v. Nebraska, 511 U.S. 1 (1994) (explaining the holding in Cage).  In Cage, the Court summarily reversed a conviction where the Trial Court had improperly instructed the jury on the element of reasonable doubt.

290.    The instruction under review in Cage provided as follows:

If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty.  Even where the evidence demonstrated a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused.  This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible basis and not upon mere caprice and conjecture.  *It must be such doubt as would give rise to a grave uncertainty*, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof.  A reasonable doubt is not mere possible doubt.  *It is an actual substantial doubt.*  It is a doubt that a reasonable

man can seriously entertain.  What is required is not an absolute or mathematical
certainty, but a *moral certainty*.

Cage, 498 U.S. at 40 (emphasis by Supreme Court).

291.    In holding this charge unconstitutional, the Supreme Court commented as follows:

It is plain to us that the words "substantial" and "grave," as they are commonly
understood, suggest a higher degree of doubt than is required for acquittal under the
reasonable doubt standard.  When those statements are then considered with the
reference to "moral certainty," rather than evidentiary certainty, it becomes clear that
a reasonable juror could have interpreted the instruction to allow a finding a guilt
based on a degree of proof below that required by the Due Process Clause.

Id. at 41 (footnote omitted).

292.    Accordingly, the Supreme Court concluded that there was a reasonable likelihood that

the jury interpreted the instruction to allow a finding of guilt based on a degree of proof below that

required by Due Process Cf. Estelle v. McGuire, 502 U.S. 62, 73 n.4 (1991) (clarifying that the

standard of review is whether there is a reasonable likelihood that the jury applied the charge

improperly).

293.    At Victor Stephens's trial, the Trial Court used almost exactly the words that Cage

held are commonly understood to denote a higher degree of doubt.  The Trial Court stated that "the

doubt which would justify an acquittal must be an actual and substantial doubt." TR 832 (emphasis

added).  The Trial Court told the jury that to acquit the jury must have "a reasonably substantial

doubt." TR 832 (emphasis added). In addition, the Trial Court, at several points, equated beyond a reasonable doubt with "to a moral certainty." TR 833 (emphasis added).

294.    As a result of these erroneous jury instructions, there is a reasonable likelihood that the jury found Victor Stephens guilty without "reaching the subjective state of certitude" required by due process. <u>Johnson v. Louisiana</u>, 406 U.S. 356, 360 (1972) (citations and internal quotations omitted). The similarity between <u>Cage</u> and the present case shows that the Trial Court violated Victor Stephens's due process rights and his conviction and sentence of death must be vacated.

**F.    Coerced Statements (Claim I)**

295.    The Court of Criminal Appeals held that this claim was only precluded under Rule 32.2(a)(2). Based on Ala. R. App. P. 45(a), Rule 32(a)(2) does not apply, especially since this issue was raised on appeal. Because the State waived all other grounds of preclusion, this claim was not precluded.

296.    Coerced statements that were obtained illegally from Victor Stephens were later admitted into evidence at his trial (Claim I & Claim G, ¶ 81(f)). This evidence violated Victor Stephens's rights secured by Art. I, § 6 of the Alabama Constitution and the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

297.    Victor Stephens did not and could not voluntarily waive his rights to remain silent and to have counsel provided for him during police interrogations, which resulted in two signed statements being admitted into evidence at his trial. Rather, the statements were coerced from Victor Stephens by the police interrogators while Victor Stephens was in great physical pain and while medical attention was purposely withheld in order to obtain the statements. TR 25-62.

298.    The evidence adduced at trial made clear that Victor Stephens was admitted to Carroll County Hospital on January 21, 1986 with a shotgun wound to his left hand. Surgery to remove the shotgun pellets could not be performed at that time due to massive swelling. The attending physician, Dr. Fleck, decided that surgery could not yet be performed on the wound.

299.    Nonetheless, Victor Stephens was removed from the hospital two days later by law enforcement personnel and brought to the Carroll County Jail, where he was promptly thrown in "the hole" (isolation) and denied medical treatment for his hand. Victor Stephens was told that he would be given medical treatment only after he gave a statement to the police, despite his physical pain.

300.    At no time was Victor Stephens given any medication to alleviate the pain in his hand while he was in custody at the Carroll County Jail. On February 14, 1986, Dr. Fleck surgically removed numerous shotgun pellets from Victor Stephens's left hand.

301.    Withholding of medical treatment from Victor Stephens in exchange for incriminating statements rendered invalid Victor Stephens's signed statements and waiver of his constitutional rights to remain silent and to have counsel present during questioning. The failure to respect Victor Stephens's rights violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### G.    Prosecutorial Misconduct (Claim J)

302.    The Court of Criminal Appeals held that this claim was only precluded under Rule 32.2(a)(3). Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply, especially since this issue was raised on appeal. Because the State waived all other grounds of preclusion, this claim was not precluded.

303.    The State prosecutor engaged in numerous acts of misconduct in violation of Victor Stephens's federal constitutional rights (Claim J & Claim G, ¶ 81(h)). These acts of misconduct included, but are not limited to, the following:

304.    At Victor Stephens's trial, the State made an improper reference to the substance of Christopher Starks's statement, in direct violation of Bruton v. United States, 391 U.S. 123 (1968). During the closing argument, the State made the following remarks regarding Christopher Starks' testimony:

> Now in the course of this trial, there was some evidence about an eyewitness and there was a comment from the witness stand concerning the fact, that wait a minute, there's another eyewitness. You can only speculate as to what he had to say. You're not going to know anything about what he said or didn't say. Now this man's codefendant is not saying, "Oh, yeah, it was my idea, I'm the guilty one." You can bet your bottom dollar he's pointing the finger at him saying, "no, he lead us into it." So what is this statement? It is that, "I was there, I was involved with it," and he's covering up what he really did and that is that both of those men went in there to rob and do whatever was needed to get money from those two old men . . .

TR 818-19 (Victor Stephens's trial counsel failed to object). Earlier in the trial, the Trial Court had specifically precluded the State from questioning an investigative officer on Christopher Starks's statement, exclaiming "I can't do that. I cannot do that. I can't let Starks's out-of-court statement -- I just can't do that. I think that's rank hearsay in one respect." TR 651.

305.    The State's use of Christopher Starks's statement denied Victor Stephens the right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. Bruton v. United States, 391 U.S. 123 (1968); Douglas v. Alabama, 380 U.S. 415 (1965). The highly prejudicial nature of the prosecutor's statement, namely that Christopher Starks pointed the finger at Victor Stephens, requires reversal in this case.

306.    The State also committed an act of misconduct when he improperly shifted the burden of proof in the case, in violation of Sandstrom v. Montana, 442 U.S. 510 (1979). The State remarked during closing argument:

> He got up his closing argument, and keeps trying to talk about holes somewhere. Yet he never proved a single piece of evidence about anything connecting with that. He's supposed to give you some idea and you're supposed to believe that somewhere they

had this man down in a hole beating on him with sticks to make him confess. That's what you're supposed to believe. But he hasn't proved anything like that. . . He hasn't proved anything like that because it doesn't exist. . . He hasn't proved any of it. I get awfully tired of coming up here listening to that kind of defense. Where is his defense in this case? What is he defending this man on?

TR 814-15 (emphasis added). Counsel objected to this line of argument, claiming that it improperly shifted the burden of proof and penalized Victor Stephens for asserting his right to counsel. TR 815; see also TR 824 "[Victor Stephens's trial counsel's] got no right to sit over there and claim there's something wrong with this case.").

307.    These remarks improperly shifted the burden of proof in general and, in particular, the burden of proving the involuntariness of a statement, in violation of Victor Stephens's right to due process. The remarks also amounted to an indirect comment on the defendant's failure to take the stand and testify, in violation of his Fifth Amendment privilege against self-incrimination.

308.    The State also engaged in an act of misconduct when he questioned Victor Stephens during the sentencing phase of the trial about a crime for which Victor Stephens has never been convicted. TR 870-71. The State improperly accused Victor Stephens of the murder of Mr. Robert Saxon, a Carroll County, Georgia, grocery store-owner who was shot and killed during a robbery in November of 1985. TR 870. See TR 870-71 (Victor Stephens's trial counsel objecting). No evidence has ever linked Victor Stephens with this crime.

### H.   Reliance on a Subsequent Conviction (Claim K)

309.   The Court of Criminal Appeals held that this claim was only precluded under Rule 32.2(a)(3).  Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply, especially since this issue was raised on appeal.  Because the State waived all other grounds of preclusion, this claim was not precluded.

310.   The Trial Court improperly relied on a subsequent conviction to reject the jury's recommendation of life imprisonment without parole in violation of Victor Stephens's state and federal constitutional rights (Claim K & Claim G, ¶ 81(i)).  Victor Stephens was convicted of first degree robbery and attempted murder on October 20, 1987, in Randolph County, Alabama, and sentenced to life imprisonment without parole.  This conviction was obtained nine months __after__ Victor Stephens allegedly participated in the events leading to this case (January 20, 1986).

311.   Nevertheless, the Trial Court used the Randolph County conviction as an aggravating factor.  The Trial Court said that "the Defendant was previously convicted of a felony involving the use or threat of violence to the person."

312.   Under the Alabama capital sentencing statute, it is an aggravating circumstance that "[t]he defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person." Ala. Code § 13A-5-49 (emphasis added).  The plain meaning of this provision is clear from the language employed: The defendant must have been convicted of

another violent crime prior to <u>committing</u> the capital offense charged.  <u>Cf.</u> <u>Berard v. State</u>, 402 So. 2d 1044, 1050 (Ala. Crim. App. 1980) (holding that criminal statutes are to be strictly construed, especially in death penalty cases).  <u>But see</u> <u>Ex parte Coulter</u>, 438 So. 2d 352 (Ala. 1983) (allowing consideration of conviction occurring after alleged capital crime but before sentencing).

313.    In the context of the seven other possible statutory aggravating circumstances, it is clear that the defendant must have been <u>convicted</u> of a violent crime at the time he <u>commits</u> the capital offense charged.  Also, the purpose of the aggravating circumstance -- namely, to deter repeat violent offenders -- is only served if the defendant was previously convicted <u>and</u> punished for the previous violent crime.

314.    In Victor Stephens's case, the Trial Court listed the Randolph County conviction as an aggravating circumstance.  But this conviction took place <u>after</u> the commission of the Hale County crimes.  The Trial Court believed that the Randolph County conviction was proper for consideration at sentencing so long as it occurred prior to sentencing.

315.    The result is that a defendant accused of a capital crime must rush his most serious charge to trial or risk the State building aggravating circumstances to go for the death penalty.  The State cannot have a process that penalizes an accused for needing time to investigate or to argue pretrial motions or otherwise respond to a capital charge.

1/625307.1

91

316.     Accordingly, the Trial Court's reliance on a subsequent conviction as an aggravating circumstance to reject the jury's verdict of life imprisonment without parole deprived Victor Stephens of his rights to due process , equal protection and a speedy trial, and to be free from cruel and unusual punishment, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

## I.     Death by Electrocution (Claim L)

317.     The Court of Criminal Appeals held that this claim was only precluded under Rule 32.2(a)(3). Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply, especially since this issue was raised on appeal.  Because the State waived all other grounds of preclusion, this claim was not precluded.

318.     Death by electrocution as applied by the State of Alabama constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States and article 1, section 15 of the State of Alabama (Claim L & Claim G, ¶ 81(c)). Furman v. Georgia, 408 U.S. 238 (1972) ("[N]o court would approve any method of implementation of the death sentence found to involve unnecessary cruelty in light of presently available alternatives."); cf. Lindsey v. Smith, 820 F.2d 1137, 1155 (11th Cir. 1987) (holding that electrocution generally is not cruel and unusual punishment).

319.     In the case of <u>Jackson v. State</u>, 516 So. 2d 726 (Ala. Crim. App. 1985), the Court of Criminal Appeals cites the unpublished order entered June 3, 1983, by Judge Sam C. Pointer in the case of <u>Raines v. Smith</u>, Docket No. 83-P-1080-S (N.D. Ala.), stating that over a period of 50 years the Alabama electric chair had been used approximately 154 times with but one failure, that involving the multiple shocks needed to execute John Lewis Evans.  However, since that time, there have been other instances where it has become necessary to repeatedly electrocute an individual in order to carry out the sentence of death.

320.     Recent executions by the State have required more than one application of the electrical charge to be administered before the individual was declared dead.  This failure to impose a swift death through the means of electrocution in the Alabama electric chair has been allegedly traced to faulty equipment and inexperienced executioners.  Def. Ex. 7.

321.     No evidence in the record suggests that these problems have been ameliorated.  For this reason, the Trial Court's finding that death by electrocution does not constitute cruel and unusual punishment, was based on an unreasonable determination of the facts in light of the evidence presented during the Rule 32 proceeding.

322.     For these reasons, the method of death by electrocution as applied by the State of Alabama is cruel and unusual punishment under the Constitution of the United States and cannot be applied to Victor Stephens in this case.

1/625307.1

**J.**     **Prejudicial Photographs (Claim M)**

323.     The Court of Criminal Appeals held that this claim was precluded under Rule 32(a)(3) and (5). Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply here.

324.     Highly prejudicial photographs of the victims after their deaths were used improperly and violated Victor Stephens's rights to a fair trial and due process of law (Claim M & Claim G, ¶ 81(m)). The prosecutor at Victor Stephens's trial published a series of highly inflammatory and prejudicial post mortem photographs of the victims to the jury. These were color photographs of the victims as they were found at the crime scene. TR 488-505.

325.     The introduction of these photographs was not probative of anything relevant to the trial and was highly inflammatory and prejudicial. The photographs were published to the jury for no other purpose other than to elicit a shocked reaction by the jury. Cf. Beck v. Alabama, 447 U.S. 625, 637-38 (1980) (death penalty must be imposed on the basis of "reason" not "emotion").

326.     The State's purpose in publishing the photographs was to have the jury react emotionally. Therefore, Victor Stephens's rights to a fair trial and due process of law as protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, were violated by the use of these photographs in this manner.

### K.   Mental or Emotional Disturbance (Claim N)

327.   The Court of Criminal Appeals held that this claim was precluded under Rule 32(a)(3) and (5).  Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply here.

328.   The Trial Court failed to find the existence of the statutory mitigating circumstance that Victor Stephens was under the influence of extreme mental or emotional disturbance at the time of the commission of the offenses (Claim N & Claim G, ¶ 81(u)).  The Trial Court rejected the statutory mitigating circumstance that "the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance."  Ala. Code § 13A-5-51 (2). C450-51.

329.   The evidence adduced at trial supported the finding of this mitigating circumstance.  Such evidence included, but was not limited to, Victor Stephens's prolonged drug and alcohol abuse and his difficult family history and emotional disturbance.  TR 619, 866-68 & 873-74.

330.   The Trial Court did not consider this evidence in support of the existence of this mitigating circumstance.  See Murray v. State, 562 So. 2d 1348, 1360 (Ala. Crim. App. 1988) (remanding case where trial court did not make specific findings concerning mitigating factors).  The failure of the Trial Court to find this mitigating circumstance deprived Victor Stephens of a fair trial and a reliable sentencing hearing in violation of his federal constitutional rights.

**L.**     **Appreciate Criminality of Conduct (Claim O)**

331.     The Court of Criminal Appeals held that this claim was precluded under Rule 32(a)(3) and (5).  Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply here.

332.     The Trial Court failed to find the existence of the statutory mitigating circumstance that the capacity of Victor Stephens to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (Claim O & Claim G, ¶ 81(u)).  A statutory mitigating circumstance may be that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Ala. Code § 13A-5-51(6).

333.     The record had substantial evidence that Victor Stephens was heavily under the influence of alcohol and drugs on the day of and at the time of the commission of the offenses.  TR 619, 626, 669-690, 779 & 879.  The Trial Court did not consider this evidence in support of the existence of this mitigating circumstance.  See Murray v. State, 562 So. 2d 1348, 1360 (Ala. Crim. App. 1988) (remanding case where trial court did not make specific findings concerning mitigating factors).  The failure of the Trial Court to find this mitigating circumstance deprived Victor Stephens of a fair trial and a reliable sentencing hearing in violation of his federal constitutional rights.

**M.**   **Non-Statutory Aggravating Factor (Claim III)**

334.   The Court of Criminal Appeals held that this claim was precluded under Rule 32(a)(3) and (5).  Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply here.

335.   The Trial Court improperly relied on a non-statutory aggravating factor in imposing the death penalty (Claim III & Claim VII, ¶ 21(D)).  This reliance denied Victor Stephens his right to a reliable sentencing proceeding in violation of the Alabama Code, the Constitution of Alabama and the United States Constitution.

336.   Under Alabama's death penalty scheme, a trial court is limited to considering the aggravating factors explicitly listed in the statute at Ala. Code § 13A-5-35 (1975).  Ponder v. State, 688 So. 2d 280, 285 (Ala. Crim. App. 1996); Bush v. State, 523 So. 2d 538, 560-61 (Ala. Crim. App. 1988); Berard v. State, 402 So. 2d 1044 (Ala. Crim. App. 1980).

337.   The Trial Court placed strong emphasis in its Sentencing Order on the State's pellet-in-the-barrel argument and on Victor Stephens having fired first.  While this circumstantial evidence was discussed in the section of the Sentencing Order on the statutory "course of robbery" aggravating factor, it is irrelevant to this factor.

338.   Instead, the Trial Court discussed who fired first to indicate the relative culpability of Victor Stephens's crime or some other factor that cannot be determined.

339.    The Trial Court in the Sentencing Order also expressly rejected the mitigating factor of extreme duress based on the State's circumstantial evidence of intent and pellet-in-the-barrel argument.   These errors are compounded by the inaccurate and misleading nature of the State's pellet-in-the-barrel argument.

340.    The Trial Court's emphasis on a lesser, non-statutory culpability determination in the Sentencing Order constituted impermissible consideration of a non-statutory aggravating factor, requiring a new sentencing hearing, and depriving Victor Stephens of a fair trial and a reliable sentencing hearing, in violation of his federal constitutional rights.

**N.    <u>Randolph County Conviction (Claim IV)</u>**

341.    The Court of Criminal Appeals held that this claim was precluded under Rule 32(a)(3) and (5).   Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply here.

342.    The Trial Court's finding of a statutory aggravating factor based on Victor Stephens's prior conviction is constitutionally deficient because Victor Stephens was denied his constitutional right to counsel in that proceeding (Claim IV & Claim VII, ¶ 21(D)).   Trial Court based its finding of a statutory aggravating factor on Victor Stephens's prior conviction in Randolph County.   This conviction was never appealed, because the State never appointed an appellate counsel.

343.    Victor Stephens was entitled, under the Alabama and federal constitutions, to counsel on his first appeal. <u>Douglas v. California</u>, 372 U.S. 353 (1963). <u>See</u> <u>Carroll v. State</u>, 468 So. 2d 186 (Ala. Crim. App. 1985) (prejudice presumed where counsel failed to file a brief on appeal). Because he was denied this right, and therefore was unable to appeal effectively, the prior conviction was unconstitutional and void for purposes of sentencing Victor Stephens in this proceeding.

344.    The Circuit Court denied relief on this ground, in part, based on no related proof being in the record. The Rule 32 record, however, shows that the Randolph County Circuit Court convicted Victor Stephens of attempted murder and robbery and sentenced him to life imprisonment without parole. It also includes all the Randolph County post-trial pleadings, including a motion for new trial and no notice of appeal. Therefore, this decision was based on an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceeding.

345.    The use of the Randolph County conviction tainted Victor Stephens's trial in this matter. His death sentence cannot constitutionally be based even in part on an unconstitutional conviction for another crime. Therefore, a new sentencing hearing is required.

**O.      All Non-Statutory Mitigating Circumstances (Claim VI)**

346.    The Court of Criminal Appeals held that this claim was precluded under Rule 32(a)(3) and (5). Based on Ala. R. App. P. 45(a), Rule 32(a)(3) does not apply here.

347.    Victor Stephens's death sentence must be vacated because the Trial Court's Sentencing Order does not state whether all non-statutory mitigating circumstances were considered (Claim VI & Claim VII, ¶ 21(D)).

348.    In rendering a sentence of death, a trial judge must consider every mitigating circumstance of any type, whether enumerated in the statute or not. Parker v. Duggan, 498 U.S. 308 (1991); Lockett v. Ohio, 438 U.S. 586 (1978).  The sentencing order must explicitly indicate that a court has considered all evidence offered in mitigation.  A sentencing order which does not so indicate cannot support a sentence of death, and the case must be returned for re-sentencing. Dobyne v. State, 672 So. 2d 1319, 1352 (Ala. Crim. App. 1994).

349.    In this case, the Sentencing Order does not indicate that the Trial Court considered all evidence offered in mitigation.  Therefore, Victor Stephens's sentence is constitutionally defective and Victor Stephens's sentence must be set aside.  Because the original trial judge is unavailable, this case must be set for a new sentencing hearing before a new judge.

**P.    The Rulings on Raised Claims as if Not Raised**

350.    The Court of Criminal Appeals Opinion, p. 7, mistakenly states as follows: "In his brief to this Court, [Victor Stephens] specifically argues only five [ineffective assistance of counsel] claims: G.81(c), VII.21(D), G.81(s), G.81(m), and the "totality of the evidence" of all the claims." In Victor Stephens's Brief to the Court of Criminal Appeals, however, the following claims were

also argued (and referenced by paragraph number used in the Rule 32 Petition) on the following pages: G.81(l) on pp. 82-85; G.81(g) on pp. 85-86; G.81(b) on pp. 86-88; G.81(d) on pp. 88-91; G.81(f) on pp. 91-92; G.81(h) on pp. 92-95; G.81(i) on pp. 95-97; G.81(cc) on pp. 97-99; G.81(m) on pp. 99-100; G.81(u) on pp. 100-101; and G.81(v) on pp. 101-102.

351.    Because claims G.81(2), G.81(g), G.81(b), G.81(d), G.81(f), G.81(h), G.81(i), G.81(cc), G.81(m), G.81(u), and G.81(v) were argued on appeal, the Court of Criminal Appeals' finding that the claims were not argued is an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceeding.

352.    The Court of Criminal Appeals and the Circuit Court erred by ruling that Claims B and C were precluded under Ala. R. Crim. P. 32.2(a)(3), "because Stephens could have, but did not, raise them at trial." C037. Claims B and C are based on the Trial Court's jury instructions, which did not include the proper lesser included offenses of felony murder and reckless murder, included a confused generic murder charge that appears to be intentional murder, and took away Victor Stephens's right under Beck v. Alabama, 447 U.S. 625 (1980), of jury nullification of a capital offense. Victor Stephens's trial counsel tried to ask for the felony murder and murder charge, even though he mistakenly called the lessor included offenses "manslaughter" and "reckless endangerment." TR 782-84, 787 & 851. The Trial Court was even going to give a felony murder (noncapital robbery-murder) charge, but the State erroneously convinced the Trial Court that all robbery-murders were capital. TR 781-82. After the jury was charged, Victor Stephens's trial

counsel again objected to the Trial Court's failure to give a "manslaughter" charge or a "reckless endangerment" charge.  TR 851.

353.    Because Claims B and C were raised at trial, the Court of Criminal Appeals's and the Circuit Court's rulings during Victor Stephens's Rule 32 proceedings (that Claims B and C were not so raised) are based on unreasonable determinations of the facts in light of the evidence presented in the Rule 32 proceeding.

354.    The Circuit Court also erred by ruling that Claims B, C, D, H, J, K, I and L were precluded under Ala. R. Crim. P. 32.2(a)(5), "because they could have been but were not raised on appeal." C040.  The Court of Criminal Appeals did not rely upon Ala. R. Crim. P. 32.2(a)(5) as precluding Claims B, D, H, J, K, I and L., but did for Claim C.  Opinion, pp. 4-6. These claims were all raised on appeal, including Claim C.  See, e.g., Victor R. Stephens v. State of Alabama, Court of Criminal Appeals of Alabama, Case No. 2 DIV 738, Brief of Appellant, Victor R. Stephens, (filed January 19, 1990) (Claim D, see pp. 29-30; Claim J, see pp. 24-26; Claim L, see pp. 31-32); Ex parte Victor Stephens, Supreme Court of Alabama, No. 1900032, On Petition for Writ of Certiorari to the Alabama Court of Criminal Appeals, Application for Rehearing and Brief in Support of Application for Rehearing (filed March 29, 1991) (Claim B & C, see pp. 5-8; Claim D, see pp. 3-5; Claim H, see pp. 8-10; Claim I, see pp. 14-16; Claim J, see pp. 10-13; Claim K, see pp. 13-14).

355.    Because Claim B, C, D, H, J, K, I and L were raised during Victor Stephens's initial appeal, the Circuit Court's ruling during Victor Stephens's Rule 32 proceedings that they were not is an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceeding.  Because Claim C was raised during Victor Stephens's initial appeal, the Court of Criminal Appeals' ruling (on appeal of the denial of his Rule 32 Petition) that it was not is also an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceeding.

356.    The Court of Criminal Appeals and the Circuit Court erred by ruling that Claims B, C, D, E, F, H, I, J, K, L, M, N and O of the Petition and Claims III, IV, V and VI (all claims other than some of the new evidence claims, the Brady claims, and the ineffective assistance of counsel claims) were precluded under Ala. R. Crim. P. 32.2(a).

357.    These claims sought relief for violations of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution.  Under federal law, these procedural bars should not foreclose relief based on such constitutional violations in a death penalty case.

358.    The Circuit Court's and Court of Criminal Appeals's rulings on Rule 32 procedural bars are another example of the fundamental unfairness of the procedures applied to Victor Stephens in this Alabama death penalty matter.  Other examples include the State's misrepresentations "as an officer of the Court" that it was not violating Batson, the State's ex parte communications about and providing ex parte the Sentencing Order with a judicial override imposing a death sentence, the

State's relying on new expert evidence in the Rule 32 proceedings, the Circuit Court's denying Victor Stephens's motion for funds to hire an expert for the Rule 32 proceedings, the State's not bothering to brief any issues in opposition to the Rule 32 Petition and instead merely submitting a proposed order to the Circuit Court, the Circuit Court's adopting that proposed order without even checking to see if it correctly identified the applicable Rule 32 procedural bars, and the Court of Criminal Appeals's affirming the Circuit Court's denial of the Rule 32 Petition without addressing these deficiencies and with additional erroneous rulings that rejected claims as procedurally barred on plainly inapplicable grounds. Under these circumstances, any deference to state court proceedings would be inconsistent with Victor Stephens's rights under the U.S. Constitution.

## VI.   ADDITIONAL INEFFECTIVE ASSISTANCE OF COUNSEL

359.   Victor Stephens's trial counsel did not provide the effective assistance of counsel required by due process and the Sixth Amendment right to counsel. The Rule 32 Petition identifies trial and appellate counsels' deficiencies in Claim G to the Petition and Claim VII to the Supplement to Petition. Victor Stephens incorporates by reference the Petition and Supplement to Petition, particularly ¶¶ 79-83 of the Petition and ¶¶ 18-20 of the Supplement to Petition. Id.

360.   The Court of Criminal Appeals did not expressly review the Circuit Court's ruling for most of the ineffective assistance claims. The Circuit Court found that Victor Stephens failed to carry his burden of proof under Ala. R. Crim. P. 32.3 for Claim G, ¶ 81 (c), (d), (f), (g), (h), (k), (l), (m), (n), (o), (p), (q), (r), (s), (t), (u), (v), (w), (x), (y), (z), (aa) and (cc) and ¶ 82 and Claim VII,

¶ 21(D).  In explanation, the Circuit Court stated that Victor Stephens "fail[ed] to present any relevant evidence or argument."

361.    Yet, the Rule 32 Petition expressly gives legal and evidentiary arguments and citations.  Furthermore, the evidence for these claims of ineffective assistance of counsel is the trial record and, perhaps more important, the absence of anything in the trial record suggesting that Victor Stephens's trial or appellate counsel protected these constitutional rights.  Victor Stephens made the entire trial record Defendant's Exhibit 8 to the Rule 32 hearing.

362.    Therefore, the Circuit Court's finding that Victor Stephens presented no relevant evidence is an unreasonable determination of the facts in light of the evidence presented in the Rule 32 proceeding and otherwise violates Victor Stephens's constitutional rights.

363.    For example, the first ineffective assistance claim listed by the Circuit Court as not being supported by any evidence is ¶ 81(c).  This paragraph asserts that trial and appellate counsel did not effectively object to or challenge at trial or on appeal the Trial Court's failure to give jury charges on the lesser included offenses of reckless murder and felony murder and the Trial Court's giving a confusing jury charge on the lesser included offense of noncapital intentional murder.  The Rule 32 Petition includes further explanation of what trial and appellate counsel should have done, as well as legal citations and record citations.  As pointed out, this failure could not be strategy, because Victor Stephens's trial counsel repeatedly asked for a "manslaughter" charge and the Trial

Court gave a self-defense charge. TR 778-787 & 829-830. See Williams v. State, 675 So. 2d 537, 541-42 (Ala. Crim. App. 1996) (holding that the lesser included charges are required where a self-defense charge is given). Because the jury (once it rejected the mistaken identity defense) should have convicted Victor Stephens of reckless murder or felony-murder based on an imperfect self-defense defense, id., the prejudice to Victor Stephens is obvious.

364.    For this Claim G.81(c), the Court of Criminal Appeals's Opinion, p. 7, wrongly asserts that Victor Stephens "failed to show that, absent the alleged errors, the result of the trial probably would have been different." With regard to prejudice based on failing to ensure proper jury charges were given, the Court of Criminal Appeals is suggesting no one could ever make such a showing of prejudice – retrying the case with the same jurors and different jury instructions would be the only way of making the showing suggested.

365.    Another example, the last ineffective assistance claim discussed by the Circuit Court as not being supported by any evidence is Claim VII, ¶ 21(D), of the Supplement to Petition. This paragraph asserts that trial and appellate counsel failed to challenge the Sentencing Order for not indicating that all non-statutory mitigating factors had been considered. As the Rule 32 Petition points out,, a death sentence order must explicitly indicate that the sentencing court has considered all evidence offered in mitigation and, if the death sentence order does not so indicate, the case must be returned so the same judge can resentence the defendant. Dobyne v. State, 672 So. 2d 1319, 1352 (Ala. Crim. App. 1994). The evidence showing that the Sentencing Order does not explicitly

indicate that all evidence offered in mitigation was considered is the Sentencing Order.  See also TR 912-930 (Trial Court's reading the Sentencing Order into the record).  Based on trial and appellate counsel's failure to raise this issue, Victor Stephens has been denied his right to a re-sentencing.

366.    For this Claim VII.21(D), the Court of Criminal Appeals's Opinion, p.7, wrongly asserts that Victor Stephens "failed to show that, absent the alleged errors, a death sentence probably would not have ben [sic] imposed."  The Court of Criminal Appeals requires the wrong showing.  Victor Stephens had an absolute right to a re-sentencing, which alone is prejudice.  This right was forfeited due to his counsel's deficient performance.  Especially because the Trial Court overrode the jury, a sentence other than death would be a real possibility.  Upon re-sentencing, Victor Stephens could have presented the evidence and arguments discussed above in mitigation and in support of the jury's recommendation.  Moreover, the loss of a new sentencing hearing is, by itself, prejudice.

367.    As with Claims G, ¶ 81 (v), (w), (x), (y), (z) and (aa), the evidence for Claim VII 21(D) is the absence of anything in the record showing trial or appellate counsels's efforts to prevent, avoid or change the judicial override.  See TR 856-907 & 908-930 (the sentencing hearing); cf. Stevens v. State, 552 So. 2d 1082, 1086 (Fla. 1989) (finding trial counsel to be ineffective for failing to present evidence to judge after jury recommendation of life imprisonment, which resulted in

judicial override).  Victor Stephens did not "fail to present any relevant evidence" for these claims,

because the evidence is the absence of any action at trial and the trial record was presented.


368.    As explained in the Rule 32 Petition, Victor Stephens's claims of ineffective

assistance of counsel turn on his trial and appellate counsel's failure to protect these constitutional

rights.  The legal arguments and the factual support for most[3] of the underlying claims is developed

above.  Several of the issues warrant further discussion.


369.    Without objection, the Trial Court allowed the victims families to be seated close to

the jury (Claim G, ¶ 81(s).  The Trial Court even allowed, after the State requested, that Mr. Bailey's

daughter sit with the prosecutors throughout the week of trial.  TR 413 & 417.  Cf. Sheppard v.

Maxwell, 384 U.S. 333 (1980) (accused entitled to verdict and sentence based on the evidence and

not on extraneous occurrences in the courtroom); Fuselier v. State, 468 So. 2d 45 (Miss. 1985)

(finding victim's daughter's "presence at counsel table cannot be justified"); Walker v. State, 132

Ga. App. 476, 208 S.E.2d 350 (1974) (finding presence of victim's mother at counsel table must

have had prejudicial impact); State v. Henry, 198 So. 910 (La. 1940) (finding presence of victim's

family at counsel table prejudicial to rights of accused).  Victor Stephens's trial counsel's failure to

object to Mr. Bailey's daughter sitting at counsel table was ineffective assistance of counsel.

---

[3]The exceptions are Claims G, ¶ 81(p), (q) & (r).  These claims concern Victor Stephens's
trial counsel's failures to object to heavy security measures and uninformed officers in the courtroom
and failure to make sure that Victor Stephens had street clothes when the trial began.  For these
claims, the record does not include sufficient evidence.

370.     Victor Stephens's trial and appellate counsel failed to secure a complete transcript of the trial (Claim G, ¶ 81(m)).  The missing pages were of voir dire, which would be relevant to the venue and Batson issues.  The transcript pages missing from the Trial Court's and Victor Stephens's copies of the trial record, however, were found in the State's copy of the transcript.  Those pages are now part of the record for this Rule 32 proceeding.  While conduct falling below what is professionally reasonable, it now appears that Victor Stephens was not prejudiced by trial and appellate counsel's failure to secure a complete transcript.

371.     As a final point, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Strickland v. Washington, 466 U.S. 668, 695 (1984).  The totality of the evidence here includes Victor Stephens's trial and appellate counsels' (1) failures to investigate defenses, to investigate for the sentencing phase, and to investigate to oppose the judicial override (see Claim G, ¶ 81(b), (g), (o), (t), (v) & (bb), and Claims VII, ¶ 21(A), (B) & (C); see also, supra, pp. 39-42 (discussing part of the result from the failures to investigate)), (2) failures to investigate, to preserve the record for appeal, or otherwise to handle the Batson issues effectively (see Claim G, ¶ 81(f) & Claim VII, ¶ 21(E); see also, supra, pp. 63-66 (discussing the Batson ineffectiveness)), (3) failures to object to or to challenge the Trial Court's erroneous  jury instructions or the prosecutors' improper arguments (see Claim G, ¶ 81 (c), (d), (h) & (l)), and (4) failures to be any type of advocate for Victor Stephens in opposing or responding to the judicial override (Claim G, ¶ 81 (g), (i), (j), (u), (v), (w), (x), (z) & (aa), and Claim VII, ¶ 21(D)).  Together, these failures show "a breakdown in the adversarial process that our system counts on to produce just

results." Strickland, 466 U.S. at 696.  For these reasons, fundamental fairness requires that Victor Stephens be given a new trial and a new sentencing.

## VII.    CONCLUSION

372.    Victor Stephens is entitled to a new trial based on the Batson evidence, erroneous jury instructions, new evidence, Brady material, or ineffective assistance of counsel grounds, or on the other grounds in this petition.  Alternatively, Victor Stephens is entitled to a new sentencing proceeding based on the new evidence, Brady material, or ineffective assistance of counsel grounds, or on the other grounds in this petition.  Accordingly, Victor Stephens respectfully requests this Court to grant him the following relief:

(a)    grant Victor Stephens's accompanying motion to proceed in this matter *in forma pauperis* and appoint the undersigned as counsel for petitioner.

(b)    afford Victor Stephens an opportunity to reply to any responsive pleading filed by respondent;

(c)    grant Victor Stephens discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and a sufficient period of time to conduct discovery, and further grant Victor Stephens authority to obtain subpoenas to further document and prove the facts set forth in this petition;

(d)    grant Victor Stephens an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in this petition;

(e)    permit Victor Stephens after additional factual development an opportunity to brief and argue the issues presented in this petition.

(f)    issue a writ of habeas corpus granting Victor Stephens' relief from his unconstitutionally obtained conviction and sentence of death; and

(g)    grant such further and other relief as may be appropriate.

_James S. Christie, Jr._

James S. Christie, Jr. (CHRIJ3162)
Kenneth D. Sansom (SANSK2998)
BRADLEY ARANT ROSE & WHITE LLP
2001 Park Place, Suite 1400
Birmingham, Alabama  35203
(205) 521-8000

Attorneys for Petitioner
Victor R. Stephens

1/625307.1

111

## ATTORNEY'S VERIFICATION

I affirm under penalty of perjury that, upon information and belief, this Petition for Writ of Habeas Corpus is true and correct.  Executed on April 6th, 2001.

_James S. Christie, Jr._
James S. Christie, Jr.

### CERTIFICATE OF SERVICE

I hereby certify that I have this date served the foregoing on

Michael Billingsley
Assistant Attorney General
Alabama State House
11 South Union Street
Montgomery, AL 36130

by U.S. Mail, prepaid and addressed to  regular mailing address, on this _6th_ day of April, 2001.

*James S. Christie, Jr.*
Attorney for Petitioner, Victor R. Stephens