## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **VICTOR STEPHENS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| vs. | ) | **CIVIL ACTION NO. 01-0257-CG-B** |
| | ) | |
| **MICHAEL HALEY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## ORDER

Petitioner, Victor Stephens, (hereinafter referred to as "Petitioner" or "Stephens") initiated this action on April 9, 2001, by filing a Petition for Writ of Habeas Corpus (Doc. 1) pursuant to 28 U.S.C. § 2254. The petitioner challenges a 1987 state court judgment of conviction for two counts of capital murder entered in the Fourth Circuit Court, Hale County, Alabama, for which he was sentenced to death by electrocution. (Doc. 1, p. 6). This matter is before the court on the petitioner's motion for partial summary judgment (Doc. 37), the respondent Michael Haley's (hereinafter referred to as "Respondent" or "Haley") response (Doc. 49), the petitioner's reply (Doc. 53), and petitioner's supplemental brief. (Doc. 68). Upon consideration of all matters presented, and for the reasons stated below, this court finds that the petitioner's motion for partial summary judgment is due to be **GRANTED**.

## I. Facts and Procedural Posture

### A. Trial

Upon extensive review of the record, the court finds that the underlying facts

were succinctly stated by the Court of Criminal Appeals of Alabama in <u>Stephens v. State</u>, 580 So.2d 11 (Ala.Crim.App. 1990):

The bodies of James R. Bailey and Adam "Pop" Pickens were discovered at Bailey's Grocery Store on Alabama Highway 14 in the Wedgeworth community near Sawyerville, in Hale County, Alabama, on January 20, 1986. Mr. Bailey, age 72, the owner of the store, was found dead inside the store--apparently of multiple gunshot wounds. Adam Pickens, age 83, was still alive, but also suffering from multiple gunshot wounds. Mr. Pickens was taken to Druid City Hospital in Tuscaloosa, Alabama, where doctors attempted to save his life. However, Mr. Pickens died while in surgery.

The evidence as presented by the State tended to establish that Mr. Bailey and Mr. Pickens were last seen alive by Mr. Bailey's daughter-in-law Sandra Bailey. Ms. Bailey "ran down" to her father-in-law's store between 4:25 and 4:30 p.m. on January 20 to purchase a gallon of milk before the store closed for the day. Sylvester Jackson came to the store between 4:30 and 5:00 p.m. to buy some gasoline for his car. After pumping the gas, Mr. Jackson entered the store to pay for the gas. He observed both victims lying on the floor. Mr. Jackson ran out of the store and rushed home to tell his mother what he had seen. His mother called the sheriff's department and told them what her son had seen.

Shortly thereafter, Hale County Sheriff H.C. Colvin, Alabama Bureau of Investigation investigator C.W. Gibson, and Alabama Department of Forensic Sciences crime scene examiner John McDuffie arrived at the store to begin their investigation and to collect any evidence which might assist them in discovering the identity of the person or persons who shot the two men. The examination of the store revealed that Mr. Bailey was robbed of money and food stamps and that Mr. Bailey had fired his .20 gauge shotgun at the robbers. Adam Pickens was unarmed. Mr. Bailey was found in the middle of the store still clutching his shotgun. Mr. Bailey had apparently been shot in a different location inside the store as there was a trail of blood leading to Bailey's body. Further examination of the scene revealed that one individual--later determined to be the appellant--had been hit by the shotgun blast as blood was found near the front door together with a .25 caliber automatic pistol. A number 8 shotgun pellet was removed from the barrel of the weapon.

Further investigation revealed that Carrie Ingram and Sheila Kennedy were walking along Alabama Highway 60 in Akron late on the afternoon of January 20, 1986. The two women were walking in

the oncoming traffic lane--approximately 6 miles from Bailey's store--when they were met by a small black pickup truck traveling at a high rate of speed. The truck was proceeding in a direction away from Bailey's store. The women noticed that the passenger in the truck was black and that he appeared to be slumped over in the seat. Linda Johnson and her son Kevin also saw the black pickup on Highway 60 that afternoon. According to Ms. Johnson, she was preparing to turn left from Highway 60 onto County Road 45 when she looked into her rear-view mirror and noticed a black pickup truck coming up behind her at a high rate of speed. Despite the fact that Ms. Johnson had turned on the vehicle's left-turn signal, the truck showed no sign of reducing its rate of speed. Fearing a collision, Ms. Johnson stopped her vehicle and allowed the truck to overtake her before she completed her left turn. Although she could not identify the make of the truck or who was driving it, her son Kevin readily identified it as a black Nissan pickup truck and told authorities that he had observed two black males inside the truck.

Pursuant to the information received from various witnesses and the evidence collected at the scene, the Hale County Sheriff's Department issued a regional teletype advising law enforcement agencies to "be on the lookout" for two males, armed, one possibly injured. The teletype also requested that these agencies check area clinics and hospitals for persons with possible gunshot wounds. On Tuesday, January 21, 1986, Georgia Bureau of Investigation agent Charles Stone and ABI agent Ed Traylor advised the Hale County Sheriff's Department that both subjects were in custody in Carroll County, Georgia. Further information from Georgia officials revealed that Christopher L. Starks was apprehended in possession of a .32 caliber pistol and that the appellant, Victor R. Stephens, was treated for a shotgun wound to his left hand at the Bowdon Area Hospital in Carroll County, Georgia, on Monday evening January 20, 1986.

On Wednesday, January 22, 1986, a black Nissan pickup truck owned by Christopher L. Starks, a co-defendant, was searched by law enforcement agencies. Found in the vehicle were blood stains on the passenger's seat and three (3) one-dollar denomination "food stamps" which had been issued from food stamp offices in Hale County and Tuscaloosa County, Alabama. Also taken from the glove compartment of the truck were identification papers belonging to the appellant, Victor R. Stephens.

A series of statements were taken by law enforcement officials from the appellant while he was in the custody of Georgia officials. These statements were taken orally on January 23, 25, and 28, 1986. The gist of the three statements revealed that appellant and

Christopher "Peabody" Starks, left Georgia on Saturday, January 18, 1986, and traveled to New Orleans, Louisiana, where they remained until Monday, January 20, 1986. On Monday, while Stark was driving through Alabama on the way back to Georgia, the two men decided they needed some money. According to the appellant, Starks suggested that they find someplace to rob. They went into a store in Alabama occupied by an elderly white man--subsequently identified as James R. Bailey--and an elderly black man--subsequently identified as Adam Pickens. "Peabody" entered the store and displayed his weapon, while the appellant guarded the entrance. After the appellant and Starks obtained the contents of the store's cash register, they started to leave. At this time, Mr. Bailey pulled out a shotgun and fired it. Pellets from the shotgun shell struck the appellant in the left hand. It was then that the appellant "emptied" his .25 caliber pistol. According to the appellant, Starks was armed with either a .22 or .32 caliber pistol. Appellant admitted leaving his .25 caliber automatic pistol at the store. The two men then got back into their truck and drove back to Georgia.

Autopsies were performed on both victims. The results revealed that James R. Bailey died as a result of multiple gunshot wounds to the face, chest, abdomen, and hand. Two expended .32 caliber bullets and one .25 caliber bullet were removed from Mr. Bailey's body. Adam's Pickens' autopsy revealed that he died from four separate gunshot wounds to the back. All four expended bullets recovered from Pickens' body were .25 caliber bullets. The seven expended bullets removed from the victims (three from Bailey, four from Pickens) were sent to the Alabama Department of Forensic Sciences for examination. Forensic firearm examiner Lawden Yates examined each of the seven bullets. His examination revealed that the two .32 caliber bullets removed from Mr. Bailey's body were fired from the same .32 caliber pistol found on the person of Christopher Starks at the time of his arrest. The five .25 caliber bullets removed from the victims (one from Mr. Bailey, four from Mr. Pickens) were fired by the .25 caliber automatic pistol that was left at the store by the appellant. Shotgun pellets removed from Stephens' hand at the Bowdon Area Hospital in Carroll County, Georgia, were compared with shotgun pellets removed from the store and the barrel of the .25 caliber gun. The analysis revealed all to be number 8 shotgun pellets, consistent with the type shell recovered from Bailey's weapon. This concluded the State's evidence.

The only evidence presented by the defense was in the form of testimony from Jessie Portis. Mr. Portis testified that he arrived at Bailey's store after Mr. Bailey and Mr. Pickens were shot. He leaned

down and asked Mr. Pickens if he could say what color vehicle the robbers were in. According to Mr. Portis, Mr. Pickens responded that the robbers were in a red vehicle. When asked if the robbers were white or black, Mr. Pickens stated, "white."

Id., at 13-15.

The defendant was tried by a jury composed of 7 white jurors and 5 black jurors following the prosecution's use of 21 of its 23 peremptory challenges to strike black prospective jurors. Id. at 15. After the striking process, Stephens' trial counsel reminded the court that it had previously filed a motion pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and that the motion was ripe. (Tr. 386).[1] The trial court ruled that a prima facie case of discrimination had been made and accordingly ordered the prosecutor to "justify your strikes." (Tr. 388). The prosecutor complied by giving his race-neutral justifications for striking black prospective jurors. (Tr. 388-396). After listening to the reasons given and defendant's arguments against, the trial court found that "the [Batson] motion [was] not well-taken and overrule[d] the motion." (Tr. 401).

Based on the evidence outlined above, the jury convicted the defendant on December 17, 1987, of two counts of violating Ala.Code § 13A-5-40, "murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant." Ala.Code § 13A-5-40(a)(2) (West 2002). (Tr. 853.). The guilty verdict was returned at approximately 6:00 p.m. on the night of December 17, 1987.

---

[1]The trial transcript is submitted as an exhibit to Document 18 and is cited hereafter only as "Tr.___".

(Tr. 856.). The court reconvened at 7:00 p.m. that night for the sentencing phase of the trial. Ibid. After hearing testimony, the jury deliberated and thereafter pronounced a recommendation that the defendant be sentenced to life without parole. The vote, however, was eight in favor of the death penalty and four in favor of life imprisonment. (Tr. 903.). The trial court explained that the recommendation was inconsistent with the jury charge; life imprisonment could only be recommended if at least seven jurors voted for the life sentence. (Tr. 904.). Defense counsel moved for a mistrial, arguing that the verdict was inconsistent with the instructions, that the penalty phase instructions were erroneous, and that the jury had revealed its numerical division before returning a unanimous verdict. The motion was denied. (Tr. 905.). The jury returned at 11:00 p.m., and the court inquired whether further deliberations would be fruitful and whether the court should reconvene on the following day. The jury returned to the jury room and reported a verdict at 11:15 p.m. (Tr. 906.). On both murder counts, the jury recommended life without parole; in each case, the vote was seven for life imprisonment to five in favor of the death penalty. Ibid.

Some nineteen months later, on July 24, 1989, the court convened for sentencing. (Tr. 908.). The State asked the court to override the jury's advisory verdict of life without parole. The court agreed, finding beyond a reasonable doubt as aggravating circumstances (1) that the murders were committed in the course of robbery, and (2) that the defendant had previously been convicted of a felony

involving use or threat of violence to the person.[2] (Tr. 919-20.). Furthermore, the court found that no statutory mitigating circumstances existed.[3] Considering this lack of mitigation along with nonstatutory evidence presented and the court's advisory verdict of life without parole, the court sentenced defendant to death:

> The court has carefully weighed the existence of the statutory and aggravating circumstances and the non-existence of any of the statutory mitigating circumstances and has additionally considered both the nonstatutory mitigating circumstances and the jury's recommending of life imprisonment without parole have weighed heavily in my consideration – I mean, it has weighted heavily in my consideration, and it is the judgment of this court that they are substantially outweighed by the aggravating circumstances and non-existence of statutory mitigating circumstances. There are those who, for one reason or another, do not believe in capital punishment. The same people agree, however, in many cases with the doctrine of self-defense. The individual has a right of self defense. In my opinion, society has a right of self defense to take a life to protect the house that we live in. That is our society and, therefore, for those reasons, and it's not done lightly, this court orders, adjudges and decrees that you, Mr. Stephens, be punished by death. Your appeal is automatic. You have 42 days to take your appeal. (Tr. 929-930.)

---

[2]The court accepted the state's certified copies of defendant's convictions for first degree robbery and attempted murder in the Circuit Court of Randolph County, Alabama, on October 20, 1987. (Tr. 921.)

[3]Far from being insignificant, the court found defendant's criminal history to be "atrocious"; there was no evidence that defendant suffered from "any psychiatric disorder" at the time of the offense; there was no evidence that defendant acted under "the influence of extreme mental or emotional disturbance; there was no evidence suggesting defendant was an unwilling or minor participant in the murders, nor that the victims provoked their own deaths; there was no evidence that defendant acted under the substantial influence of another person in committing the crime; there was no evidence that defendant lacked the capacity to appreciate the criminality of his conduct; defendant's age--23 at the time of the murders--did not mitigate the offense. As to nonstatutory mitigating factors, the court found it an "admirable gesture" that he had begun writing in prison a book warning of the dangers of drug use. (Tr. 921-930.)

## B. Direct Appeal

The petitioner pursued a direct appeal to the Alabama Court of Criminal Appeals. In his direct appeal, Stephens asserted a <u>Batson</u> claim arguing that the prosecutor's race-neutral reasons were not valid and that the prosecutor's <u>voir dire</u> was inadequate. (Doc. 18, Tab R-26, pp. 21-23). The Alabama Court of Criminal Appeals affirmed petitioner's conviction in an opinion issued August 3, 1990. <u>Stephens v. State</u>, 580 So.2d 11 (Ala.Crim.App. 1990). In its opinion, the court examined the prosecutor's race-neutral reasons and found that the "tenets of <u>Batson</u>... have been minimally satisfied" and that under a clearly erroneous standard of review, found that "as a whole, the prosecutor provided sufficiently race-neutral reasons for the exercise of those challenges." <u>Id.</u> at 18-20. The Alabama Supreme Court thereafter affirmed the conviction in a two-sentence <u>per curiam</u> opinion issued March 15, 1991, and denied rehearing on April 11, 1991. <u>Stephens v. State</u>, 580 So.2d 26 (Ala. 1991). With new appellate counsel, petitioner sought review by the Supreme Court of the United States. The Supreme Court denied <u>certiorari</u> on October 7, 1991. <u>Stephens v. Alabama</u>, 502 U.S. 859 (table)(1991).

## C. Rule 32 Petition/Collateral Attack

The petitioner filed an Alabama Criminal Procedure Rule 32 petition for post-conviction relief with the Circuit Court of Hale County, Alabama, on April 9, 1993. The petitioner again raised a <u>Batson</u> claim, specifically arguing that he "was

deprived of a fair trial by an impartial jury through the prosecutor's racially discriminatory use of peremptory challenges."  (Doc. 18, Vol. 15, Tab 47, pp. 23-25). After a hearing, the court denied the petition on February 19, 1998.[4]  In regards to the petitioner's <u>Batson</u> claim, the court found that "[t]he claim that Stephens was deprived of a fair trial by an impartial jury through the prosecutor's racially discriminatory use of peremptory challenges" was "barred from further Rule 32 proceedings" pursuant to Rule 32.2(a)(2) of the Alabama Rules of Criminal Procedure because in part "they were raised or addressed at trial."  (Doc. 18, Vol. 10, Tab 40, pp. 2-3).  Furthermore, the judge found that "[t]he claim that Stephens was deprived of a fair trial by an impartial jury through the prosecutor's racially discriminatory use of peremptory challenges" was "procedurally defaulted" under Rule 32.2(a)(4) of the Alabama Rules of Criminal Procedure because it was "raised or addressed on appeal." (<u>Id.</u>, p. 6).

Petitioner appealed the denial of the Rule 32 petition to the Alabama Court of Criminal Appeals on July 17, 1998.  (Doc. 18, Vol. 17, Tab 49).  The Court of Criminal Appeals affirmed the decision of the Circuit Court on July 9, 1999. <u>Stephens v. State</u>, 778 So.2d 869 (table)(Ala.Cr.App. 1999).  First, the court agreed with the Rule 32 trial court that the petitioner's <u>Batson</u> claim was procedurally defaulted.  (Doc. 18, Vol. 17, Tab 53, p. 4).  Second, the court ruled that the evidence presented by Stephens at the Rule 32 evidentiary hearing - "notes on the

---

[4]It is unclear why it took the Circuit Court approximately five years to rule on the Rule 32 petition.

prosecutor's strike sheets; evidence that the prosecutor used inaccurate, unverified, and off-the-record information to strike blacks; and the pattern of the State's strikes" - could not be considered "newly discovered evidence" for two reasons. First, "he failed to include it in his petition or supplemental petition to the trial court" and "[t]his court will not consider an argument that is raised for the first time on appeal" since "its review is limited to evidence and arguments considered by the trial court." Second, "he failed to show that the evidence could not be obtained through due diligence", one of five requirements which must be established before a state post-conviction court can consider "newly discovered evidence." (Doc. 18, Vol. 17, Tab 53, p. 4); <u>see</u> Ala.R.Crim.P. 32.1(e)(1).

Following the decision of the Court of Criminal Appeals, the petitioner filed a petition for <u>certiorari</u> with the Alabama Supreme Court. The Supreme Court denied <u>certiorari</u> on April 14, 2000, without rationale. <u>Ex parte Stephens</u>, 787 So.2d 722 (table)(Ala. 2000).

### D. § 2254 Federal Habeas Petition

The petitioner filed a 28 U.S.C. § 2254 federal habeas petition in the federal district court for the Southern District of Alabama on April 9, 2001. (Doc. 1.). The case was transferred to the undersigned on February 8, 2002. On January 10, 2003, the petitioner filed a motion for partial summary judgment arguing that the "undisputed evidence shows that the State discriminated against blacks when selecting the jury for Victor Stephen's [sic] trial" and "[t]his discrimination violates <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), and thus entitles Victor Stephens to a writ

of habeas corpus." (Doc. 37, p.1).  On August 25, 2004, the respondent filed a response (Doc. 49), and on September 29, 2004, the petitioner filed a reply.  (Doc. 53).

## E. Second Rule 32 Petition

The petitioner filed a second Alabama Criminal Procedure Rule 32 petition for post-conviction relief with the Circuit Court of Hale County, Alabama, on October 25, 2004.  In this petition, he raised the claim that execution by lethal injection violates the Eighth and Fourteenth Amendments of the United States Constitution.  (Doc. 54-1, pp. 1-10).  On November 19, 2004, without a hearing, the court dismissed the petition.  (Doc. 57-2).  After the parties were notified of the dismissal, a petition for writ of mandamus was filed with the Alabama Circuit Court of Criminal Appeals, and that court directed the Circuit Court to set aside the order dated November 19, 2004, and to enter a new order.  Ex parte Stephens, 907 So.2d 1094 (Ala.Crim.App. 2005).  On June 7, 2005, the Circuit Court entered another order and again dismissed Stephens' second Rule 32 petition without a hearing.  Stephens, thereafter, appealed to the Alabama Court of Criminal Appeals (See Docs. 57 & 58), and the Court of Criminal Appeals affirmed the Circuit Court in an unpublished opinion.  (Doc. 59-1).  On October 26, 2006, the Supreme Court of Alabama denied Stephens' petition for a writ of certiorari and entered a Certificate of Judgment.  (Doc. 61-1), and on May 12, 2008, the Supreme Court of the United States denied Stephens' petition for writ of certiorari. Stephens v. Alabama, 128 S.Ct. 2427, 171 L.Ed.2d 234 (2008).

### F. Supplemental Brief

On May 29, 2008, the petitioner filed a motion for leave to file a supplemental Batson brief asserting that "[d]uring the stay of this action for Stephens to exhaust in state court his claims based on Alabama's method of performing lethal injection, the United States Supreme Court reversed two denials of habeas corpus petitions: Snyder v. Louisiana, 128 S.Ct. 1203 (2008); Miller-El v. Dretke, 545 U.S. 231 (2005)." (Doc. 66, p. 1). On June 2, 2008, this court granted petitioner's motion (Doc. 67), and the petitioner thereafter filed his supplemental brief. (Doc. 68).

## II. Statement of the Law

### A. The Anti-Terrorism and Effective Death Penalty Act of 1996

Section 2254(a) of Title 28 of the United States Code provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Pub.L 104-132, § 104, 110 Stat. 1214, 1218-1219. "Under AEDPA the role of the federal court[] is strictly limited." This court no longer has "plenary authority to grant habeas relief" but rather this court's "authority to grant relief is now conditioned on giving deference to the states." Jones v. Walker, 496 F.3d 1216,

1226 (11th Cir. 2007). Specifically, § 2254(d) provides in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court has stated that this court must first determine whether the AEDPA is satisfied, and only then, may this court review the petitioner's constitutional claims "without the deference the AEDPA otherwise requires." Panetti v. Quarterman, 551 U.S. 930, 127 S.Ct. 2842, 2858-2859, 168 L.Ed.2d 662 (2007); see also Jones, 496 F.3d at 1228.

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[5] Justice O'Connor maintained that "§ 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of

---

[5] Unless otherwise noted, reference to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and -except as to the footnote - Scalia) in part II. 529 U.S. at 403-413. The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

habeas corpus with respect to claims adjudicated on the merits in state court." In other words, "[u]nder § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied – the state-court adjudication resulted in a decision that (1) was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) involved an unreasonable application of... clearly established Federal law, as determined by the Supreme Court of the United States." First, "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Second, "[u]nder the 'reasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-413 (O'Connor, J., concurring)(internal citations omitted); see also Ramdass v. Angelone, 530 U.S. 156, 165-166, 120 S.Ct. 2113, 2119-2120, 147 L.Ed.2d 125 (2000).

In applying this test, the Supreme Court has instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 155

L.Ed.2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." <u>Neelley v. Nagle</u>, 138 F.3d 917, 923 (11th Cir. 1998) <u>overruled on other grounds by</u> <u>Parker v. Head</u>, 244 F.3d 831, 835 (11th Cir. 2001).

In the second step, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or if 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" <u>Lockyer</u>, 538 U.S. at 73 (quoting <u>Williams</u>, 529 U.S. at 405-406).  The Supreme Court later clarified that "[a]voiding these pitfalls does not require citation of our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002).  "If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim." <u>Williams v. McNeil</u>, slip op., 2010 WL 144986, at *5 (N.D.Fla. Jan. 7, 2010).

If, on the other hand, this court first concludes that the state court applied the correct Supreme Court precedent and, second, finds that the facts of the Supreme Court cases and the petitioner's case are materially distinguishable, this court must go to the third step and determine whether the state court

"unreasonably applied" the governing legal principles set forth in the Supreme

Court's cases.  See  28 U.S.C. § 2254(d)(1).  The standard for an unreasonable

application inquiry is "whether the state court's application of clearly established

federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a

state court's decision was an unreasonable application of legal principle "must be

assessed in light of the record the court had before it."  Holland v. Jackson, 542 U.S.

649, 652, 124 S.Ct. 2736, 2737-2738, 159 L.Ed.2d 683 (2004)(per curiam)(citations

omitted); cf. Bell v. Cone, 535 U.S. 685, 697 n. 4, 122 S.Ct. 1843, 1851 n.4, 152

L.Ed.2d 914 (2002)(declining to consider evidence not presented to state court in

determining whether its decision was contrary to federal law).

    An objectively unreasonable application of federal law occurs when the state

court "identifies the correct legal rule from Supreme Court case law but

unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably

extends, or unreasonably declines to extend, a legal principle from Supreme Court

case law to a new context."  Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).

It is important to note that "[t]he question under AEDPA is not whether a federal

court believes the state court's determination was incorrect but whether that

determination was unreasonable – a substantially higher threshold."  Schriro v.

Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007);

see also Williams, 529 U.S. at 412 ("an unreasonable application of federal law is

different from an incorrect or erroneous application of federal law.").

    Besides obtaining relief under (d)(1), a petitioner may also receive federal

habeas relief from a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  In regards to this subsection, the Supreme Court has provided that "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding." Miller-El v. Cockrell ("Miller-El I"), 537 U.S. 322, 348, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003).

When performing a review under § 2254(d), a federal court presumes the state court's factual findings to be sound unless the petitioner rebuts the "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see Miller-El I, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones, 496 F.3d at 1226-1227 (11th Cir. 2007)(holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that the standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

As stated above, only if this court finds that the petitioner satisfied the AEDPA and § 2254(d), does this court take the final step of conducting an

independent review of the merits of the petitioner's claims.  See Panetti, 127 S.Ct. at 2858-2859; Jones, 469 F.3d at 1228.  In this independent review, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

### III. Petitioner's <u>Batson</u> claim based on evidence available at trial and direct appeal

In his motion for partial summary judgment, the petitioner presents this court with a  ground for relief based on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69  (1986).  The petitioner argues that "the decision of the State courts resulted in a decision that was contrary to, or involved an unreasonable application of, Batson and that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." (Doc. 37, p. 2).[6]

---

[6] The respondent initially argues that this court should deny the petitioner's motion for partial summary judgment because this would lead to "piecemeal litigation" which "the Eleventh Circuit has 'express[ed] [its] deep concern over..." (Doc. 49, pp. 1-2)(citing Clisby v. Jones, 960 F.2d 925, 235 (11th Cir. 1992)).  In Clisby, the Court of Appeals for the Eleventh Circuit expressed concern over the number of habeas cases that it had to remand for consideration of issues the district court had not resolved when ruling on an entire petition, thus it instructed the district courts to resolve all claims presented in a habeas petition, regardless of whether the district court granted relief.  See Clisby, 960 F.2d at 935-936.  This court declines to extend Clisby to this case.

Unlike the situation in Clisby, the petition is not before this court at this time, but rather the petitioner has filed a motion for partial summary judgment. The Supreme Court has stated that "Habeas Corpus Rule 11, permits application of the Federal Rules of Civil Procedure in habeas cases to the extent that [the civil rules] are not inconsistent with any statutory provisions or [the habeas] rules."

18

## A. State Court Decisions on Direct Appeal

As stated above, Stephens, a black male, was tried by a jury composed of 7 white jurors and 5 black jurors following the prosecutor's use of 21 of its 23 peremptory challenges to eliminate black potential jurors. The petitioner's counsel objected to the composition of his client's jury based on the prosecutor's alleged discriminatory use of his peremptory challenges in violation of Batson v. Kentucky, 476 U.S. 79 (1986) and Ex parte Branch, 526 So.2d 609 (Ala. 1987). Finding that Stephens' counsel had established a prima facie case of racial discrimination, the trial court required the prosecution to state the reasons for its strikes, and the

---

Mayle v. Felix, 545 U.S. 644, 654, 125 S.Ct. 2562, 2569, 162 L.Ed.2d 582 (2005)(internal quotations and citations omitted). Thus, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." Clark v. Johnson, 202 F.3d 760, 764 (5th Cir. 2000).

If this court were to extend Clisby to a petitioner's motion for summary judgment, this court would have to deny the petitioner's motion automatically, an action which would bar all motions for summary judgment in the future by any petitioner. On the other hand, in habeas cases, the Court of Appeals for the Eleventh Circuit has routinely affirmed district courts who granted summary judgment for the State. See e.g., Wainwright v. Secretary, Dept. of Corrections, 537 F.3d 1282 (11th Cir. 2007); Summers v. Singletary, 119 F.3d 917 (11th Cir. 1997); Waldrop v. Jones, 77 F.3d 1308 (11th Cir. 1996). To allow the State to file a motion for summary judgment but not allow the petitioner to file such a motion is too broad an application of Clisby.

As a result, this court finds that Clisby's instruction to district courts to resolve all claims does not extend to a petitioner's motion for partial summary judgment. See Wilson v. Beard, 589 F.3d 651, 655 (3d Cir. 2009)(affirming a district court which granted partial summary judgment for petitioner on one claim); Judge v. Beard, 611 F.Supp.2d 415, 419-420 (E.D.Pa. 2009)(granting petitioner's motion for partial summary judgment for one claim); Pierce v. Quarterman, 2008 WL 4445064, at *3-4 (S.D.Tex. 2008)(granting partial summary judgment for the petitioner); Rickman v. Dutton, 854 F.Supp. 1305, 1308-1309 (M.D.Tenn. 1994)(granting petitioner's motion for partial summary judgment).

following reasons were given:

1. Mr. Mickens - "his position on capital punishment"

2. Mrs. Ball - "her position on capital punishment"

3. Mr. Ball - "the information was that he had answered affirmatively on drugs, that is, that he, or somemember [sic] of his family or some close personal friend being so involved. The information also received was that he was some sort of part-time preacher and that his son had been in some serious trouble dealing with drugs and/or criminal activity. That was from law enforcement investigation." Finally, he indicated he did not want to serve and would ask to be let off."

4. Mr. Patton - he "had answered affirmatively on our question concerning previous knowledge or association of any type of criminal offense. Our office had prosecuted him for night hunting. We seized his weapons and sold them and he had also been convicted of a DUI on other occasions."

5. Ms. Hood - "she asked off and had quite a bit to say about lack of transportation and inability to get here and she was concerned and wouldn't be able to pay attention, etc. Finally it seems as if she and her husband have a history or problem in the child support court. Her husband is actually being prosecuted and even done some time in jail with reference to that. Of course, our office handles the child support program. Now that was in Perry County, there was some type of connection, a cousin or something. That's the reason we're so familiar with them."

6. Ms. Hollifield - "she had been arrested and charged with worthless checks and similar type offenses on several different occasions."

7. Ms. C. Harris - "[t]he information gathered during voir dire was that she was young, single and unemployed and our information in our investigation prior to that was that her brother is a defendant or has been a defendant in a criminal case which is being prosecuted."

8. Ms. Spence - "The information was that her sons had been in

some very serious criminal offenses. We just felt like she would not be a good State's juror in this case."

9. Ms. Johnson - "Information from investigation was that she had been a defendant in small claims court and been served with numerous civil suits. She was not particularly well thought of and recommended to us as a juror to strike. In voir dire, she seemed to be extremely responsive to the Defendant's questions. I noticed that she was chewing gum and not particularly concerned about this and felt like she would not be a proper juror to serve on this jury."

10. Ms. Cottrell - "She asked off this jury. She did not want to serve and she answered our questions with reference to involvement and knowledge of criminal activity in the affirmative. She indicated that she or someone very close to her had been charged with some criminal offense."

11. Mr. Pratcher - "This is the juror who indicated that he lived in Atlanta and seemed to be interested in not serving. He was wearing sunglasses and that to me has always been a point. When I find jurors doing that, unless there's a real good reason for it, generally, they do not tend to make very good State jurors. He's the only one in that position. He also was sitting next to Mr. Gray. Defense counsel brought to the Court's attention, of course, our attention at the same time, that Mr. Gray, a juror struck for his feelings on capital punishment, had approached defense counsel discussing or talking or making some comments about buring [sic] the guy or something of that nature and Mr. Pratcher seemed to have some type of relationship with him. I felt uncomfortable leaving him on the jury knowing the propensity of the Juror Gray to verbalize his position."

12. Ms. Lewis - "Our information is that she was single and unemployed. Also, our investigative information indicated that her son had been involved in a death or a killing. Information was not clear as to whether it was some type of automobile accident or whether it was some criminal charge, but in any event, her son was involved in it in some manner and we felt like she could not stay on as a juror."

13. Ms. Shelton - "This juror, in the course of individual voir

dire, is from the community and, of course, was listed here, her marital status here, as separated. She was very insistent on that. She reported that she lives in this particular community and never heard anything about this case whatsoever. We find that extremely strange and based on that, felt like she should not remain as a juror in this case."

14. Ms. E. Williams - "On individual voir dire, she seemed to be familiar with the case which, being from the general area of this offense, that would seem to be a plus, but her individual voir dire, she seemed to be very concerned and communicated to us that she was well aware of the fact that one of the men had lived to tell all about it and she was waiting [sic] very much to hear that. Of course, we're very familiar with the evidence in this case where there is a proposed dying declaration from the deceased, "Pop", indicating some words to the effect that some two white men did it. We felt that leaving her on the jury with anticipation of testimony would certainly be detrimental to us."

15. Ms. B. Wilson - Sheriff's Office recommended this juror be struck. The Sheriff himself indicated he had known her for quite a long time and felt that she was extremely anti-establishment. That her mother was considered by him to be a person he thought well of, but he was concerned with Mrs. Wilson. He believed that her husband had been previously in some type [of] criminal trouble. We felt that during the voir dire, she seemed to be very unconcerned about this very serious matter that she was about."

16. Ms. A. Harris - "She had reported from her information as being single, unemployed and relatively young. The note I made was that she knew nothing about the case."

17. Mr. K. Williams - "Observations by our group in observing the jurors was that this man was once again, seemed to be involved with the juror, Mr. Gray. He seemed to be associating with him. His general appearance was very rough and we simply felt like the combination of the two justified and required us to remove him from the jury panel."

18. Ms. Brown - "Now, she, according to our information, had had a husband who had been killed in a homicide. That seemed

to be a plus. Sheriff's Office was very concerned that she was extremely negative about that particular case and we felt that leaving her as a juror would not be wise under these circumstances. She was not happy or pleased with the situation, that we should remove her, so we did."

19. Mrs. Hayes - "getting the point where some of these jurors had some pluses. We were concerned about keeping her. Mrs. Hayes worked with Mrs. Bailey at the nursing home [where the wife of one of the victims now lived]. However, the reaction during individual voir dire concerning that, she seemed to be totally removed from that situation and totally unconcerned about it and based on that, we felt there might be some animosity or something we didn't realize with Mrs. Hayes. We struck her on that basis."

20. Mrs. Hobson - "this was a juror we had decided that we would leave on the jury or keep on the jury, but we felt that she was all right, from our standpoint. However, our information was that she was requesting to get off the jury and had requested to get off the jury. She had had an invalid husband and the storm last night essentially damaged their house. So we went ahead and removed her for those reasons. Otherwise, we would have kept her."

21. Ms. S. Harris - "The information reported was that she had kinspeople who had been in criminal trouble and though we had otherwise felt that she was all right, that information caused us to remove her."

(Tr. 388-396).

The defense counsel challenged the prosecutor's reasons for several of his strikes, but the trial court ultimately "found that Stephens' <u>Batson</u> motion was not well-taken, and overruled the motion."

On direct appeal to the Court of Criminal Appeals, Stephens argued that the prosecutor's race-neutral reasons were not valid and that the prosecutor's voir dire was inadequate. (Doc. 18, Vol. 7, Tab 26, pp. 21-23). Specifically, Stephens argued

that "[t]he justification for the State's strikes ranges from the ridiculous (chewing gum []), to the sublime (wearing sunglasses []).  However in <u>all</u> instances where the State indicated that it might have some information that was gained by investigation prior to voir dire, the State <u>never</u> tried to investigate this information in any manner during voir dire." (<u>Id.</u>, p. 21).   The court affirmed petitioner's conviction in an opinion issued August 3, 1990.  <u>Stephens v. State</u>, 580 So.2d 11 (Ala.Crim.App. 1990).  In its opinion, the court examined the prosecutor's race-neutral reasons and found that the "tenets of <u>Batson</u>... have been minimally satisfied" and, under a clearly erroneous standard of review, found that "as a whole, the prosecutor provided sufficiently race-neutral reasons for the exercise of those challenges." <u>Id.</u> at 17-20.  In regards to three of the black potential jurors – Ms. Spence, Ms. S. Harris, and Ms. Lewis – the court maintained that "[c]onnection with or founded suspicion of criminal activity can also constitute a sufficiently race-neutral reason for the exercise of a peremptory challenge" and "[t]his connection with or suspicion of criminal activity includes not only the juror in question, but also relatives and close friends of the juror."  <u>Id.</u> at 19(citations omitted).

The Alabama Supreme Court thereafter affirmed the conviction in a two-sentence <u>per curiam</u> opinion issued March 15, 1991, and denied rehearing on April 11, 1991.  <u>Stephens v. State</u>, 580 So.2d 26 (Ala. 1991).  With new appellate counsel, petitioner sought review by the Supreme Court of the United States.  The Supreme Court denied <u>certiorari</u> on October 7, 1991.  <u>Ex parte Stephens</u>, 502 U.S. 859 (table)(1991).

**B. Federal Review of the State Court Decisions on Direct Appeal**

In his motion for partial summary judgment, the petitioner argues that "the decision of the State courts resulted in a decision that was contrary to, or involved an unreasonable application of, <u>Batson</u>..." (Doc. 37, p. 2). "The evaluation of a prosecutor's race-neutral explanations under <u>Batson</u> is a 'pure issue of fact... peculiarly within a trial judge's province.'" <u>McGahee v. Ala. Dept. of Corrections</u>, 560 F.3d 1252, 1255 (11th Cir. 2009)(quoting <u>McNair v. Campbell</u>, 416 F.3d 1291, 1310 (11th Cir. 2005). Hence, "a <u>Batson</u> claim at habeas is often analyzed under AEDPA § 2254(d)(2), and is only granted 'if it was unreasonable to credit the prosecutor's race- neutral explanations.'" <u>Id.</u>(quoting <u>Rice v. Collins</u>, 546 U.S. 333, 338, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006). However, "[w]here the concern is that a state court failed to follow <u>Batson</u>'s three steps, the analysis should be under AEDPA § 2254(d)(1)..." <u>Id.</u> at 1256. As stated above, under § 2254(d)(1), this court may only issue a writ of habeas corpus "if one of the following two conditions is satisfied – the state-court adjudication resulted in a decision that (1) 'was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of... clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Williams</u>, 529 U.S. at 412-413 (O'Connor, J., concurring).

**Step 1: clearly established Supreme Court case law**

In applying the test under § 2254(d)(1), the Supreme Court has instructed that the first step on any issue raised in a federal habeas petition, upon which there

has been an adjudication on the merits in a formal state court proceeding, is that the federal court should first ascertain the "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer, 538 U.S. at 71-72, 123 S.Ct. 1166. As stated above, the law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley, 138 F.3d at 923.

The governing legal principle at the time of the direct appeal was Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In Batson, the Supreme Court held it was unconstitutional for the prosecution to challenge potential jurors based solely on their race or on the assumption that because of their race, they should be unable to consider the case impartially. 476 U.S. at 89, 106 S.Ct. at 1719. A defendant may raise the necessary inference of "purposeful discrimination in selection of the petit jury" based "solely on evidence concerning the prosecutor's exercise of peremptory challenges" during the trial. Id. at 96, 106 S.Ct. at 1723.

> [T]he defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the [undisputed] fact... that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.
> Id., 106 S.Ct. at 1723 (internal citations and quotation marks omitted).

Once the defendant makes a prima facie showing, the burden shifts to the State to explain, in clear and reasonably specific terms, the legitimate race-neutral reasons for striking the jurors in question. <u>Batson</u>, 476 U.S. at 97, 98 n.20, 106 S.Ct. at 1273 & 1274 n. 20.

Finally, the court must determine whether the defendant has established purposeful discrimination. <u>Batson</u>, 476 U.S. at 98, 106 S.Ct. at 1724. "The reasons stated by the prosecutor provide the only reasons on which the prosecutor's credibility is to be judged." <u>Parker v. Allen</u>, 565 F.3d 1258, 1271 (11th Cir. 2009)(citing <u>United States v. Houston</u>, 456 F.3d 1328, 1335 (11th Cir. 2006)). "The credibility of the prosecution's explanation is to be evaluated considering the 'totality of the relevant facts,' including whether members of a race were disproportionately excluded." <u>Id.</u>(quoting <u>Hernandez v. New York</u>, 500 U.S. 352, 363, 111 S.Ct. 1859, 1868, 114 L.Ed. 2d 395 (1991)). "Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual (1) when the prosecutor's explanation for a strike is equally applicable to jurors of a different race who have not been stricken; (2) upon a comparative analysis of the jurors struck and those who remained, including the attributes of the white and black venire members; (3) or when the prosecution fails to engage in a meaningful voir dire examination on a subject that it alleges it is concerned." <u>Id.</u>(internal citations omitted). As stated above, "[t]he evaluation of a prosecutor's race-neutral explanations under <u>Batson</u> is a 'pure issue of fact... peculiarly within a trial judge's province.'" <u>McGahee</u>, 560 F.3d at1255(quoting <u>McNair</u>, 416 F.3d at 1310).

### Step 2: Whether the State court's adjudication is
### contrary to clearly established Supreme Court case law

This court must next determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405-406). The record indicates that the trial court and the appellate court found that Stephens established a prima facie case of discriminatory jury selection. The prosecutor was then asked by the trial court to provide his race-neutral reasons for striking the black jurors. When the prosecutor provided his reasons, the trial court provided Stephens' counsel with an opportunity to cross the State, which he refused, after which the trial court found that "the [Batson] motion [was] not well-taken and overrule[d] the motion." (Tr. 401). On direct appeal, the appellate court analyzed each reason given by the prosecutor under Batson and state law as it stood at that time and concluded that each use of the peremptory challenges to remove the black prospective jurors was proper. Therefore, this court finds that the state courts' adjudications on direct appeal were not contrary to clearly established Supreme Court case law since the state courts applied Batson and there were no Supreme Court cases at that time which were factually materially indistinguishable.

**Step 3: Whether the State court "unreasonably applied" <u>Batson</u>**

Since the state court applied the correct Supreme Court precedent and the facts of Supreme Court cases and the petitioner's case are not materially indistinguishable, this court must go to the third step and determine whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  <u>See</u>  28 U.S.C. § 2254(d)(1).  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  <u>Williams</u>, 529 U.S. at 409. As stated above, whether a state court's decision was an unreasonable application of legal principle "must be assessed in light of the record the court had before it." <u>Holland</u>, 542 U.S. at 652, 124 S.Ct. at 2737-2738.

This court finds that the appellate court's decision was an objectively unreasonable application of clear federal law because the appellate court did not extend the principles of the third step of <u>Batson</u> to the facts and arguments at hand. Here, there is no question that the trial court and the appellate court found that Stephens had shown a prima facie case of discriminatory motive and that the prosecutor had provided his race-neutral reasons for striking the black proposed jurors.  However, the Alabama Court of Criminal Appeals' adjudication failed to follow clearly established law when it did not consider "all relevant circumstances" in its analysis of the trial court's ruling.[7]  <u>Batson</u> is quite clear that "[i]n deciding

---

[7] This court focuses here on the decision by the Alabama Court of Criminal Appeals, <u>Stephens v. State</u>, 580 So.2d 11 (Ala.Crim.App. 1990), because it is the

whether the defendant has made the requisite showing, the trial court should

consider <u>all relevant circumstances</u>."[8] <u>Batson</u>, 476 U.S. at 96, 106 S.Ct. at 1723

(emphasis added).

   In its adjudication, upon determining that Stephens had established a prima

facie case of discrimination, the Alabama Court of Criminal Appeals analyzed each

of the State's explanations for striking the black potential jurors and found that

each reason was a legally acceptable race-neutral reason for exercising a

peremptory strike.  <u>Stephens v. State</u>, 580 So.2d at 18-20.  The court ultimately

---

"last reasoned decision" of the state courts on this issue.  The Court of Appeals for
the Eleventh Circuit has held that "in discerning whether a state court opinion
rests on federal grounds or state procedural grounds, we 'look through' a summary
decision to the 'last reasoned decision' on the issue."  <u>McGahee v. Ala. Dept. of
Corrections</u>, 560 F.3d 1252, 1262 n. 12 (11th Cir. 2009).

   [8] The Supreme Court has repeated this point in later opinions applying
<u>Batson</u>. <u>See e.g.</u>, <u>Snyder v. Louisiana</u>, 552 U.S. 472, 478, 128 S.Ct. 1203, 1208, 170
L.Ed.2d 175 (2008)("[I]n considering a <u>Batson</u> objection, or in reviewing a ruling
claimed to be <u>Batson</u> error, all of the circumstances that bear upon the issue of
racial animosity must be consulted."); <u>Miller-El v. Dretke</u>, 545 U.S. at 251-252, 125
S.Ct. at 2331("[T]he rule in <u>Batson</u> provides an opportunity to the prosecutor to give
the reason for striking the juror, and it requires the judge to assess the plausibility
of that reason in light of all evidence with a bearing on it."); <u>Hernandez v. New
York</u>, 500 U.S. 352, 363, 111 S.Ct. 1859, 1868, 114 L.Ed.2d 395 (1991)("An invidious
discriminatory purpose may often be inferred from the totality of the relevant
facts.")(quoting <u>Washington v. Davis</u>, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048-2049,
48 L.Ed.2d 597 (1976)).  "Of course, these cases were not 'clearly established
Federal law' at the time of [Stephens'] trial and direct appeal, but the opinions
confirm [this court's] reading of what <u>Batson</u> required."  <u>McGahee v. Ala. Dept. of
Corrections</u>, 560 F.3d 1252, 1262 n. 13 (11th Cir. 2009).  The Supreme Court in
<u>Batson</u> pointed out that "[i]n deciding if the defendant has carried his burden of
persuasion [of proving purposeful discrimination in the selection of the venire], a
court must undertake a sensitive inquiry into such circumstantial and direct
evidence of intent as may be available."  <u>Batson</u>, 476 U.S. at 93, 106 S.Ct. at 1721
(internal quotations and citations omitted).

found that "[w]hile this Court has concern about several of the reasons articulated by the prosecutor for the exercise of his peremptory jury challenges, we find that, as a whole, the prosecutor provided sufficiently race-neutral reasons for the exercise of those challenges." The court then concluded that it did not "find the trial court's ruling" to be "clearly erroneous" thus "no reversal is warranted." Id., p. 20-21.

The court did not, however, address a crucial argument raised by Stephens in his brief. Stephens maintained in his brief that "the State expressed it had information about several of the black jurors that was gained by investigation prior to voir dire" but "the State never tried to investigate this information in any manner during voir dire." In fact, Stephens argued that "[t]he prosecutor, in this instant case, had the right of almost unlimited voir dire (within reason) to either confirm or deny his suspicions" but that "he never chose to do so." (Doc. 18, Vol. 7, Tab 26, pp. 21-22). This fact was not mentioned or discussed by the Alabama Court of Criminal Appeals in analyzing any of the State's proffered reasons, but it should have been discussed in relation to the third step of Batson.

For example, the State proffered its race-neutral reason for striking Ms. S. Harris by stating that "[t]he information reported was that she had kinspeople who had been in criminal trouble and though we had otherwise felt that she was all right, that information caused us to remove her." (Tr. 394-395). This reason was contradicted by Ms. S. Harris' response in group voir dire.[9] Despite the fact that

_____

[9] Mr. Greene asked the potential jurors "if you had any of the following experiences: have you personally, ...a member of your immediate family... or a close

the State expressed it had concerns about Ms. S. Harris that were not established on-the-record, the State did not further question Ms. S. Harris about these concerns even though it had opportunity to do so in individual <u>voir dire</u>. By comparison, the state individually questioned a white potential juror Mr. C. Wyatt about a cousin who had criminal trouble. (Tr. 355-357). In sum, one of the State's proffered reasons for striking a black potential juror is unsupported by the record, thus the fact that the State did not investigate its "information" in <u>voir dire</u> should have been included in the state court's analysis of the third step of <u>Batson</u>, where all relevant circumstances must be examined to determine whether the State had struck any of the jurors based on their race.

Furthermore, like Ms. S. Harris, a similar situation arose in regards to another black potential juror, Ms. Lewis. The state proffered its race-neutral reason for striking Ms. Lewis by stating

> our investigative information indicated that her son had been involved in a death or a killing. Information was not clear as to whether it was some type of automobile accident or whether it was some criminal charge, but in any event, her son was involved in it in some manner and we felt like she could not stay on as a juror.

> (Tr. 392).

---

personal friend, ever been charged with a criminal offense other than traffic offenses?" Ms. S. Harris did not respond affirmatively to that question. (Tr. 154-155).

This reason was again called into issue during group voir dire,[10] and even though the prosecution had concerns that Ms. Lewis' son had "been involved in a death or a killing" and even though the "[i]nformation was not all that clear", the prosecution did not ask Ms. Lewis any question about this information in her individual voir dire.  (See Tr. 293-294).  Like with Ms. S. Harris, the fact that the State did not investigate its unclear "information" in voir dire should have been included in the state court's analysis of the third step of Batson.[11]  The state court's failure to address the State's lack of questioning Ms. S. Harris and Ms. Lewis is an unreasonable application of Batson to the facts of this case.[12]  See Ex parte Travis,

_____

[10] When Mr. Greene asked the potential jurors "if you had any of the following experiences: have you personally, ...a member of your immediate family... or a close personal friend, ever been charged with a criminal offense other than traffic offenses?", Ms. Lewis, like Ms. S. Harris, did not respond.  (Tr. 154-155)

[11] In addition to Ms. Lewis and Ms. S. Harris, a similar situation occurred in regards to five other black potential jurors.  For example, the state proffered its race-neutral reason for striking Ms. Spence that "[t]he information was that her sons had been in some very serious criminal offenses" and that "[w]e just felt like she would not be a good State's juror in this case." (Tr. 390).  Again, like the previous two black potential jurors, Ms. Spence did not respond to Mr. Greene's question concerning criminal offenses of immediate family members (see Tr. 154-155) and Ms. Spence was not asked any questions in individual voir dire.  (See Tr. 208-210).  The State's proffered reasons as to the other four black potential jurors is also not based on the trial record, is contradicted by voir dire, and the state failed to ask any questions concerning its proffered reasons in individual voir dire. (See Tr. 389-390 & 393)(Ms. Hood - husband's criminal nonpayment of child support; Ms. Holliefield - two worthless check charges; Ms. Harris - brother a defendant in a criminal case; and Ms. Wilson - husband "in some type of criminal trouble").

[12] In Williams v. Taylor, the Supreme Court held that the state court's failure to evaluate all available evidence was an unreasonable application of law under AEDPA, 28 U.S.C. § 2254(d).  529 U.S. 362, 397-398, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000)(Stevens, J., writing for the majority).  The Court noted that the

776 So.2d 874, 881 (Ala. 2000)("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination."). This finding is supported by the Supreme Court's decision in <u>Miller-El v. Dretke ("Miller-El II")</u>, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). In <u>Miller-El II</u>, the Supreme Court ultimately held that "[t]he state court's conclusion that the prosecutors' strikes of [two black jurors] were not racially determined... was unreasonable as well as erroneous." 545 U.S. at 266. At the trial, the prosecution struck Billy Jean Fields, a black male who supported the death penalty. <u>Id.</u> at 242. The prosecution initially proffered the reason for striking Mr. Fields was "he said that he could only give death if he thought a person could not be rehabilitated..." <u>Id.</u> at 243. The Court noted that the other evidence "unequivocally stated that he would impose the death penalty regardless of the possibility of rehabilitation." <u>Id.</u>

---

state court's opinion discussed the mitigation evidence developed in the state post-conviction hearing, "[b]ut the state court failed even to mention the sole argument in mitigation that trial counsel did advance." <u>Id.</u> at 398, 120 S.Ct. at 1515. Justice O'Connor agreed that the state court's "decision reveals an obvious failure to consider the totality of the omitted mitigation evidence ... For that reason, and the remaining factors discussed in the Court's opinion, I believe that the [state court's] decision 'involved an unreasonable application of... clearly established Federal law, as determined by the Supreme Court of the United States." <u>Taylor</u>, 529 U.S. at 416, 120 S.Ct. at 1525 (O'Connor, J., concurring)(citation omitted). Relying on this case and prior precedent, the Court of Appeals for the Eleventh Circuit held that "[w]here a legal standard requires a state court to review all of the relevant evidence to a claim, the state court's failure to do so is an unreasonable application of law under AEDPA." <u>McGahee v. Ala. Dept. of Corrections</u>, 560 F.3d 1252, 1262 (11th Cir. 2009).

at 244.  The Court concluded that the prosecutor had either misunderstood or had an ulterior motive for keeping Mr. Fields off the jury.  Regardless, "[i]n light of Fields' outspoken support for the death penalty, we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike." Id.[13]  Although Miller-El was a § 2254(d)(2) case, the Supreme Court's analysis is very persuasive to this court in analyzing § 2254(d)(1) since the Alabama Court of Criminal Appeals made no mention of the State's failure to question Ms. S. Harris or Ms. Lewis despite conflicting information, a fact which the Supreme Court in Miller-El II found was crucial in a Batson analysis.[14]

In sum, because the Alabama Court of Criminal Appeals omitted the above highly relevant fact from its Batson analysis, the court did not undertake a review

---

[13] In addition, the Court stated that although the State did strike two nonblack jurors "who expressed similar views about rehabilitation," it did not strike three nonblack jurors who had similar responses to voir dire questions about rehabilitation. Id. at 244-255 & n. 5.  Additionally, at Miller-El's original Batson hearing, "after Miller-El's lawyer pointed out that the prosecutor had misrepresented Fields' responses" about rehabilitation, the State "came up with Fields' brother's prior conviction as another reason for the strike." Id. at 245.  The Supreme Court dismissed this reason because Mr. Fields' "testimony indicated he was not close to this brother... and the prosecution asked nothing further [during voir dire] about the influence his brother's history might have had on Fields, as it probably would have done if the family history had actually mattered." Id. at 246.

[14] Although Miller-El was not "clearly established Federal law" at the time of Stephens' trial, the Court of Appeals for the Eleventh Circuit maintains that Miller-El still "confirm[s] our reading of what Batson required" in regards to a court's analysis of "all relevant circumstances" in the third step of Batson.  McGahee v. Ala. Dept. of Corrections, 560 F.3d 1252, 1261 & n. 13 (11th Cir. 2009).

of "all relevant circumstances" as required by the third step of <u>Batson</u>.  Therefore, this court holds that the decision was an unreasonable application of clearly established federal law as determined by the Supreme Court.

## IV. <u>De Novo</u> Review

Since this court has determined that the state court decision on direct appeal was an unreasonable application of clearly established federal law, this court is "unconstrained by § 2254's deference and must undertake a <u>de novo</u> review of the record." <u>McGahee</u>, 560 F.3d at 1266.  Therefore, this court now reviews the record below to determine if there was a <u>Batson</u> violation by the State.

As outlined above, district courts employ a three-step procedure for resolving <u>Batson</u> objections.  <u>United States v. Allen-Brown</u>, 243 F.3d 1293, 1297 (11th Cir. 2001).  First, the objecting party must make a prima facie showing that the objected-to peremptory challenge was based on race.  There is no question that Stephens has established a prima facie case of racial discrimination.  The defendant is black, which is a cognizable racial group, and the State used the first 21 of its 23 peremptory strikes to remove black potential jurors, a use of strikes which constitutes "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." <u>Batson</u>, 476 U.S. at 97. Second, the State is required to provide specific explanations for all its peremptory challenges, a task which the State has done in the present case.  (Tr. 388-396). Third, <u>Batson</u> requires this court to review "the State's proffer of specific

explanations after the trial to see whether its explanations overcome the very strong prima facie case of discrimination."  In this analysis, this court shall "review 'all relevant circumstances.'" McGahee, 560 F.3d at 1267(quoting Miller-El II, 545 U.S. at 251-252("[T]he rule in Batson provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it.").  The objecting party may carry its burden by showing that the striking party's race-neutral reason is mere pretext for discrimination.  See Miller-El II, 545 U.S. at 247-249(analyzing for pretext the prosecution's reasons for striking a prospective juror).

"[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike.  At this stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Miller-El I, 537 U.S. at 338-339(internal quotation marks and citations omitted).  "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Miller-El II, 545 U.S. at 241.

In determining purposeful discrimination, the Supreme Court has initially considered statistical evidence when considering whether the prosecution used its peremptory strikes in a discriminatory manner.  See Miller-El I, 537 U.S. at 342, 123 S.Ct. 1029; Miller-El II, 545 U.S. at 240-241, 125 S.Ct. 2317.  In Miller-El I,

prosecutors used 10 of their 14 peremptory strikes against black venire members, thereby excluding 91 percent of the eligible black venire members. Miller-El I, 537 U.S. at 342. The Court concluded that "[h]appenstance is unlikely to produce this disparity." Id. In the instant case, before the parties began the peremptory strike process, the remaining venire consisted of 26 black and 38 white potential jurors. (Tr. 401). The State used 21 of its 23 total peremptory strikes against these remaining black venire members. As a result, the State used its peremptory strikes to exclude 81 percent of remaining eligible black venire members. This court finds that this fact is unlikely to be the product of happenstance and is, at the least, indicative of discriminatory intent. However, this court needs not rely entirely on these bare statistics since the other evidence concerning the State's explanations for striking the black potential jurors contains such a clear indication that race was, in fact, a basis for their strikes.

While Stephens has challenged many of the specific explanations in his appeal to this court, this court needs not decide whether every peremptory strike of a black potential juror in this case was racially motivated. As the Court of Appeals for the Eleventh Circuit has stated, "under Batson, the striking of one black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when valid reasons for the striking of some black jurors are shown." United States v. David, 803 F.2d 1567, 1571 (11th Cir. 1986); see also Snyder v. Louisiana, 552 U.S. 472, 478,128 S.Ct. 1203,1208, 170 L.Ed.2d 175 (2008)("Because we find that the trial court committed clear error in overruling

petitioner's <u>Batson</u> objection with respect to [one juror], we have no need to consider petitioner's claim regarding [a second juror].").  This court focuses, therefore, on one strike in particular in which Stephens claims the prosecution explicitly relied on racial reasons.  Because this court finds that the State's explanations for striking Ms. S. Harris contain such a clear indication that race was, in fact, a basis for their strikes, this court harbors no doubt in holding that the State violated Stephens' equal protection rights as defined by <u>Batson</u>.

The State used its twenty-first peremptory strike on Ms. S. Harris.  The State proffered its race-neutral reason for striking Ms. S. Harris by stating that "[t]he information reported was that she had kinspeople who had been in criminal trouble and though we had otherwise felt that she was all right, that information caused us to remove her." (Tr. 394-395).  At the time the State proffered this reason, there was no evidentiary basis for such "information."  In <u>voir dire</u>, Mr. Greene asked the potential jurors "if you had any of the following experiences: have you personally, ...a member of your immediate family... or a close personal friend, ever been charged with a criminal offense other than traffic offenses?"  Ms. S. Harris did not respond to that question.  (Tr. 154-155).  Thus, the State's off-the-record information concerning Ms. S. Harris' "kinspeople" was contradicted by her response in group <u>voir dire</u>.  Perhaps the prosecutor misunderstood Ms. S. Harris' non-response in group <u>voir dire</u>, but unless he had an ulterior reason for keeping Ms. S. Harris off the jury, this court would expect that the prosecutor would have cleared up any misunderstanding by asking further questions in individual

voir dire before getting to the point of exercising a strike. "[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." Ex parte Travis, 776 So.2d at 881(cited with approval by Miller-El II, 545 U.S. at 246).

Ms. S. Harris' testimony at the Rule 32 hearing on July 18, 1997, further suggests that the State's race-neutral reason is a pretext for discrimination. At that hearing, Ms. S. Harris was asked on direct examination "[i]f someone said that S[] Harris 'has kinspeople who had been in criminal trouble,' was that true in December of 1987?" Ms. S. Harris replied, "No." (HR 34-35).[15] On cross-examination, Ms. S. Harris was again asked "you had no relatives in trouble with the law?" to which Ms. S. Harris responded "I didn't have no relatives, no, to my knowledge. I didn't have any that I know of." Ms. S. Harris was then asked whether she had a son involved in any criminal trouble to which she responded, "No." (HR 35).

Additionally, before Ms. S. Harris was struck, the State had two regular strikes (its twenty-first and twenty-second strike) and one alternate strike (its twenty-third strike). At that time, three white potential jurors remained in the venire with on-the-record information of familial criminal involvement.[16] Despite

---

[15] The Rule 32 Hearing Record is submitted as an exhibit to Document 18 and is cited hereafter only as "HR ___".

[16] Ms. Barnette and Mr. Wyatt responded to group voir dire questions about family

this on-the-record information, the State first struck Ms. S. Harris, a black female, based on off-the-record information of family criminal involvement, even though she would have admittedly been a good juror for the prosecution.[17]  After striking Ms. S. Harris, the State then removed one of the white jurors with familial criminal history with its last regular strike and a second with its alternate strike, but the State failed to strike the third white potential juror who unequivocally stated on-the-record that she has family criminal involvement.  (See Tr. 396).  "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."  Miller-El II, 545 U.S. at 241.

Lastly, the State's own notes indicate that its reason for striking Ms. S. Harris was a pretext for discrimination.  Before and during trial, each of the four attorneys working for the State had multi-page lists of typed juror names.  With each name, the list provided blanks for addresses, work, spouse, and spouse's work and also provided check lists for date of birth, race, marital status, employment status and whether they were "young", "mid", or "old."  Each attorney was also given

---

criminal involvement, and Mr. M. Harris approached the bench about his brother's criminal history.  (Tr. 155-156 & 192).

[17] The State found out from the group voir dire that Ms. S. Harris had a cousin who was a State Trooper.  (Tr. 196-197).  The State admitted at the Rule 32 hearing that a venire member's familial law enforcement connections are generally a "plus" for the State.  (HR 127-128).  Even one of the State's strike sheet noted that Ms. S. Harris was "ok".  (Vol. 14, p. 2).

space to make notes about each juror.  Two of the attorneys noted Ms. S. Harris was "ok", three noted that she had a relative who was a State Trooper, all noted that she had no criminal history and that she had an association with the health department.  None of the attorneys made a notation that she had "kinspeople" who had criminal trouble.  (See Vol. 13 & 14).

In sum, the State's explanation for striking Ms. S. Harris is by itself unconvincing and suffices for the determination that there was a Batson error.  See Snyder, 552 U.S. at 478.  However, the case for discrimination goes beyond Ms. S. Harris and includes broader patterns of practice during the jury selection.  First, the State used information that was not in the trial record to strike 6 other black potential jurors with alleged familial criminal history besides Ms. S. Harris despite the fact this information was contradicted by those jurors' voir dire responses. Furthermore, like with Ms. S. Harris, the State did not ask any of these jurors to clarify the contradiction between their off-the-record information and their responses in group voir dire.[18]  By comparison, the State received information in the trial record that the two white jurors who were struck by the State had family criminal involvement (see Tr. 155-156 & 192), and upon receiving that information, the State asked further questions to clarify that family criminal involvement.

---

[18] The State struck Ms. Lewis, Ms. Spence, Ms. Hood, Ms. Hollifield, Ms. C. Harris, and Ms. Wilson based on information that was not on the trial record and was contradicted by those jurors' responses in group voir dire. The prosecution performed no individual voir dire to resolve these contradictions.  (See Tr. 155, 208-210, 293-294, 389-390, 393).

Second, the deposition of Mr. Greene and his personal strike sheet reveal a pretext of discrimination in the State's strikes of black potential jurors.  Mr. Greene was the State's <u>Batson</u> spokesperson who proffered the State's purported reasons for striking all 21 black potential jurors.  (Tr. 387-401).  As stated above, each of the four attorneys working for the State had multi-page "strike sheets" that contained a typed list of the all the potential jurors names and also provided space for each attorney to make notes.  Mr. Greene recognized his own handwriting and identified in a deposition his personal strike sheet which was Exhibit 14 of the deposition.  (Vol. 13, Greene Dep., p. 32 & 41).  On that strike sheet, Mr. Greene marked an "S" next to the name of 13 of the total 21 black potential jurors which the State ultimately struck.  (<u>See</u> end of Vol. 13 and beginning of Vol. 14).  When asked in his deposition what the "S" mark meant, he responded "that's somebody that I don't think much of."  (Vol. 13, Greene Dep., pp. 37-38).  Mr. Greene did not write an "S" next to any white potential juror names.

In reviewing "all relevant circumstances" in this record, this court finds that it "blinks reality" to deny that the State struck Ms. S. Harris, and perhaps several other of the black potential jurors, because they were African-American.  <u>Miller-El II</u>, 545 U.S. at 266, 125 S.Ct. at 2340.  The record in this case compels a finding that the State's use of a peremptory strike in this case to dismiss Ms. S. Harris constituted intentional discrimination and violated Stephens' rights under the Equal Protection Clause and the clearly established law as determined by the Supreme Court in <u>Baston</u>.

## CONCLUSION

After due consideration of all matters presented and for the reasons set forth herein, it is **ORDERED** that the petitioner's motion for partial summary judgment (Doc. 37) is **GRANTED**.

As a result, it is further **ORDERED** that the petitioner's amended petition (Doc. 34) for a writ of habeas corpus shall be **CONDITIONALLY GRANTED**. This conditional writ shall become unconditional and permanent unless the State of Alabama commences further proceedings within 240 days of the date of this order to afford the petitioner a new trial.[19]

     **DONE and ORDERED** this 6th day of October, 2011.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE

---

[19] <u>See</u> <u>McGahee v. Campbell</u>, Civil Action 05-042, Doc. 54 (S.D.Ala. June 4, 2009)(Dubose, J.)(allowing the State of Alabama to commence further proceedings within 240 days).